BRIAN J. STRETCH (CABN 163973)
United States Attorney

BARBARA VALLIERE (CABN 147374)
Chief, Criminal Division

WILLIAM FRENTZEN (LABN 24421)
KATHRYN HAUN (DCBN 484131)
MERRY JEAN CHAN (CABN 229254)
Assistant United States Attorneys

       450 Golden Gate Avenue, Box 36055
       San Francisco, California 94102-3495
       Telephone:  (415) 436-6959
       Fax:  (415) 436-7234
       William.Frentzen@usdoj.gov; merry.chan@usdoj.gov

ANDREW S. PAK (NYBN 4463436)
CATHERINE ALDEN PELKER (MD)
Trial Attorneys

       Department of Justice
       Computer Crime & Intellectual Property Section
       1301 New York Avenue, N.W., Suite 600
       Washington, D.C. 20005
       Andrew.Pak@usdoj.gov; Catherine.Pelker@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF CONTENT STORED AT PREMISES CONTROLLED BY GOOGLE INC. AND FURTHER DESCRIBED IN ATTACHMENT A | Case No. 3:16-mc-80263-LB<br><br>REDACTED VERSION OF DOCUMENTS<br><br>ATTACHMENT TO STIPULATION REGARDING REDACTIONS<br><br>(PART 3 of 5) |

# EXHIBIT D

**PERKINS**coie

1201 Third Avenue
Suite 4900
Seattle, WA 98101-3099

☎ +1.206.359.8000
📠 +1.206.359.9000
PerkinsCoie.com

November 21, 2016

**VIA EMAIL**

Todd M. Hinnen
THinnen@perkinscoie.com
D. +1.206.359.3384
F. +1.206.359.4384

Asst. U.S. Attorney William Frentzen
United States Attorney's Office
11th Floor
450 Golden Gate Avenue
San Francisco, CA 94102
William.Frentzen@usdoj.gov

Re:    **In the Matter of the Search of Content** ▮▮▮▮▮▮▮▮▮ **Stored at Premises**
       **Controlled by Google Inc. and Further Described in Attachment A**

Assistant U.S. Attorney Frentzen:

This letter seeks to summarize Google's production of documents to date responsive to the
warrant issued by your office on June 30, 2016 (the "Warrant"), and to resolve any remaining
issues regarding that production.  Google has produced all information that it is currently able to
produce consistent with the present state of the law.  Below, please find (1) a description of the
information that Google has produced in response to the Warrant and (2) a clarification of the
portions of the Warrant with respect to which Google cannot currently produce records.  Google
hopes this additional information clarifies the status of its production in response to the Warrant
and will serve as the basis for further engagement on these issues, should it be necessary.

**A.    Google's Production in Response to the Warrant**

**1.    The July 2, 2016 Warrant**

Google received the Warrant on July 2, 2016.  The Warrant directs Google to produce, with
respect to ▮▮▮▮▮ Google accounts identified by email address, all electronic mail,
transactional information of all email and account activity, business records and subscriber
information.  It also directs Google to identify "linked" accounts based on a variety of
factors.  Finally, the Warrant requests for each of the ▮▮▮▮▮ accounts, "all files, logs and
data associated with" ▮▮▮▮▮▮▮ "Google Services."[1]

---

[1] The warrant also included an indefinite nondisclosure order, which is presumptively an unconstitutional prior
restraint. *See In re Grand Jury Subpoena for: [Redacted]@yahoo.com*, 79 F. Supp. 3d 1091, 1091 (N.D. Cal. 2015)
(holding that an indefinite non-disclosure order "would amount to an undue prior restraint of Yahoo!'s First
Amendment right to inform the public of its role in searching and seizing its information[.]")

Asst. U.S. Attorney William Frentzen
November 21, 2016
Page 2

### 2.   Google's Initial Production

In late September 2016,[2] Google produced a total of ▉▉ files containing the following
information responsive to the Warrant for each of the ▉▉▉▉▉ accounts:

- basic subscriber information for each Google account, as well as any associated YouTube
  and Android accounts;

- a list of accounts that shared an authentication cookie with any of the ▉▉▉▉
  accounts;

- contacts;

- native Google Drive files and metadata files associated with native and non-native
  Google Drive files (which production includes data responsive to the demand for
  "Google Docs");

- location history;

- search history (described in the warrant as "Web History"); and

- Maps.

Google also produced Gmail content for all but ▉▉ accounts. ▉▉ of these accounts had been
purged long before Google received the Warrant and there was therefore no Gmail content to
produce.  The content associated with the other ▉▉ accounts, identified by the email addresses
▉▉▉▉▉▉▉▉▉▉▉ was stored exclusively outside the United States and was
therefore beyond the reach of a Stored Communications Act Warrant.  *See Matter of Warrant to
Search a Certain E-Mail Account Controlled & Maintained by Microsoft Corp.*, 829 F.3d 197,
222 (2d Cir. 2016) ("*Microsoft* decision").  Consistent with the *Microsoft* decision, Google also
did not produce any Gmail attachments or Photos because they were not confirmed to be stored
within the United States.

### 3.   Supplemental Production

Google has supplemented the production with additional header information associated with the
emails that had attachments for the accounts in the United States, the content of emails for the
accounts in the United States, and Photos metadata.  Google will produce Calendar metadata for
the accounts in the United States as soon as Calendar is available for production.

---

[2] Processing the Warrant was complex and protracted because of the volume of data sought, the variety of services
to be searched, and significant new interpretations of applicable law announced shortly after the Warrant was
served. *See Matter of Warrant to Search a Certain E-Mail Account Controlled & Maintained by Microsoft Corp.*,
829 F.3d 197, 222 (2d Cir. 2016).

Dubou Cou11b

Asst. U.S. Attorney William Frentzen
November 21, 2016
Page 3

**B.      Google's Objections to the Warrant**

Google did not produce certain data demanded in the Warrant and objects to the Warrant to the extent it encompasses those demands as further explained below.

**1.      Google Cannot Produce Data Stored Overseas to U.S. Law Enforcement**

While Google produced all information it confirmed to be stored in the United States, Google did not produce other data because a warrant issued under the Stored Communications Act ("SCA"), 18 U.S.C. § 2701, *et seq.* can only extend to data stored within the United States. *See Microsoft*, 829 F.3d at 222 ("[T]he SCA does not authorize a U.S. court to issue and enforce an SCA warrant against a United States-based service provider for the contents of a customer's electronic communications stored on servers located outside the United States.").[3]  The SCA generally prohibits a provider from disclosing to the government that which it has not been compelled to produce pursuant to legal process authorized by section 2703. *See* 18 U.S.C. 2702(a) (prohibiting voluntary disclosure of content or records and other information to a government entity absent a specific statutory authorization).

**2.      The Warrant Is Overbroad and Lacks Particularity With Respect to Certain Google Services**

The Warrant requested "all" data "associated with" a laundry list of nearly every Google service, for every identified account.  These are the sorts of "catchall phrase[s]" and boilerplate descriptions, *United States v. Clark*, 31 F.3d 831, 836 (9th Cir. 1994), that tend to reflect overbreadth and lack of particularity.  Google is concerned with respect to many of the services identified that the magistrate issuing the warrant may not have been "fully apprised of the scope of the search" and could not have "[made] the determination that the search in all of its dimensions is based upon probable cause and particular descriptions." *U.S. v. Hillyard*, 677 F.2d 1336, 1339 (9th Cir. 1982).  Google's concern is rooted in both specific issues that apply to particular services and to the generic nature of the Warrant, requesting the same data for the same services for the same time period for a significant number of different accounts.  In Google's experience, that is not how different users consume Google's services.

---

[3] Although the *Microsoft* case was decided in the Second Circuit, it remains the only case to consider the issue of whether producing data stored overseas is consistent with the SCA and it has concluded it is not.  Accordingly, it carries heavy persuasive weight. *See Herbst v. Cook*, 260 F.3d 1039, 1043 (9th Cir. 2001) (finding the rationale of the Second Circuit to be persuasive on matter of first impression in the Ninth Circuit); *cf. Fang Lin Ai v. United States*, 809 F.3d 503, 507 (9th Cir. 2015) (finding persuasive a Federal Circuit holding on a "materially indistinguishable" matter, particularly where a "circuit split would create two mutually exclusive rules applicable to [a governmental entity], leading to uncertainty and obvious forum shopping opportunities.")  As such, Google cannot in good faith comply with a warrant requesting information stored outside the United States. *See* 18 U.S.C. §2707(e) (providing immunity for "good faith reliance" on a warrant).

Asst. U.S. Attorney William Frentzen
November 21, 2016
Page 4

Google's specific concerns include the fact that some of the "services" identified in the Warrant either do not exist or do not hold data. For example GA Plus, Google Apps, Dasher Policy, and the Apps Administrator Control Panel are not services or products offered by Google, but rather flags related to enterprise accounts. They do not hold any specific type of data. Moreover, *Google Talk* is a service that was deprecated in early 2015.

For other services identified in the Warrant, including Google Maps, Google Sync, Google Analytics, Webmaster Tools, and AdWords, it is not clear given the nature of the services and the type of data associated with them (and the Warrant does not specify) what type of data is being sought. For example, records associated with Maps could relate to a user's map searches (which Google produced), or they could refer to records related to other, unnamed services that tangentially involve Maps (which Google did not produce). Analytics, meanwhile, is a service available to users that host websites on Google that provides details about the visitors to those websites (such as the number of visitors, the referring websites, the regions where visitors are located, etc.) and allows the user to generate reports, and it is not clear without greater specificity what records are sought. Neither service has a discrete set of "records" to easily produce; instead, Google requires greater specificity about what, precisely, is being sought in order to conduct a search for responsive records related to these services. The Warrant thus lacks clarity regarding the disparate nature of the data associated with each service. Even assuming that the government demonstrated probable cause with respect to each of these services, the Warrant did not include direction with respect to them "specific enough to enable the person conducting the search to reasonably identify the things authorized to be seized." *United States v. Spilotro,* 800 F.2d 959, 963 (9th Cir. 1986). Such specificity is important to guide the party conducting the search, to prevent "rummaging through a person's belongings" and to "ensure[] that the magistrate issuing the warrant . . . [has] accurately determine[d] whether the entire search is supported by probable cause. *Id.*

### 3.     The Government Must Demonstrate Probable Cause With Respect To Each Service As That Service Applies To Each User, Which Could Not Have Happened Here

As the specific concerns outlined above suggest, it is unlikely that the government demonstrated probable cause that each of the ▓▓▓▓▓ different accounts used each of the services identified for the same period of time, and that the records contained within each such service would contain the fruits, instrumentalities, or evidence of a crime. Such a particular showing is required with respect to each user for each service to be searched. At the very least, there cannot have been probable cause to believe that "services" that hold no user data contained evidence.

It is likely, instead, that the Warrant is simply overbroad and lacking in particularity with respect to some services, *see Andresen v. Maryland,* 427 U.S. 463, 480, 96 S.Ct. 2737, 2747, 49 L.Ed.2d 627 (1976); *Spilotro,* 800 F.2d at 963 (9th Cir. 1986), in a manner that would be difficult for the

Asst. U.S. Attorney William Frentzen
November 21, 2016
Page 5

magistrate to understand and appreciate in an ex parte proceeding. Accordingly, Google did not produce content or non-content information associated with Sync, Analytics, GA Plus, Developer Console, Webmaster Tools, AdWords, Google Apps, Dasher Policy, or Apps Administrator Control panel.

In short, the Warrant authorized a general search of all of the online activity of ▓▓▓▓▓ accounts in most cases for a period of more than ▓▓▓▓▓ years across nearly all of Google's products and services. Google has produced, or will shortly produce, all the material it can consistent with applicable laws. Google has also sought to maintain an open and constructive dialogue with you regarding its production. As explained above, however, the Warrant encompassed some services and some categories of documents that Google cannot produce consistent with applicable laws. As has been the case since Google received the warrant, Google would welcome the opportunity to discuss further with the government particular services or requests or ways to narrow the Warrant consistent with applicable laws. Please do not hesitate to contact me if such a discussion would be helpful.

Very truly yours,

Todd M. Hinnen

TMH

1  Julie E. Schwartz, Bar No. 260624
   JSchwartz@perkinscoie.com
2  PERKINS COIE LLP
3  3150 Porter Drive
   Palo Alto, CA  94304-1212
4  Telephone:  650.838.4300
   Facsimile:  650.838.4350
5
6  Todd M. Hinnen, *pro hac vice pending*
   THinnen@perkinscoie.com
7  John R. Tyler, *pro hac vice pending*
   RTyler@perkinscoie.com
8  PERKINS COIE LLP
   1201 Third Ave. Suite 4900
9  Seattle, WA 98101
   Tel.: (206) 359-8000
10 Fax: (206) 359-9000
11
   Attorneys for Google Inc.
12

13              UNITED STATES DISTRICT COURT

14           NORTHERN DISTRICT OF CALIFORNIA

15

16 | In the Matter of the Search of Content
      █████████████ Stored at              | Case No. 3-16-70816
17 | Premises Controlled by Google Inc. and
      Further Described in Attachment A ˙    |
18 |                                         | **[Proposed] Order Granting Google Inc.'s
                                               Motion to Quash or Amend Search Warrant**
19 |                                         | Under Seal
20 |                                         | Judge:     Hon. Laurel Beeler,
21 |                                                        U.S. Magistrate Judge

22

23

24

25

26

27

28

1         The Court, having considered Google Inc.'s Motion to Quash or Amend Search Warrant,

2    the pleadings herein, and the papers filed in support of and in opposition to the motion, and being

3    fully advised of the premises, now hereby,

4         ORDERS that Google's Motion to Quash the Warrant is GRANTED. The Warrant is

5    quashed to the extent it seeks records which cannot be confirmed to be stored in locations within

6    the United States. *See Matter of Warrant to Search a Certain E-Mail Account Controlled &*

7    *Maintained by Microsoft Corp.*, 829 F.3d 197, 222 (2d Cir. 2016) ("*Microsoft*"). As explained in

8    *Microsoft*, 18 U.S.C. § 2703(a) has no extraterritorial application, and warrants issued pursuant

9    thereto cannot seek information that is not confirmed to be stored within the United States.

10        With respect to the remainder of records sought by the Warrant, the government is

11   directed to submit a new warrant and supporting affidavit establishing probable cause to search

12   each of the    different sets of records    services, as used by    different accounts) that the

13   government seeks from Google. The Court will thereafter consider the government's renewed

14   application and issue an order as appropriate.

15

16                                           Hon. Laurel Beeler

17

18

19

20

21

22

23

24

25

26

27

28

                                 -2-

Julie E. Schwartz, Bar No. 260624
JSchwartz@perkinscoie.com
PERKINS COIE LLP
3150 Porter Drive
Palo Alto, CA 94304-1212
Telephone: 650.838.4300
Facsimile: 650.838.4350

Todd M. Hinnen, *pro hac vice pending*
THinnen@perkinscoie.com
John R. Tyler, *pro hac vice pending*
RTyler@perkinscoie.com
PERKINS COIE LLP
1201 Third Ave. Suite 4900
Seattle, WA 98101
Tel.: (206) 359-8000
Fax: (206) 359-9000

Attorneys for Google Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In the Matter of the Search of Content ▮▮▮▮▮▮▮▮ Stored at Premises Controlled by Google Inc. and Further Described in Attachment A | Case No. 3-16-70816 |
| | **Google Inc.'s Administrative Motion to File Under Seal** |
| | Under Seal |
| | Judge:     Hon. Laurel Beeler, U.S. Magistrate Judge |

1    Consistent with L. Cr. R. 56-1(b)-(c) and prior order from this Court, Non-Party Google

2    Inc. ("Google") moves for leave to file its Motion to Quash or Amend a Search Warrant ("Motion

3    to Quash") and supporting documents, filed concurrently herewith, under seal. Google's Motion

4    to Amend seeks to quash or amend a search warrant issued to Google. *See* Decl. of John Tyler in

5    Support of Motion to Quash or Amend Search Warrant and Administrative Motion to File Under

6    Seal ("Tyler Decl."), Ex. A. The warrant is subject to a sealing order requiring that all papers

7    submitted to the Court with respect thereto be filed under seal. *Id.* Because Google is required to

8    file under seal by prior order of this Court, Google respectfully requests that this Court grant its

9    motion to file under seal.

10

11   DATED:  December 6, 2015                    **PERKINS COIE** LLP

12                                               By: _Julie E. S_____

13                                               Julie E. Schwartz
                                                 JSchwartz@perkinscoie.com
14
                                                 Attorneys for Google, Inc.
15

16

17

18                                               _____
                                                 Hon. Laurel Beeler
19

20

21

22

23

24

25

26

27

28

Julie E. Schwartz, Bar No. 260624
JSchwartz@perkinscoie.com
PERKINS COIE LLP
3150 Porter Drive
Palo Alto, CA  94304-1212
Telephone:  650.838.4300
Facsimile:  650.838.4350

Todd M. Hinnen, *pro hac vice pending*
THinnen@perkinscoie.com
John R. Tyler, *pro hac vice pending*
RTyler@perkinscoie.com
PERKINS COIE LLP
1201 Third Ave. Suite 4900
Seattle, WA 98101
Tel.: (206) 359-8000
Fax: (206) 359-9000

Attorneys for Google Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| In the Matter of the Search of Content ▮▮▮▮▮▮▮▮▮▮▮▮ Stored at Premises Controlled by Google Inc. and Further Described in Attachment A | Case No. 3-16-70816 |
|---|---|
| | **[Proposed] Order Granting Google Inc.'s Administrative Motion to File Under Seal** |
| | Under Seal |
| | Judge:     Hon. Laurel Beeler, U.S. Magistrate Judge |

1    Consistent with L.Cr.R. 56-1(b)-(c), prior order of this Court, and for the reasons set forth

2    in the moving papers, the Court hereby grants Non-Party Google Inc.'s Administrative Motion to

3    File Under Seal.

4    IT IS HEREBY ORDERED that all papers submitted in support of or opposition to

5    Google's Motion to Quash or Amend a Search Warrant in the above- numbered matter be filed in

6    the Office of the Clerk of Court under seal, together with this Order and Motion for Order, and

7    shall not become matters of public record until further order of the Court.

8

9                                                    _____

                                                     Hon. Laurel Beeler

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    Julie E. Schwartz, Bar No. 260624
     JSchwartz@perkinscoie.com
2    PERKINS COIE LLP
     3150 Porter Drive
3    Palo Alto, CA  94304-1212
     Telephone:  650.838.4300
4    Facsimile:  650.838.4350
5
     Todd M. Hinnen, *pro hac vice pending*
6    THinnen@perkinscoie.com
     John R. Tyler, *pro hac vice pending*
7    RTyler@perkinscoie.com
     PERKINS COIE LLP
8    1201 Third Ave. Suite 4900
     Seattle, WA 98101
9    Tel.: (206) 359-8000
     Fax: (206) 359-9000
10
11   Attorneys for Google Inc.
12
13              UNITED STATES DISTRICT COURT
14              NORTHERN DISTRICT OF CALIFORNIA
15
16   In the Matter of the Search of Content          Case No. 3-16-70816
                              Stored at
17   Premises Controlled by Google Inc. and
     Further Described in Attachment A               **PROOF OF SERVICE**
18
                                                     Under Seal
19
                                                     Judge:      Hon. Laurel Beeler,
20                                                               U.S. Magistrate Judge
21
22
23
24
25
26
27
28

PROOF OF SERVICE

I, Winnie W. Hung, declare:

I am a citizen of the United States and employed in Santa Clara County, California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 3150 Porter Drive, Palo Alto, California 94304-1212. On December 6, 2016, I served a copy of the within document(s):

**GOOGLE INC.'S MOTION TO QUASH OR AMEND SEARCH WARRANT**

**[PROPOSED] ORDER GRANTING GOOGLE INC.'S MOTION TO QUASH OR AMEND SEARCH WARRANT**

**GOOGLE INC.'S ADMINISTRATIVE MOTION TO FILE UNDER SEAL**

**[PROPOSED] ORDER GRANTING GOOGLE INC.'S ADMINISTRATIVE MOTION TO FILE UNDER SEAL**

**DECLARATION OF JOHN R. TYLER IN SUPPORT OF NON-PARTY GOOGLE INC.'S MOTION TO QUASH OR AMEND SEARCH WARRANT AND ADMINISTRATIVE MOTION TO FILE UNDER SEAL**

**PROOF OF SERVICE**

☒   by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below. For a party represented by an attorney, delivery was made (a) to the attorney personally; or (b) by leaving the documents at the attorney's office, in an envelope or package clearly labeled to identify the attorney being served, with a receptionist or an individual in charge of the office.

William Frentzen, AUSA
U.S. Attorney's Office
450 Golden Gate Ave
San Francisco, CA 94102-3495

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

-2-

1    Executed on December 6, 2016, at Palo Alto, California.

2

3    _____

4    Winnie W. Hung

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-3-

1  BRIAN J. STRETCH (CABN 163973)
   United States Attorney
2
   BARBARA VALLIERE (CABN 147374)
3  Chief, Criminal Division

4  WILLIAM FRENTZEN (LABN 24421)
   KATHRYN HAUN (DCBN 484131)
5  MERRY JEAN CHAN (CABN 229254)
   Assistant United States Attorneys
6
          450 Golden Gate Avenue, Box 36055
7         San Francisco, California 94102-3495
          Telephone: (415) 436-6959
8         Fax: (415) 436-7234
          William.Frentzen@usdoj.gov
9
   Attorneys for United States of America
10
                   UNITED STATES DISTRICT COURT
11
                  NORTHERN DISTRICT OF CALIFORNIA
12
                      SAN FRANCISCO DIVISION
13

14  In the Matter of the Search of Content          )  Case No. 3:16-mc-80263-LB
                            Stored at the Premises  )
15  Controlled by Google Inc. and Further           )
    Described in Attachment A                        )  UNITED STATES' NOTICE OF STATUS AND
16                                                   )  SUGGESTED SCHEDULE FOR BRIEFING AND
                                                     )  HEARING
17                                                   )
                                                     )  FILED UNDER SEAL
18                                                   )

19

20

21

22

23

24

25

26

27

28

   U.S. NOTICE OF STATUS

1    This filing is in response to the Court's Order.  The government and Google were already in

2  consultation regarding an appropriate schedule when the Court's Order issued, but due to the holidays

3  had been unable to reach a final agreement regarding scheduling.  Because undersigned counsel AUSA

4  Frentzen will be engaged in trial before the Honorable District Court Judge Richard Seeborg beginning

5  on January 9, 2017, the date selected by Google for the hearing of January 19, 2017, will not work for

6  the government.  The parties have consulted and are jointly recommending to the Court the following

7  schedule:

8  Government's Response                    January 13, 2017

9  Google's Reply                               January 30, 2017

10  Hearing Date                                February 13 or 14, 2017 (at the Court's convenience)

11    The parties hereby suggest that the Court accept this as the schedule moving forward and that it

12  notify the parties regarding the date for hearing that the Court prefers.[1]  The government moves for the

13  Court to file this document UNDER SEAL given the nature of the subject matter and the original filing

14  having been made UNDER SEAL.  The government will serve Google in compliance with the Court's

15  Order.

16  Dated:  January 10, 2017                                    Respectfully submitted,

17

18                                                    BRIAN J. STRETCH
                                                      United States Attorney
19

20                                                    William Frentzen
                                                      Kathryn Haun
21                                                    Merry Jean Chan
                                                      Assistant United States Attorneys
22

23

24

25        [1]  The government is aware that on January 9, 2017, Google -- after filing this matter with this
     Court -- has filed a notice that it does not consent to have the matter heard by a Magistrate Judge
26  pursuant to 28 U.S.C. § 636(c).  The government understands that statute to apply to civil matters, not
     criminal matters and believes that this Court has the background and jurisdiction to handle this matter.
27  Should this Court disagree with the government, then the government requests that the matter be
     referred immediately to the current duty District Court Judge, Hon. Richard Seeborg, who additionally
28  has familiarity with the subject matter from his handling of the case of *United States v. Carl Force and
     Shaun Bridges*, 15-CR-319 RS.

U.S. NOTICE OF STATUS

                                                    1

1    IT IS HEREBY ORDERED, that for good cause shown this document shall be filed and

2    maintained UNDER SEAL until further order of this Court. The Court adopts the parties' schedule and

3    sets the matter for hearing on February 16, 2017 at 10:30 a.m.

4

5    Date: January 11, 2017

6                                                        HON. LAUREL BEELER
                                                         UNITED STATES MAGISTRATE JUDGE
7                                                        NORTHERN DISTRICT OF CALIFORNIA

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

U.S. NOTICE OF STATUS

2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

In the Matter of the Search of Content
▮▮▮▮▮▮▮▮▮▮▮▮that is Stored at the
Premises Controlled by Google Inc. and
Further Described in Attachment A

Case No. 16-mc-80263-LB
*SEALED*

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on January 11, 2017, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Julie Erin Schwartz
Perkins Coie, LLP
3150 Porter Drive
Palo Alto, CA 94304

William Frentzen
Assistant United States Attorney
450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495

Dated: January 11, 2017

Susan Y. Soong
Clerk, United States District Court

By: _____
Ada Means, Deputy Clerk to the
Honorable LAUREL BEELER

United States District Court
Northern District of California

ORIGINAL
FILED

2017 JAN 13 P 3: 59

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NO. DIST. OF CA.

UNDER SEAL

1  BRIAN J. STRETCH (CABN 163973)
   United States Attorney
2
   BARBARA VALLIERE (CABN 147374)
3  Chief, Criminal Division

4  WILLIAM FRENTZEN (LABN 24421)
   KATHRYN HAUN (DCBN 484131)
5  MERRY JEAN CHAN (CABN 229254)
   Assistant United States Attorneys
6
        450 Golden Gate Avenue, Box 36055
7       San Francisco, California 94102-3495
        Telephone: (415) 436-6959
8       Fax:  (415) 436-7234
        William.Frentzen@usdoj.gov; merry.chan@usdoj.gov
9
   ANDREW S. PAK (NYBN 4463436)
10 CATHERINE ALDEN PELKER (MD)
   Trial Attorneys
11
        Department of Justice
12      Computer Crime & Intellectual Property Section
        1301 New York Avenue, N.W., Suite 600
13      Washington, D.C. 20005
        Andrew.Pak@usdoj.gov; Catherine.Pelker@usdoj.gov
14
   Attorneys for United States of America
15
                 UNITED STATES DISTRICT COURT
16
               NORTHERN DISTRICT OF CALIFORNIA
17
                    SAN FRANCISCO DIVISION
18

19 IN RE: SEARCH WARRANT FOR           )  Case No. 3: 16-mc -80263 (LB)
   PRODUCTION BY GOOGLE ISSUED ON      )
20 JUNE 30, 2016                       )
                                       )  UNITED STATES' OPPOSITION TO MOTION TO
21                                     )  QUASH, MOTION TO COMPEL COMPLIANCE
                                       )  WITH THIS COURT'S ORDER AND FOR AN
22                                     )  ORDER TO SHOW CAUSE FOR
                                       )  NONCOMPLIANCE WITH FEDERAL COURT
23                                     )  ORDER, AND [PROPOSED] ORDER
                                       )
24 _____ )
                                          FILED UNDER SEAL
25

26

27

28


   U.S. OPP. AND MOT. TO SHOW CAUSE

| | |
|---|---|
| 1 | **INTRODUCTION** |
| 2 | The United States hereby opposes the Motion to Quash filed by Google, Inc. (hereafter |
| 3 | "Google"), requests immediate production of all data called for by this Court's properly issued search |
| 4 | warrant, and moves the Court for an Order to Show Cause why Google should not be held in contempt |
| 5 | for its failure to comply with a federal court order, namely a search warrant issued by the Honorable |
| 6 | Magistrate Judge Laurel Beeler on June 30, 2016.  The warrant issued in connection with an ongoing |
| 7 | investigation into |
| 8 | This is not the first time that Google, as recipient of a search warrant order, has violated this |
| 9 | Court's Orders.  Google, which has not reviewed the affidavit in support of the search warrant, has no |
| 10 | basis for challenging this Court's correct determination that the warrant complied with the particularity |
| 11 | requirement of the Fourth Amendment.  It is apparent from the warrant that it particularly describes the |
| 12 | places to be searched and the things to be seized. |
| 13 | Google also improperly asserts that the Second Circuit's decision in *Matter of Warrant to Search* |
| 14 | *a Certain E-Mail Account Controlled & Maintained by Microsoft Corp*, 829 F.3d 197 (2d Cir. July 14, |
| 15 | 2016) ("*Microsoft*"), prohibits it from making further disclosures than it has.  *Microsoft* was wrongly |
| 16 | decided, but Google has not even made a showing to support that *Microsoft* would apply to it. |
| 17 | Accordingly, the government moves for the Motion to Quash to be denied.  Should Google make some |
| 18 | showing that it might fall under the *Microsoft* decision, the government would request an evidentiary |
| 19 | hearing. |
| 20 | The search warrant in this case was issued upon this Court's careful consideration of the |
| 21 | affidavit.  It addresses a matter of ongoing and wide-reaching criminal activity, which is why the Court |
| 22 | ordered Google to provide the materials "forthwith."  Google ignored the Court's order.  By its own |
| 23 | recitation of the chronology of facts, Google decided to circumvent the Court's order on its own |
| 24 | authority and comply with only those portions with which it felt like complying.  It did not raise its |
| 25 | motion to quash the search warrant in a timely way.  Its motion was filed December 6, 2016, five |
| 26 | months after the search warrant was issued, and nearly as long after *Microsoft* was decided. |
| 27 | Google must immediately produce all of the data called for by this Court's properly issued |
| 28 | search warrant, and the government moves the Court for an Order to Show Cause why Google should |

U.S. OPP. AND MOT. TO SHOW CAUSE

1

1   not be held in contempt for its failure to comply with the warrant.

2                         **FACTUAL BACKGROUND**

3       This Court has been presented with a similar situation before. In the matter of *In Re Search of*

4   *the Content of Gmail Account and In Re Search of the Content of Account Serviced by Google Voice*,

5   13-90556-MISC-LB (N.D. Cal. 2013), the government moved this Honorable Court to hold Google in

6   contempt for failing to comply with a duly issued search warrant. Google's irresponsible failure to

7   comply in that case resulted in the loss of material evidence in connection with a murder investigation.

8   Settlement Agreement, Doc. 23 (attached hereto as Exhibit A). In response to the Motion of the United

9   States, Google negotiated the stipulated settlement attached hereto that purportedly represented a

10   renewed effort by Google to comply with search warrants properly issued by courts. Not three years

11   later, Google again takes the position that it, and not the Court, is the arbiter of the lawful scope of a

12   search warrant.

13       As noted above, on June 30, 2016, this Court issued the search warrant at issue. On July 6, 2016,

14   Homeland Security Investigations Special Agent Michael Delaney served the warrant on Google, which

15   called for execution by July 14, 2016. See Declaration of SA Delaney (attached hereto as Exhibit B).

16   Google did not move to quash the warrant prior to the July 14 deadline, nor even shortly after that date,

17   which coincided with the Second Circuit's decision in *Microsoft*. *Id.* In fact, Google did not file its

18   motion to quash until *five months later* and after it had already announced that it would not comply with

19   the Court's Order. *Id.*

20       On September 28, 2016, Google provided what it conceded was incomplete information

21   responsive to the warrant. *Id.* On October 12, 2016, 2016, SA Delaney contacted Google and spoke

22   with a representative. *Id.* Google indicated that it might not further comply with aspects of the search

23   warrant, apparently claiming the ability to *sua sponte* narrow the Court's Order based on the *Microsoft*

24   decision of the Second Circuit. *Id.* The matter was subsequently taken up by outside counsel who

25   incorrectly characterized the Court's Order as a "request" to Google. *Id.* On November 18, 2016,

26   Google provided additional production that it called "supplemental" and without explanation regarding

27   why it had not produced the supplemental data earlier. *Id.* On November 21, 2016, Google wrote a

28   letter to the government claiming that it had not produced all data called for by the warrant on the basis

U.S. OPP. AND MOT. TO SHOW CAUSE

1  that 1) it "cannot produce data stored overseas to U.S. law enforcement" and citing the *Microsoft*

2  decision; 2) that the Court erred in issuing the warrant as "overbroad" and without "particularity" and

3  3) speculating that the Court erred because probable cause could not have existed for the warrant.

4  Apparently then realizing that it had acted as its own judge without authorization of this Court, Google

5  filed a post hoc Motion to Quash on December 6, 2016.

6          Based on Google's assertions and conduct, the government believes that Google has custody and

7  control over additional data called for by the Court's Order that Google argues, but has not established,

8  may be stored outside of the United States.

9                                    **ARGUMENT**

10 I.     THE WARRANT IS SUFFICIENTLY PARTICULAR AND GOOGLE LACKS ANY BASIS
11        TO CHALLENGE THE COURT'S DETERMINATION AS TO PROBABLE CAUSE

12         The Fourth Amendment requires that a search warrant describe with particularity the place to be

13 searched, and the persons or things to be seized. U.S. Const. Amend. IV. The description must enable

14 the person conducting the search reasonably to identify the things authorized to be seized. *United States*

15 *v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986). The particularity requirement is aimed at protecting

16 against general searches and insures that nothing is left to the discretion of the executing officer. *Id.*

17         The warrant in this case comports with the particularity requirement. It asks for materials

18 pertaining to        listed email addresses/user accounts stored at premises controlled by Google. In

19 addition to emails and business/subscriber information, the warrant seeks data associated with

20 Google services. The amount of information sought by the warrant may be large, but it is clear what is

21 targeted.

22         The validity of the warrant is not questionable simply because it is not clear to Google how the

23 items to be seized and turned over to the government might be evidence, or how the government

24 established probable cause for the warrant. Google has not, as this Court has, reviewed the affidavit

25 supporting the search warrant. For logistical reasons that are presumably preferential to Google, Google

26 personnel rather than law enforcement agents, are directed to execute the search. Nevertheless, it is not

27 Google's place to speculate that insufficient probable cause supports the warrant.

28         A warrant permitting the government to search a target's home, for example, will regularly

U.S. OPP. AND MOT. TO SHOW CAUSE

1 | permit the government to seize indicia of that person's residence. That indicia may not be at the home

2 | does not mean the warrant is defective. Similarly, that some of the target user accounts may not use

3 | some or all of the Google services listed in the warrant is irrelevant to whether the warrant is valid.

4 | In fact, Google's failure to comply with the warrant on its face has impeded the government's

5 | investigation in this case and has frustrated ongoing efforts to locate the perpetrators. The volumes of

6 | data withheld by Google include the full contents of ▮▮▮ accounts; all email attachments associated with

7 | the ▮ accounts listed in the warrant; all Google Calendar records; [1] Google Maps[2] data; information

8 | pertaining to Google Sync; and data associated with multiple developer-related services, including

9 | Google Analytics, Webmaster Tools, and AdWords.

10 | Contrary to Google's assumptions regarding what information is relevant to the government's

11 | ongoing investigation, data stored by Google in connection with any of the above services may contain

12 | crucial evidence of the substantive crimes under investigation, as well as evidence of the account

13 | holders' geographic location and travel plans, the true identity and/or aliases of the account holders, and

14 | the location of financial assets subject to seizure. Indeed, the Court affirmatively recognized the value

15 | of this information when it issued its Order directing Google to produce these materials. Google's

16 | decision to ignore the Court's order has impaired the government's ability to investigate the alleged

17 | offenses and to apprehend the individuals responsible for the ongoing criminal activity.

18 | For example, through other information produced by Google in response to legal process issued

19 | by the Court, the government is aware of communications between an account – one of the ▮▮▮ accounts

20 | for which Google withheld all contents – and other accounts controlled by the individuals under

21 | investigation. Many of these emails appear to relate directly to the criminal activity that the government

22 | is investigating. Because of Google's refusal to comply with the Court's order to produce that accounts

23 | email contents, however, the government is restrained from investigating the full extent of the illicit

24 |

25 | [1] Google informed the Government in November that "Google will produce Calendar metadata for the accounts in the United States as soon as Calendar is available for production." No such metadata, much less contents, have been produced to date.

26 |

27 | [2] A limited subset of Google Maps information may be found within the Search History data that was produced for at least some of the accounts. The information that Google refuses to produce may include, by Google's own account, "records associated with custom maps, changes and edits to public places, starred places, private labels, and saved locations." Any of the above information could be instrumental in the government's investigation.

28 |

1 | activity and from identifying potential co-conspirators. Even for the accounts listed in the warrant

2 | where Google did produce email content, Google withheld all attachments. Investigators thus are able

3 | to see that emails pertaining to the criminal conduct under investigation contain references to

4 | attachments, but they are unable to view the attachments themselves.

5 |     Google's failure to produce any Google Calendar records renders the government unaware of

6 | potentially valuable information concerning the account holders' travel, meetings, or other planned

7 | events. Google's refusal to produce data associated with Google Maps for any of the listed accounts has

8 | deprived the government of what may have been critical information regarding the account holders'

9 | geographic locations and travel plans. Due to the nature of the account holders' criminal enterprise, any

10 | information contained in or associated with the assorted developer-related applications is highly likely to

11 | contain evidence relevant to the government's investigation. However, Google has withheld all data

12 | pertaining to any of the developer-related services listed in the Court's order.

13 |     In addition to the substantive contents of the services themselves, data associated with the

14 | account holders' use of the services is likely to provide valuable information regarding their locations

15 | and true identities. In particular, evidence surrounding user attribution and location information is

16 | critical to the government's case. The information Google stores related to each of the above services

17 | could therefore be instrumental in the government's investigation. For example, Google logs the

18 | Internet Protocol (IP) addresses from which users access Google services along with the time and date of

19 | access. By determining the physical location associated with the logged IP addresses, investigators can

20 | locate and identify the account holders. Indeed, IP login information has already proven critical in this

21 | case. Google's refusal to produce the records associated with the above-listed records, as ordered by the

22 | Court, has precluded the government from making full use of the location data that would otherwise be

23 | available.

24 | II.    GOOGLE HAS FAILED TO ESTABLISH THE FACTUAL PREDICATE FOR

25 |        *MICROSOFT*'S APPLICATION, AND *MICROSOFT* WAS WRONGLY DECIDED

26 |     Google invokes the Second Circuit's decision in *Microsoft* to sanction its failure to comply with

27 | this Court's search warrant. Google has made no showing that *Microsoft*, which was wrongly decided,

28 | applies to its situation. On that basis alone, Google's Motion should be denied, it should be ordered to

U.S. OPP. AND MOT. TO SHOW CAUSE

5

1  produce the requested materials, and it should be ordered to show cause why it should not be held in

2  contempt for its delay and non-compliance.  In the event that Google makes a factual showing sufficient

3  to invoke *Microsoft*, the government asks for an evidentiary hearing to determine how Google stores and

4  retrieves its data, and what steps Google has taken after being served with the search warrant to

5  determine what responsive data it maintains exclusively abroad.  Only with this information can this

6  Court determine whether *Microsoft* applies to Google at all.

7        A.    The *Microsoft* decision

8        In *Microsoft*, the government served Microsoft Corp. at its headquarters in Washington state

9  with a search warrant under the Stored Communications Act ("SCA"), 18 U.S.C. § 2703, for the email

10  account of one of its customers.  829 F.3d at 200.  Microsoft produced the customer's non-content

11  information, which was stored in the United States to the government, but moved to quash the warrant

12  with respect to the content of the customer's emails, which Microsoft determined was stored in its data

13  center in Dublin, Ireland.  *Id.* at 200-01.  Microsoft argued that the warrant, like ordinary search

14  warrants had no extraterritorial reach.  *In re Warrant to Search a Certain E-Mail Account Controlled*

15  *and Maintained by Microsoft Corporation*, 15 F. Supp. 3d 466, 470 (S.D.N.Y. 2014) ("*In re Warrant*").

16  The magistrate judge, whose findings the district court adopted, denied the motion to quash, and the

17  district court found Microsoft Corp. in civil contempt.  *Microsoft*, 829 F.3d at 201, 204-05.

18        The magistrate judge noted that 18 U.S.C. §§ 2703(a) and 2703(c)(A) refer to "a warrant issued

19  using the procedures described in the Federal Rules of Criminal Procedure," and the question was

20  whether that referred merely to the procedural aspects of Federal Rule of Criminal Procedure 41 ("Rule

21  41"), or also substantive limits on territorial reach of conventional search warrants.  *In re Warrant*, 15

22  Supp. 3d at 470.  The magistrate judge observed that the SCA was enacted to create a set of Fourth

23  Amendment-like privacy protections for digital information held by third parties such as Internet Service

24  Providers ("ISPs"), which the government could otherwise obtain with a subpoena.  *Id.* at 471 (citing

25  Orin Kerr, *A User's Guide to the Stored Communications Act, and a Legislator's Guide to Amending It*,

26  72 Geo. Wash. L.R. 1208, 1212 (2004)).  Thus, the SCA scaffolded a range of procedural protections –

27  from subpoenas requiring no demonstration of probable cause, to court orders issuable only upon

28  specific and articulable reasonable suspicion, to warrants issuable only upon probable cause – around

U.S. OPP. AND MOT. TO SHOW CAUSE

1    tiers of digital information concerning lesser to greater privacy interests. *Id.* at 468-70. The government

2    could obtain basic customer information, 18 U.S.C. § 2703(c)(2), stored emails more than 180 days old,

3    18 U.S.C. § 2703(a), any email with prior (or, where authorized under 18 U.S.C. § 2705, delayed) notice

4    to the customer, 18 U.S.C. § 2703(b)(1)(b)(i), with an administrative subpoena authorized by a federal

5    or state statute or a federal or state grand jury or trial subpoena. *Id.* at 468-69. Subpoenas are not

6    limited to domestic information. *Id.* at 472. The government could obtain all of the above information

7    and also more detailed customer records by applying for a court order pursuant to 18 U.S.C. § 2703(d),

8    issuable only upon specific and articulable facts showing that there are reasonable grounds to believe

9    that the data sought are relevant and material to an ongoing criminal investigation. *Id.* at 469 (citing 18

10   U.S.C. § 2073(d)). The government could obtain all of the above information as well as the contents of

11   emails in storage for 180 days or less, "only pursuant to a warrant issued using the procedures described

12   in the Federal Rules of Criminal Procedure" (or state warrant procedures). 18 U.S.C. § 2703(a); *In re*

13   *Warrant*, 15 F. Supp. 3d at 470. It would be anomalous to the structure of SCA to find that the class of

14   information reached with the least procedural protection extended to information maintained anywhere

15   in the world, but that the class of information reached with the greatest procedural protection did not.

16   *Id.* at 472. Thus, the magistrate judge concluded that a warrant issued under 18 U.S.C. § 2703 refers to a

17   hybrid order that is "obtained like a search warrant when an application is made to a neutral magistrate

18   who issues the order only upon a showing of probable cause," but is "executed like a subpoena in that it

19   is served on the ISP in possession of the information and does not involve government agents entering

20   the premises of the ISP to search its servers and seize the e-mail account in question." *Id.* at 471. The

21   magistrate judge also drew on legislative history and practical considerations to support its conclusion.

22   *Id.* at 472-73.

23          Additionally, the magistrate held that "the concerns that animate the presumption against

24   extraterritoriality are simply not present here: an SCA Warrant does not criminalize conduct taking place

25   in a foreign country; it does not involve the deployment of American law enforcement personnel abroad;

26   it does not require even the physical presence of service provider employees at the location where data

27   are stored." *Id.* at 475-76. Indeed, because Microsoft Corp. personnel operating in the United States

28   could access the target data from the United States, and because a search does not occur until the object

U.S. OPP. AND MOT. TO SHOW CAUSE

1   of the search is exposed to possible human observation, the search at issue would take place in the

2   United States, even though the data might be stored abroad. *Id.* at 472.

3       The Second Circuit, acknowledging that it was strongly influenced by the fact that the SCA, part

4   of the broader Electronic Communications Privacy Act ("ECPA"), was enacted in 1986, in a

5   "technological context very different from today's Internet-saturate reality," reversed. *Microsoft*, 829

6   F.3d at 201-02, 205-06.

7       Applying the framework set forth in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247,

8   261-65 (2010), the Second Circuit found that the SCA did not expressly or implicitly contemplate

9   extraterritorial application, and then that the challenged application was extraterritorial. *Id.* at 210-13.

10   The Second Circuit found that as used in the SCA, "a warrant" was a term of art that incorporated the

11   traditional territorial limitations embedded in the procedural requirements, for magistrate judges may

12   only issue warrants within the United States. *Id.* at 201, 208, 212. The Second Circuit also held that

13   even under the magistrate judge's hybrid warrant-subpoena theory of an SCA warrant, the warrant

14   would not reach Microsoft Corp.'s data in Ireland. *Id.* at 215. The Second Circuit explained that

15   although it had held that a subpoena may compel a target to turn over its own records, wherever they

16   may be, it had "never upheld the use of a subpoena to compel a recipient to produce an item under its

17   control and located overseas when the recipient is merely a caretaker for another individual or entity and

18   that individual, not the subpoena recipient, has a protectable privacy interest in the item." *Id.* at 215-16,

19   218-19.

20       The Second Circuit acknowledged that although the data at issue was indisputably located

21   beyond United States borders, the act of retrieving it would be performed in the United States. *Id.* at

22   209, 216-17. However, it found that this domestic contact was not sufficient to avoiding triggering the

23   presumption against extraterritoriality because the domestic contacts were not the "focus" or object of

24   the SCA. *Id.* at 216-17. The Second Circuit found that the focus of the warrant provisions of the SCA is

25   user privacy of stored communications, and that follows the location from which the content subject to

26   the warrant is to be seized. *Id.* at 217-18, 220-21. The Second Circuit found that the seizure would

27   occur where the data was stored, in Dublin. *Id.* at 220.

28       In his concurrence, Judge Lynch pointed out that it was a "very close case to the extent that the

U.S. OPP. AND MOT. TO SHOW CAUSE

1   presumption against extraterritoriality shapes our interpretation of the statue" and that the decision led to

2   the preposterous result of email users' privacy varying arbitrarily with business practices they have

3   nothing to do with. *Id.* at 224, 229, 230 (Lynch, J., concurring).  Judge Lynch noted that there was a

4   strong argument that compelling Microsoft Corp. to produce data stored in Ireland was not an

5   extraterritorial application of the SCA. *Id.* at 226-27.  The SCA referred to a warrant, and not a search

6   warrant, which supported the argument that the SCA does not refer to a traditional search warrant, but

7   prescribes the procedural mechanism to allow the government to require a service provider to disclose

8   the contents of certain electronic communications without notice to the subscriber or customer. *Id.*  As

9   such, it was questionable whether the focus of the SCA should be on the location of the search or where

10  the data is kept. *Id.* at 227-28.  "Tangible documents, having a material existence in the physical world,

11  are stored in a particular physical location," and executing a traditional search warrant requires a visit to

12  that location. *Id.* at 228-29.  The location of electronic documents, however, "is, in important ways,

13  merely virtual." *Id.* at 229.  Microsoft Corp.'s employees, located in the United States, "can review

14  those records" "without ever leaving their desks in the United States," and the "entire process of

15  compliance" with a warrant "takes place domestically." *Id.*  Nonetheless, Judge Lynch concurred

16  because "there is no evidence that Congress" clearly intended to reach situations of this kind. *Id.* at 230-

17  31.  Judge Lynch urged Congress to revise the statute to overrule the *Microsoft* decision "with a view to

18  maintaining and strengthening" the SCA's "privacy protections, rationalizing and modernizing the

19  provisions permitting law enforcement access to stored electronic communications and other data where

20  compelling interests warrant it, and clarifying the international reach of those provisions after carefully

21  balancing the needs of law enforcement . . . against the interests of other sovereign nations." *Id.* at 231-

22  33.

23        B.       Google has not established that responsive data is stored extraterritorially

24        For the reasons discussed briefly below, this Court should reject *Microsoft*, which the Second

25  Circuit wrongly decided, apparently with the goal of inciting legislative action.  But Google has not even

26  established that it would be entitled to resist the warrant at issue, even if this action were in the Second

27  Circuit.  Microsoft Corp. established that data responsive to the search warrant in that case was in

28  Ireland at all times relevant to the warrant, and not in the United States.  Google failed to make any

U.S. OPP. AND MOT. TO SHOW CAUSE

9

1   showing that the only copy of materials within the scope of the search warrant existed outside of the

2   United States at all times during the pendency of the warrant, such that the *Microsoft* decision would

3   facially apply to it.  Google has not put anything into the record establishing how it preserves data,

4   where that data is stored, or how it may retrieve and access that data.  Using the passive voice

5   repeatedly, Google states that it has produced records "known to be stored in the United States," Google

6   Motion to Quash at 6, but it is silent as to whom it is known by, how it is known, when it is known, what

7   the scope of things is known, or even what it means to be known.  If Google has not taken steps to

8   "know" whether certain contents of email addresses are stored in the United States, then those contents

9   are not "known" to be stored in the United States.  But neither are they known to be stored overseas.

10  Perhaps, as with a traditional warrant, the government should be tasked to make those determinations in

11  executing future warrants.

12       Google also stretches *Microsoft*'s holding beyond recognition.  *Microsoft* held that the SCA does

13  not reach records the providers knows and proves to be outside of the United States.  Google asserts that

14  a search warrant "cannot reach records if it is unknown whether the records are located in the United

15  States," suggesting that the government must know where the records are at the time of the search

16  warrant's issuance.  Google's Motion to Quash at 6.  *Microsoft* does not require the government to know

17  where records are located.  Microsoft Corp. determined that the responsive records were in Ireland; that

18  was the premise of its motion to quash.  The location of the records was known, and known by the entity

19  in control of the location of the records.

20       Google is not entitled to assert that *Microsoft* excuses its failure to comply with this Court's

21  search warrant when it has done nothing to establish the factual predicates.  The government therefore

22  respectfully submits that Google's Motion is fatally flawed and should be denied.  If Google can assert

23  facts sufficient to cause the Court to inquire further, then the government asks for an evidentiary

24  hearing.  If, in fact, Google can make a factual showing that data was actually stored outside of the

25  United States as the post hoc basis for its non-compliance and the Court views that issue as bearing on

26  Google's obvious contempt, then further briefing may be necessary.

27       C.      *Microsoft* was wrongly decided

28       This Court should most certainly reject Google's fun-house mirror version of *Microsoft*.  But

1  should it reach the issue, it should also reject *Microsoft* as the Second Circuit wrote it. *Microsoft* is the

2  only decision to hold that the SCA does not reach data retrievable from the United States if it is stored

3  abroad, is non-binding, and was wrongly decided. The *Microsoft* decision was wrongly decided for at

4  least three reasons. First, the *Microsoft* court placed unwarranted emphasis on the SCA's use of the

5  term "warrant" and, as a result, mistook the SCA's grant of power to courts as *in rem* as opposed to *in*

6  *personam*. Second, it misapplied the second step of the *Morrison* test in applying the presumption

7  against extraterritoriality, which, properly applied, establishes that the compelled disclosure at issue is a

8  permissible territorial application of the SCA. Third, it did not consider Congress's unequivocal action

9  confirming that the SCA does in fact reach foreign-stored data.

10      1.  The SCA Provides Courts With Power *In Personam* To Require U.S. Providers To
11          Produce Information In Their Custody Or Control, Regardless Of The Location Of The
12          Information.

12      The SCA grants courts with the *in personam* power to require certain providers, including email

13  providers, to produce certain information responsive to a warrant. Unlike searches for physical items, or

14  even electronically stored information on a defendant's computer or cellular phone, the data at issue

15  here, primarily email content, is truly abstracted from any physical form. This is not merely because the

16  data itself is digital. For example, when dealing with electronically stored information on a computer or

17  cellular phone, the physical source of the information, *e.g.*, the computer or phone and where they were

18  found, is as relevant as the data it contains. Accordingly, in using such materials in a prosecution, the

19  government must take steps to establish that any resulting evidence came directly from the original,

20  seized item. The data at issue here is different. The concept of an "original" email is inapposite. The

21  government does not seek to seize or even obtain information about the specific hard drives the

22  requested data sits on at the time the warrant is issued; rather, the warrant seeks only the information

23  itself, abstracted from any physical device. Given this distinction, it comes as no surprise that Rule 41,

24  governing traditional search warrants for persons or property, grants courts with *in rem* power by

25  limiting the authority to issue such warrants to situations where the person or property to be searched is

26  located within the court's territorial jurisdiction. Equally unsurprising is that the SCA, dealing with

27  abstracted data, grants courts with *in personam* power over certain U.S. providers, namely providers of

28

1  electronic communications and/or remote computing services.

2       Rule 41(b) generally requires that the property to be searched for and seized "be located in the

3  district." (*compare* Rule 41(b)(1) *with* 41(b)(2)-(6)).  The SCA, however, operates differently: it

4  explicitly broadens the jurisdiction of courts to issue warrants for information located outside of the

5  district.  In addition to creating jurisdiction when the information is stored in the same district, the Act

6  also defines a "court of competent jurisdiction" as a court having jurisdiction over the offense under

7  investigation or a court in the district in which the provider is located.  *See* 18 U.S.C. §§ 2703(a)-(c)

8  (requiring in certain circumstances a "warrant issued using the procedures described in the Federal Rules

9  of Criminal Procedure ... *by a court of competent jurisdiction*") (emphasis added) and 2711(3) (defining

10  a "court of competent jurisdiction"). [3]  Additionally, a court of competent jurisdiction can still only

11  exercise such power over certain types of entities, namely electronic communication service and remote

12  computing service providers.  *Id.*  Accordingly, under the broader jurisdiction granted by the SCA, the

13  information required to be disclosed pursuant to a warrant need not be in this district at the time the

14  warrant is issued.  Fed. R. Crim. P. 41(a)(1) explicitly recognizes such statutory provisions.  ("This rule

15  does not modify any statute regulating search or seizure, or the issuance and execution of a search

16  warrant in special circumstances.").  Therefore, the SCA recognizes that, in the context of certain

17  electronic information (such as the content of emails held and controlled by providers of electronic

18  communications service and computing service), the fact that such information is electronically stored in

19  remote locations does not limit the ability of this Court to require it to be gathered and produced in this

---

20
21       [3] The full definition of "court of competent jurisdiction" includes --

22            (A) any district court of the United States (including a magistrate judge of such a
            court) or any United States court of appeals that --

23            (i) has jurisdiction over the offense being investigated;
24            (ii) is in or for a district in which the provider of a wire or electronic
            communication service is located or in which the wire or electronic
            communications, records, or other information are stored; or
25            (iii) is acting on a request for foreign assistance pursuant to section 3512 of this
            title; or
26
            (B) a court of general criminal jurisdiction of a State authorized by the law of that
27            State to issue search warrants[.]

28  18 U.S.C. § 2711(3).

U.S. OPP. AND MOT. TO SHOW CAUSE
                                        12

1  district. In that regard, the SCA implements the fundamental principle, detailed below, that requiring

2  the production in a given district of information located abroad does not trigger extraterritorial issues

3  because the act of compulsion takes place domestically.

4       This is not a novel concept. On the contrary, it is well-settled in this Circuit, and others, that the

5  power to require a person to disclose information applies to all information in that person's custody or

6  control, regardless of where the information is located. *See Sec. & Exch. Comm'n v. Minas De*

7  *Artemisa, S. A.*, 150 F.2d 215, 218 (9th Cir. 1945) ("The obligation to respond applies even though the

8  person served [with a subpoena] may find it necessary to go to some other place within or without the

9  United States in order to obtain the documents required to be produced.") (cited approvingly in *Steel v.*

10  *Bulova Watch Co., Inc.*, 344 U.S. 280, 289 & n.17 (1952) for the proposition that "the District Court in

11  exercising its equity powers may command persons properly before it to cease or perform acts outside

12  its territorial jurisdiction"); *United States v. Martin*, No. 14-00678, 2015 WL 4463934, at *3 (D. Ariz.

13  July 21, 2015) (denying the defendant's motion to suppress information obtained from Facebook and

14  Twitter where they did not disclose the location of their servers, because "[t]he SCA warrants . . . sought

15  information plainly under the control of two United States corporations") (not published); *cf. Republic of*

16  *the Philippines v. Marcos*, 862 F.2d 1355, 1363-64 (9th Cir. 1988) ("The injunction is directed against

17  individuals, not against property; it enjoins the [defendants] and their associates from transferring certain

18  assets wherever they are located. Because the injunction operates *in personam*, not *in rem*, there is no

19  reason to be concerned about its territorial reach.").[4]  These cases reason that because a court's ability to

20

21       [4] *Hay Group, Inc. v. E.B.S. Acquisition Corp.*, 360 F.3d 404, 412 (3d Cir. 2004) (Alito, J.)

22  ("'Production' refers to the delivery of documents, not their retrieval, and therefore 'the district in which the production . . . is to be made' is not the district in which the documents are housed but the district in

23  which the subpoenaed party is required to turn them over."); *Reinsurance Co. of Am. v. Administratia Asigurarilor de State (Admin. of State Ins.)*, 902 F.2d 1275, 1281 (7th Cir. 1990) ("A court or agency in

24  the United States, when authorized by statute or rule of court, may order a person subject to its jurisdiction to produce documents, objects, or other information relevant to an action or investigation,

25  even if the information ... is outside the United States.") (quoting RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW § 442); *Gerling Int'l Ins. Co. v. CIR*, 839 F.2d 131, 140 (3d Cir. 1988)

26  (explaining that, under the rule governing the production of documents and other evidence in tax court, "[t]he location of the documents, whether within the territorial jurisdiction of the court or not, is

27  irrelevant" (citing *In re Marc Rich & Co., A.G.*, 707 F.2d 663, 667 (2d Cir. 1983), and citing *In re Uranium Antitrust Litigation*, 480 F. Supp. 1138, 1144 (N.D. Ill. 1979))); *United States v. Bank of Nova*

28  *Scotia*, 691 F.2d 1384, 1389-90 (11th Cir. 1982) (affirming the district court's order enforcing a grand

U.S. OPP. AND MOT. TO SHOW CAUSE

1  require disclosure is premised on the court's jurisdiction over the person, the compulsion is domestic.

2  This conclusion remains the same, even when some of the information required to be disclosed must be

3  gathered from outside the United States. *See* Restatement (Third) of Foreign Relations Law § 442(1)(a)

4  (1987) (making clear that "[a] court or agency in the United States, when authorized by statute or rule of

5  court, may order a person subject to its jurisdiction to produce documents, objects, or other information

6  relevant to an action or investigation, even if the information or the person in possession of the

7  information is outside the United States"). Courts have long been empowered to exert authority on

8  people and entities over whom they have jurisdiction, even if that authority has consequences overseas

9  or otherwise outside of a court's territorial jurisdiction. *See, e.g., Blackmer v. United States*, 284 U.S.

10  421, 438 (1931) ("The jurisdiction of the United States over its absent citizen, so far as the binding

11  effect of its legislation is concerned, is a jurisdiction in personam, as he is personally bound to take

12  notice of the laws that are applicable to him and to obey them."); *Hale v. Henkel*, 201 U.S. 43, 75 (1906)

13  ("It would be a strange anomaly to hold that a state, having chartered a corporation to make use of

14  certain franchises, could not, in the exercise of its sovereignty, inquire how these franchises had been

15  employed, and whether they had been abused, and demand the production of the corporate books and

16  papers for that purpose."). Indeed, in *Martin*, the court, following this principle, noted that "it is well-

17  established that so long as a court has jurisdiction over a custodian, records within the custodian's

18  control are subject to disclosure regardless of their location." 2015 WL 4463934, at *3 (citing *Marc*

19  *Rich*, 707 F.2d at 667).

20

21  jury subpoena against a Bahamian bank which was "subpoenaed while subject to the jurisdiction of [the
district court]," where the subpoena required disclosure of records located in the Bahamas); *Marc Rich*

22  *& Co. v. United States*, 707 F.2d 663, 667 (2d Cir. 1983) (a witness may not "resist the production of

23  [subpoenaed] documents on the ground that the documents are located abroad … [t]he test for
production of documents is control, not location") (citations omitted); *In re Anschuetz & Co., GmbH*,

24  754 F.2d 602, 614 n.29 (5th Cir. 1985) (noting that "[i]t is not *ipso facto* a defense to a discovery request
that the law of a foreign country may prohibit production or disclosure. As the Eleventh Circuit held in

25  *United States v. Bank of Nova Scotia*, 691 F.2d 1384 (11th Cir.1982), even at the sanction stage,
violation of foreign law is not necessarily a valid defense to a lawfully issued subpoena for

26  documents."), *cert. granted, judgment vacated on other grounds sub nom. Anschuetz & Co., GmbH. v.*

27  *Mississippi River Bridge Auth.*, 483 U.S. 1002 (1987); *In re Sealed Case*, 832 F.2d 1268, 1284 (D.C.
Cir. 1987), *abrogated on other grounds by Braswell v. United States*, 487 U.S. 99 (1988) (holding that a

28  subpoena for documents in Switzerland is enforceable by the District Court if it has personal jurisdiction
over the companies whose records are sought).

U.S. OPP. AND MOT. TO SHOW CAUSE
                                                              14.

1    This fundamental concept – that a court's power to compel disclosure is directed to the person

2    (*in personam*), not the items to be produced (*in rem*) – was well-established at common law long before

3    Congress enacted Section 2703 of the SCA in 1986. It was not, therefore, a radical change when, in

4    2001, Congress broadened the jurisdiction of courts to issue warrants for information located outside the

5    normal jurisdiction of the issuing court. Accordingly, the decision not to impose a Rule 41-type

6    territorial limitation on warrants issued pursuant to the SCA, but rather to define a "court of competent

7    jurisdiction" to include *any* Federal court that has jurisdiction over the offense being investigated, must

8    be read as a deliberate choice by Congress to authorize a court to require the disclosure of information

9    not located in the district. "'[W]hen a statute covers an issue previously governed by the common law,'

10   [courts] must presume that 'Congress intended to retain the substance of the common law.'" *Kirtsaeng*

11   *v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351, 1363 (2013) (quoting *Samantar v. Yousuf*, 560 U.S. 305,

12   320 n.13 (2010)). Indeed, in light of the settled common law on the *in personam* nature of a court's

13   power to compel the disclosure of documents, as well as Section 2703's focus on regulating such

14   disclosure, there can be little doubt that Congress envisioned "a court of competent jurisdiction" as one

15   empowered to compel a U.S.-based provider of electronic communications service or remote computer

16   service to disclose information in its custody and control – regardless of where that information may be

17   when the provider takes action in the United States to gather it.

18        Instead of acknowledging the distinction between *in personam* and *in rem* proceedings, the

19   *Microsoft* court focused on the distinction between the terms "warrant" and "subpoena." 829 F.3d at

20   214 ("We see no reasonable basis in the statute from which to infer that Congress used 'warrant' to

21   mean 'subpoena.'"). The Second Circuit erroneously concluded that because the SCA uses the term

22   "warrant," Congress implicitly imported the "traditional[] . . . territorial limitations" that apply to

23   warrants such as those imposed by Rule 41(b). *Id.* at 201. But that conclusion ignores explicit language

24   in the SCA reflecting Congress's intent *not* to impose such limitations and also ignores the fact that the

25   use of the term "warrant" is more logically understood *not* as a geographic limitation inconsistent with

26   the plain language of the SCA, but as a description of the procedures to be followed in order to require

27   the information to be produced, including the probable cause requirement, exactly as the plain language

28   repeatedly indicates. *See* 18 U.S.C. § 2703(a) ("pursuant to a warrant using the procedures described in

1   the Federal Rules of Criminal Procedure"); § 2703(b)(1)(A) (same); § 2703(c)(1)(A) (same).  Indeed, as

2   the concurring opinion in *Microsoft* notes, the "the SCA does not describe the warrant" as a Rule 41

3   search warrant; instead, "it simply authorizes the government to *require the service provider to disclose*

4   certain communications to which it has access."  829 F.3d at 226-28 (Lynch, J., concurring) (emphasis

5   in original).

6          Finally, the *Microsoft* decision ignores the fact that the case law involving the issuance of

7   subpoenas is not the "Law on 'Subpoenas,'" *id.* at 214, but is rather the law defining the extent of a

8   court's *in personam* power to compel the production of documents. *See, e.g., Steel,* 344 U.S. at 289 &

9   n.17; *Marcos,* 862 F.2d at 1363-64.  The *Microsoft* court instead notes that the cases involving

10  subpoenas to banks are distinguishable because they do not involve situations where the subpoenaed

11  entity was "merely a caretaker for another individual and that individual, not the subpoena recipient, has

12  a protectable privacy interest in the item."  829 F.3d at 215-16.  However, the court failed to recognize

13  that even where a subpoena is sent directly to an individual with a privacy interest in the requested

14  information, the Fourth Amendment imposes only a reasonableness requirement. *See Fisher v. United*

15  *States,* 425 U.S. 391, 401, 408-09 (1976) (holding that the Fourth Amendment's reasonableness

16  requirement applies to a summons or subpoena for compelling the production of private papers held by

17  criminal defendants' attorneys); *cf. Hale,* 201 U.S. at 73-76 (the Fourth Amendment imposes a

18  reasonableness requirement in the context of compelled disclosure of a corporation's records).  Here, the

19  procedure the government used to under the SCA is eminently reasonable – it required the government

20  to obtain a warrant based on a showing of probable cause to a neutral and detached magistrate before it

21  could compel the production of certain information.  Adopting the Second Circuit's view would lead to

22  the anomalous conclusion that records held by a "caretaker" of another's records are somehow entitled

23  to greater protection than they would be if they were held directly by the individual with a privacy

24  interest those records.

25         2.  The *Microsoft* Court Misapplied The Second Step Of The *Morrison* Test.

26         The Second Circuit misapplied the Supreme Court's two-step framework for analyzing

27  extraterritoriality as explained in *Morrison v. Nat'l Australia Bank, Ltd.,* 561 U.S. 247 (2010), *Kiobel v.*

28  *Royal Dutch Petroleum Co.,* 133 S. Ct. 1659 (2013), and *RJR Nabisco, Inc. v. European Community,* 136

U.S. OPP. AND MOT. TO SHOW CAUSE

16

1   S. Ct. 2090, 2100-01 (2016).   The *Morrison* Court explained that the presumption against

2   extraterritoriality, a canon of statutory construction, means that "[w]hen a statute gives no clear indication

3   of an extraterritorial application, it has none." *Morrison*, 561 U.S. at 255.   The Court in *RJR Nabisco*

4   subsequently detailed the two-step framework for applying the canon that was set forth in *Morrison*.   "At

5   the first step, [a court must] ask whether the presumption of extraterritoriality has been rebutted – that is

6   whether the statute gives a clear, affirmative indication that it applies extraterritorially." *RJR Nabisco*,

7   136 S. Ct. at 2101.   At the second step, triggered only if a provision is found not to apply extraterritorially,

8   courts must determine whether the case nonetheless "involves a domestic application of the statute . . . by

9   looking to the statute's 'focus.'" *Id.*   Ultimately, if the relevant conduct "occurred in the United States,

10   then the case involves a permissible domestic application *even if other conduct occurred abroad*." *Id.*

11   (emphasis added).

12       The *Microsoft* court correctly concluded that the presumption against extraterritoriality applies to

13   the SCA. 829 F.3d at 216.   It erred, however, at the second step of *Morrison* when it determined that (1)

14   the relevant "focus" of Section 2703 of the SCA under a *Morrison* analysis is privacy, as opposed to

15   disclosure, and (2) any invasion of that privacy "takes place . . . where the customer's protected content

16   is accessed – here, where it is seized by Microsoft, acting as an agent of the government." *Id.* at 216-20.

17       In discerning the focus under the step two of the *Morrison* analysis, the *Microsoft* court concluded

18   that Section 2703's warrant provision evokes a focus on privacy because "Rule 41 is undergirded by the

19   Constitution's protections of citizens' privacy[.]" 829 F.3d at 217 (quotations omitted).   The court then

20   looked to other sections of the SCA, noting that various provisions included mechanisms designed to

21   protect individuals' "privacy interest in their stored communications." *Id.* at 217-18.   Finally, the court

22   cited legislative history indicating that Congress sought to "ensure protections traditionally afforded by

23   the Fourth Amendment" and "to protect privacy interests in personal and proprietary information, while

24   protecting the Government's legitimate law enforcement needs." *Id.* 219-20 (quotations omitted).

25       The Second Circuit erred, however, when it went beyond Section 2703 to look at the SCA as a

26   whole in order to discern its "focus," because step two of a proper extraterritoriality analysis should

27   proceed on a section by section basis. *See, e.g., Morrison*, 561 U.S. at 263–65 (holding that Section 10(b)

28   of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), does not apply extraterritorially, but that

1 | Section 30(a), 15 U.S.C. § 78dd(a), does); *RJR Nabisco*, 136 S. Ct. at 2100-11 (holding that RICO's

2 | substantive provisions, 18 U.S.C. § 1962, apply extraterritorially to the extent the charged predicates apply

3 | extraterritorially, but that RICO's civil damages provision, 18 U.S.C. § 1964(c), does not). The focus of

4 | Section 2703 alone – which is all about "[r]equired disclosure of customer communications or records" –

5 | is apparent not just from its title, but also from the fact that in each subsection, the exact same requirement

6 | – *i.e.*, to disclose – applies without regard to the type of process that must issue as a precondition to the

7 | requirement. *See* 18 U.S.C. § 2703(b) (creating the same authority to require disclosure pursuant to

8 | warrants, subpoenas, and court orders under Section 2703(d)); *see also* § 2703(c) (requiring disclosure

9 | pursuant to warrants, subpoenas, court orders, consent, and certain written requests). Regardless of the

10 | process to be followed, the showing that must be made, or the level of information that must be disclosed,

11 | once the statute's requirements are met, the end result is that the provider is compelled to disclose the

12 | information described.[5] It is difficult to conceive of a section whose focus on disclosure could be clearer.

13 | That is not to say there are no privacy concerns triggered by such disclosures, but the *Microsoft*

14 | court incorrectly concluded that those concerns trump the actual focus of Section 2703. Section 2703

15 | *does* address privacy, by detailing when, and on what basis, the government can require the disclosure of

16 | certain information. The various processes and showings required reflect the way Congress balanced

17 | privacy concerns against the government's legitimate law enforcement needs. That, however, does not

18 | alter the language of the provision, which is about disclosure. *See Microsoft*, 829 F.3d at 218 (incorrectly

19 | surmising that had the SCA "instead created . . . a rebuttable presumption of law enforcement access to

20 | content premised on a minimal showing of legitimate interest, the government's argument that the Act's

21 | focus is on aiding law enforcement and disclosure would be stronger"). There is nothing incongruous

22 | about conditioning disclosure obligations on certain processes, but requiring those processes to be

23 |

---

24 |     [5] *See* 18 U.S.C. § 2703(a) (requiring a warrant for disclosure "by a provider of electronic communication service of the contents of a wire or electronic communication, that is in electronic storage

25 | in an electronic communications system for one hundred and eighty days or less"); § 2703(b) (setting rules for disclosure of specified information by a provider of remote computing service and requiring either a

26 | warrant, court order, or subpoena, depending on whether notice is provided to the subscriber); § 2703(c)(1) (applicable to disclosures of a record or other information pertaining to a subscriber to or customer of such

27 | service (not including the contents of communications) and requiring either a warrant, court order, consent of the subscriber, or a formal request by law enforcement in certain enumerated circumstances); and

28 | § 2703(c)(2) (permitting a subpoena to require the disclosure specified basic subscriber information).

U.S. OPP. AND MOT. TO SHOW CAUSE

1   followed in order to compel the disclosure does not change the simple conclusion that such processes are

2   the procedural means to the substantive end: disclosure.

3          By looking at the other sections of the SCA – Sections 2701 and 2702 – instead of only Section

4   2703, the Second Circuit came to the erroneous conclusion that Section 2703 was "an exception to" those

5   other "primary" sections.  That is a plain misapplication of the purpose of the section by section analysis

6   because, as *RJR Nabisco* makes clear, different subsections of a statute can operate differently.  136 S. Ct.

7   at 2102-03 (noting that the presumption of extraterritoriality may differ by subsection and it is only after

8   performing the step one analysis on that basis is it appropriate to inquire into "focus").  The *Microsoft*

9   court's error in this regard is all the more inexplicable, given that it appeared to otherwise acknowledge

10   that, at the second step, it was required to look only to the territorial events that are the focus of "*the*

11   *relevant statutory provision*."  *Microsoft*, 829 F.3d at 216 (emphasis added).

12          The court then compounded that error when it concluded that requiring an entity in the United

13   States to disclose information stored abroad results in an extraterritorial application of the statute.  To the

14   contrary, the law is clear that such compulsion occurs in the United States, on United States persons, and

15   in United States courts.[6]  Disclosure in accordance with the section's requirements is therefore, *not* an

16   extraterritorial application of the statute.  *See RJR Nabisco*, 136 S. Ct. at 2101 ("If the conduct relevant to

17   the statute's focus occurred in the United States, then the case involves a permissible domestic application

18   *even if other conduct occurred abroad*.") (emphasis added).  In exactly the same way as occurs for other

19   types of compelled production of materials, *Minas De Artemisa*, 150 F.2d at 218, the compulsion to

20   require the disclosure of information pursuant to process under the SCA – whether the process that gives

21   rise to the requirement is a subpoena, a court order under Section 2703(d), or a warrant – occurs in the

22   United States, and thus is not an extraterritorial application of Section 2703.[7]

_____

[6]   Indeed, such compulsion occurs only after a warrant is issued based on an application made to
a court of competent jurisdiction in the United States.

[7]   For that reason, the *Microsoft* court's concerns that "Microsoft will necessarily interact with the
Dublin datacenter," 829 F.3d at 220, were misplaced.  Nothing in the record showed "the citizenship and
location of the customer," *id.*, or for that matter, that the subscriber either had any right to prevent
Microsoft from moving data anywhere it saw fit, or any knowledge about where the information resided.
In fact, the notion that, in the Internet era, data resides in any particular geographic location is otherwise
in considerable tension with the court's recognition that data today is properly thought of as "stored on
the 'cloud.'"  *Id.*

U.S. OPP. AND MOT. TO SHOW CAUSE

1    Given that the entire purpose of the second step in a *Morrison* analysis, the "focus" inquiry, is to
2    determine whether the subsection in dispute has sufficient domestic contacts to be considered a domestic
3    application of law, thus avoiding extraterritorial concerns, the *Microsoft* court placed insufficient weight
4    on these fundamental concepts and, instead, concluded "that the invasion of the customer's privacy takes
5    place . . . where the customer's protected content is accessed – here, where it is seized by Microsoft, acting
6    as an agent of the government." *Id.* at 216-20.  However, even if one were to assume that Section 2703's
7    focus is privacy, any "invasion of the customer's privacy" occurs when the information is disclosed to the
8    government in the United States and then searched pursuant to the warrant by investigators in the United
9    States.  As outlined in the attached warrant application, Google is not being asked to conduct a search of
10   the information for evidence of the specified federal offenses. *Compare* Warrant Attachment B.I
11   (describing the materials Google is required to disclose), *with* Warrant Attachment B.II (describing the
12   information the government may search for and seize).  Rather, the search of the disclosed information is
13   conducted by the government in the United States. *See In re Warrant*, 15 Supp. 3d at 473 ("in the
14   context of digital information, 'a search occurs when information from or about the data is exposed
15   to possible human observation, such as when it appears on a screen, rather than when it is copied by
16   the hard drive or processed by the computer.'") (citing Orin S. Kerr, *Searches and Seizures in a Digital
17   World,* 119 Harv. L. Rev. 531, 551 (2005)).  This two-step approach – first the disclosure of information
18   by a provider, and second, its search by law enforcement – reflects the fact that Google is simply a
19   custodian of certain information the court has determined should ultimately be searched by law
20   enforcement for evidence of crime. *See In the Matter of the Search of Information Associated with
21   [redacted]@mac.com that is Stored at Premises Controlled by Apple, Inc.*, 13 F. Supp. 3d 157 (D.D.C.
22   2014) (approving of the two-step approach to e-mail search warrants because "[e]nlisting a service
23   provider to execute the search warrant could also present nettlesome problems"); *In the Matter of a
24   Warrant for All Content & Other Info. Associated with the E-mail Account xxxxxxx gmail.com Maintained
25   at Premises Controlled By Google, Inc.*, 33 F. Supp. 3d 386, 395 (S.D.N.Y. 2014), as amended (Aug. 7,
26   2014) (approving of two-step process in part because "[p]lacing the responsibility for performing these
27   searches on the e-mail host would also put the host's employees in the position of appearing to act as
28   agents of the Government vis-à-vis their customers").  In fact, Google has expressed a preference for this

U.S. OPP. AND MOT. TO SHOW CAUSE

1   procedure. *In re Search of Google E-mail Accounts*, 99 F.Supp. 3d 992 (D. Alaska 2015) (sustaining

2   Google's objection that it be required under a warrant to search for "communications with a minor, a

3   person purporting to be or have access to a minor or which otherwise related to the 'enticement of a minor

4   to engage in sexual activity for which any person can be charged with a criminal offense'" on the grounds

5   that it was not competent to do so).

6         The role of the provider in disclosing the information to be searched is precisely like the role of

7   any party compelled to produce information.   Contrary to the *Microsoft* court's assertion, persons

8   compelled to testify or produce documents are not deemed to be agents of the government simply because

9   they are compelled to produce information. *See, e.g., United States v. Miller*, 425 U.S. 435, 443-44 (1976)

10   (finding that bank responding to subpoena for bank records is not an agent for the government, and

11   applying the "general rule that the issuance of a subpoena to a third party to obtain the records of that

12   party does not violate the rights of a defendant, even if a criminal prosecution is contemplated at the time

13   . . . the subpoena is issued"). Furthermore, the notion that email providers are just "caretakers" of certain

14   information for which there is a protectable privacy interest is inapposite because, as discussed above,

15   *supra p. 16*, the procedures followed here under the SCA meet the Fourth Amendment's reasonableness

16   requirement.

17         Finally, and importantly, the Second Circuit's application of the presumption against

18   extraterritoriality is inconsistent with the very interest that the presumption is meant to serve. As stated

19   by the Supreme Court, the "presumption [against extraterritoriality] 'serves to protect against unintended

20   clashes between our laws and those of other nations which could result in international discord.'" *Kiobel*

21   *v. Royal Dutch Petroleum*, 133 S. Ct. 1659, 1664 (2013) (citing *EEOC v. Arabian American Oil Co.*,

22   499 U.S. 244, 248 (1991)).  However, concerns over "international discord" are mitigated by the fact

23   that, as set forth in the next subsection, the United States and 48 other countries have concluded, in

24   connection with the Council of Europe Convention on Cybercrime treaty (the "Cybercrime Convention"

25   or "Convention"), that compelling a person or entity located domestically to produce data that is in its

26   control or custody, regardless of location, is a domestic exercise of power.

27

28

3. **Congress Has Taken Unequivocal Action Confirming That It Believes The SCA Requires Disclosure of Information, Even If Stored Abroad.**

Action taken by Congress since it enacted the SCA further confirms that Congress intended to require providers in the United States to disclose information stored elsewhere to United States authorities. In 2006, the Senate ratified the Cybercrime Convention, the leading international treaty concerning combatting cybercrime and the collection of electronic evidence. Article 18 of the Cybercrime Convention requires its signatories to "adopt such legislative and other measures as may be necessary to empower its competent authorities to order . . . a person in its territory to submit specified computer data in that person's possession or control, which is stored in a computer system or a computer-data storage medium[.]" Cybercrime Convention, Art. 18.1.a.[8]

The Department of State's interpretation of Article 18, as presented to Congress, was that under subsection (a), a "person" includes a "third party custodian of data, such as an ISP." *See Letter of Submittal* at XV ("Under Article 18 authorities must be able to order a person, *including third party custodian of data, such as an ISP* [meaning "internet service provider"], to produce data, including subscriber information, that is in that person's possession or control.") (emphasis added); *see also Abbott v. Abbott*, 560 U.S. 1, 15 (2010) (referring to the "well established canon of deference" to the "Executive Branch's interpretation of a treaty") (relying on *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 185 (1982)); *see also* Explanatory Report ¶ 26 (noting that the "term 'service provider' encompasses a broad category of *persons* that play a particular that play a particular rule with regard to communication or processing data on computer systems") (emphasis added). Significantly, this provision focuses its territorial limit, "in [the compelling authority's] territory," on the location of the person being ordered, not on the location of the system or storage medium. Further, the official Explanatory Report transmitted to the Senate noted that the use of the term "possession or control" as used in paragraph 1(a) of Article 18

---

[8]  In ratifying the Cybercrime Convention, the United States Senate was asked to provide advice and consent on a multilateral treaty outlining, *inter alia*, requirements for its signatories "to have the ability to investigate computer-related crime effectively and to obtain electronic evidence in all types of criminal investigations and proceedings." *See Letter of Transmittal to Senate from the President* ("Letter of Transmittal") at III, Treaty Doc. 108-11. The signed treaty was submitted to the Senate by then-president George W. Bush accompanied by a letter of submittal from the Department of State, signed by Colin L. Powell, along with its "official Explanatory Report, which was also adopted by the [Council of Europe's] Committee of Ministers on November 8, 2001." *See Letter of Submittal to Senate from the Department of State* ("Letter of Submittal") at V, Treaty Doc. 108-11.

1    of the Cybercrime Convention "refers to physical possession of the data concerned in the ordering Party's

2    territory, *and situations* in which the data to be produced *is outside of the person's physical possession*

3    *but the person can nonetheless freely control production of the data from within the ordering Party's*

4    *territory . . . ."* *See* Explanatory Report ¶ 173 (emphasis added); *see also* Letter of Submittal at V

5    (specifically referencing the "official Explanatory Report" for review by the Senate). Simply stated, all

6    of the signatories to the Cybercrime Convention – including the United States – view the production of

7    data stored abroad, but controllable and accessible from within the signatories' borders, as a domestic act,

8    and require that domestic legislation exist to ensure each signatory has such power.

9           When it ratified the Convention, the Senate agreed with the President, the Department of State,

10   and the Department of Justice that federal statutes governing the collection of electronic data – *i.e.,* the

11   SCA – already provided the power required under Article 18. *See* Letter of Transmittal at III (with

12   certain reservations and declarations not including Article 18, the Cybercrime Treaty "would not require

13   implementing legislation for the United States"); Letter of Submittal at VI ("The Convention would not

14   require implementing legislation for the United States."); S. Hrg. 108-721 at 9 (testimony of Samuel M.

15   Witten, Deputy Legal Advisor, U.S. Department of State, before the Senate Committee on Foreign

16   Relations that "[t]he Convention would not require implementing legislation for the United States") *and*

17   27 (testimony of Bruce Swartz, Deputy Assistant Attorney General, Criminal Division, U.S. Department

18   of Justice, that "the Convention will be implemented in the United States under our existing statutes").

19   The Senate Committee on Foreign Relations report specifically notes that Articles 16 through 21 of the

20   Convention require parties to have the ability to "preserve, search, and seize stored computer data" and

21   conclude that "[i]t bears emphasis that all of these investigative tools *are already provided for under*

22   *U.S. domestic law." Senate Executive Report* 109-6 (emphasis added).

23          The Cybercrime Convention was ratified in 2006,[9] which was well after not only the original

24   enactment of the SCA in 1986, but also its substantial modification in 2001, when Congress deliberately

25   broadened the jurisdiction of courts to issue warrants so that it includes information outside the

26   _____

27          [9]  Indeed, the recency of the Cybercrime Treaty and the resulting view that the SCA need not be
     amended in order for the United States to fulfill its obligations under it mitigates the *Microsoft* court's
28   concern that the Act was passed "almost thirty years ago" and that the "technological context" was very
     different back then. *Microsoft,* 829 F.3d at 205-06.

1   jurisdiction of the issuing court (as discussed above).  Congress plainly saw no need to amend the Act or

2   create new legislation to meet the Convention obligations described above.  Moreover, Congress has

3   since revisited the SCA to amend it in related ways, but still has not concluded it was necessary to add

4   any new language or provisions to empower courts to compel the disclosure of foreign-stored data from

5   domestic providers as required by Article 18. *See* 123 Stat. 2086 (enacting the Foreign Evidence

6   Request Efficiency Act of 2009, which made certain amendments to the SCA designed to address

7   requests by foreign law enforcement with respect to foreign criminal investigations).

8         Accordingly, there now have been two occasions – first when the Senate ratified the Cybercrime

9   Convention, and then when Congress enacted subsequent amendments to the SCA – on which Congress

10  has acted in a manner consistent with its view that the SCA already gives courts the power to require

11  U.S. service providers to disclose information, pursuant to a warrant, in their possession or control,

12  regardless of from where the data must be gathered.  This is further and powerful indication that the

13  SCA must be read to authorize the production of information domestically, even if stored remotely

14  abroad.  Where Congress interprets a prior enactment in the context of the "proceed[ing] formally

15  through the legislative process," that interpretation is entitled to "great weight in statutory construction."

16  *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 118 n.13 (1980) (explaining *Red*

17  *Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 380–81 (1969)); *Commodity Futures Trading Comm'n v.*

18  *Schor*, 478 U.S. 833, 846 (1986) ("It is well established that when Congress revisits a statute giving rise

19  to a longstanding administrative interpretation without pertinent change, the 'congressional failure to

20  revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one

21  intended by Congress.") (quoting *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 274-75 (1974)); *see also*

22  *Bell v. New Jersey*, 461 U.S. 773, 784-85 (1983) ("Of course, the view of a later Congress does not

23  establish definitively the meaning of an earlier enactment, but it does have persuasive value.").

24  III.   GOOGLE FAILED TO COMPLY WITH THE COURT'S ORDER TO PRODUCE THE
         MATERIALS FORTHWITH, AND SHOULD BE HELD IN CONTEMPT ON THAT BASIS
25       ALONE

26
        Google did not produce data in a timely fashion, did not move to quash the warrant until five
27
28  months after service of the warrant, and simply elected on its own to ignore the scope of the Court's

U.S. OPP. AND MOT. TO SHOW CAUSE

1   Order. Its motion to quash the warrant is both untimely and unsubstantiated. For these reasons, this

2   Court should order Google to comply with the search warrant order immediately, and issue an order to

3   show cause for why Google should not be held in contempt.

4       Google was properly served a search warrant on July 6, 2016. Production of the data was to be

5   done by Google "FORTHWITH," according to the Attachments to the Court's Order. Procedurally, if

6   Google wished to challenge production of certain data, then it should have moved to quash the warrant

7   upon receipt of the warrant. If Google was following the *Microsoft* litigation, it would have known that

8   was the procedure Microsoft followed in the Southern District of New York. *Microsoft*, at 200-01

9   (describing procedural history and that Microsoft moved to quash the warrant in a timely fashion).

10  Here, Google has defaulted in making an appropriate production by severely delaying production, and

11  by ignoring the explicit terms of the search warrant issued by this Court. If Google believed that it was

12  not required to produce all of the data called for by the search warrant, then it should have timely

13  petitioned the Court. Google should be ordered to immediately produce the data at issue, and should be

14  held to answer in a contempt proceeding regardless of whether this Court were to adopt the reasoning of

15  the Second Circuit or not.

16      Google now – five months later and following two partial productions – asserts that the Court's

17  Order was overbroad, insufficiently particular, and that probable cause did not exist. Those are

18  judgments reserved for this Honorable Court, not a private citizen or corporation. In any event, Google

19  did not challenge the execution of the warrant in a timely manner. In the event of an improperly issued

20  search warrant or an improperly executed search warrant, the remedy is a subsequent challenge to the

21  admissibility of the evidence obtained by a criminal defendant. The subject of the search warrant –

22  Google – did not move the Court to quash until five months later and following two incomplete

23  productions of data. If this Court's Order was illegal from its inception, as Google now concludes, then

24  Google should have petitioned the Court rather than making incomplete productions pursuant to an

25  Order it deemed unlawful. This conduct, especially in light of Google's prior conduct, should obviously

26  be deemed a contempt of court because Google decided to *sua sponte* ignore the Court's explicit Order

27  rather than petition the Court to modify or alter the Order in a timely manner.

28      The Second Circuit's decision in *Microsoft* is not binding in the Ninth Circuit. This Court's

1  Order issued prior to that decision, which was announced on the date called for of execution of the

2  warrant in this case.  And yet there was no motion to quash by Google until five months later.  If Google

3  had previously intended to comply in a timely manner, then it necessarily would have collected the data

4  – likely collecting it within the United States – to make the production.  If the data was present in the

5  United States on the date of the issuance of the Second Circuit's opinion, or at any point during the

6  pendency of the warrant, then there this Court need not reach whether the warrant applied to

7  extraterritorial data.  The production should have occurred.  If Google did not act to gather the data in an

8  effort to comply with the search warrant in a timely manner, then it clearly had no intention of

9  complying with the Court's Order.  If so, the late and incomplete production as well as the Motion to

10  Quash are simply cover for Google's failure to comply with the warrant on time.

11      A prolonged hearing over whether the Second Circuit was correct is not necessary in this case

12  because Google clearly defied the Court's Order, even if this Court eventually agreed with the Second

13  Circuit.  Google should be ordered to produce the responsive data forthwith and required to appear to

14  show why it should not be held in contempt.  This Court should also hold a hearing to investigate the

15  extent, in this case, to which Google has been acting in compliance with the settlement previously

16  reached between the parties.

**CONCLUSION**

18      In light of all of the foregoing, the United States moves for this Court to (1) order Google to

19  produce the data responsive to the Court's search warrant immediately, (2) issue an Order to Show

20  Cause to Google, and (3) given the nature of the subject matter, order this pleading and its attachments

21  be filed under seal.

U.S. OPP. AND MOT. TO SHOW CAUSE

26

1    Dated: January 13, 2017                        Respectfully submitted,

2

3                                                   BRIAN J. STRETCH
                                                    United States Attorney
4

5                                                   William Frentzen
                                                    Kathryn Haun
6                                                   Merry Jean Chan
                                                    Assistant United States Attorneys
7

8                                                   Andrew S. Pak
                                                    Catherine Alden Pelker
9                                                   Trial Attorneys

10

11            IT IS HEREBY ORDERED, good cause being shown, that this Opposition and Motion to Show

12   Cause, and its attachments, shall be filed under seal until further order of this Court.

13

14

15   Dated:  1/13/2017

16                                                  HON. LAUREL BEELER
                                                    U.S. MAGISTRATE JUDGE
17                                                  NORTHERN DISTRICT OF CALIFORNIA

18

19

20

21

22

23

24

25

26

27

28

U.S. OPP. AND MOT. TO SHOW CAUSE
                                          27