BRIAN J. STRETCH (CABN 163973)
United States Attorney

BARBARA VALLIERE (CABN 147374)
Chief, Criminal Division

WILLIAM FRENTZEN (LABN 24421)
KATHRYN HAUN (DCBN 484131)
MERRY JEAN CHAN (CABN 229254)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone:  (415) 436-6959
    Fax:  (415) 436-7234
    William.Frentzen@usdoj.gov; merry.chan@usdoj.gov

ANDREW S. PAK (NYBN 4463436)
CATHERINE ALDEN PELKER (MD)
Trial Attorneys

    Department of Justice
    Computer Crime & Intellectual Property Section
    1301 New York Avenue, N.W., Suite 600
    Washington, D.C. 20005
    Andrew.Pak@usdoj.gov; Catherine.Pelker@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF CONTENT STORED AT PREMISES CONTROLLED BY GOOGLE INC. AND FURTHER DESCRIBED IN ATTACHMENT A | Case No. 3:16-mc-80263-LB<br><br>REDACTED VERSION OF DOCUMENTS<br><br>ATTACHMENT TO STIPULATION REGARDING REDACTIONS<br><br>(PART 5 of 5) |

FILED

FEB 06 2017

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF CONTENT ▓▓▓▓ STORED AT PREMISES CONTROLLED BY GOOGLE AND AS FURTHER DESCRIBED IN ATTACHMENT A | Case No. 16-mc-80263-LB<br>*SEALED*<br><br>**ORDER RESETTING HEARING** |

The government filed an amended unopposed motion to continue the February 16 hearing to February 21. The court hears civil and miscellaneous motions only on Thursdays and reserves other days for civil trials and settlement conferences. Thus, cases usually are rescheduled only to a different Thursday. That said, the court will reset the hearing to February 21, 2017, at 2:00 p.m., to accommodate the government. The court has a jury trial that day; the hearing will be at the end of the trial day. If the trial shifts, the court will move the hearing time to 9:30 a.m. The government must serve this order on Google by email. The court will serve it too by mail and email (but processing will take a day). The government also lodged supplemental authority today. It must file it. The court never received the government's earlier motion, probably because it is being processed in the clerk's office. The court reiterates its prior order at ECF No. 7: the parties must serve copies by email to avoid delay. The government also must email its proposed orders.

IT IS SO ORDERED.

Dated: February 6, 2017

LAUREL BEELER
United States Magistrate Judge

ORDER — No. 16-mc-80263-LB

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GOOGLE,

        Plaintiff,

v.

GOOGLE,

        Defendant.

Case No. 16-mc-80263-LB
*SEALED*

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on 2/7/2017, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Julie Erin Schwartz
Perkins Coie, LLP
3150 Porter Drive
Palo Alto, CA 94304

William Frentzen
U.S. Attorney's Office, NDCA Gang Strike Force Unit
450 Golden Gate Avenue
San Francisco, CA 94102

Dated: 2/7/2017

Susan Y. Soong
Clerk, United States District Court

By: _____
Roger Moua, Deputy Clerk to the
Honorable LAUREL BEELER

1  Julie E. Schwartz, Bar No. 260624
   JSchwartz@perkinscoie.com
2  PERKINS COIE LLP
   1201 Third Avenue, Suite 4900
3  Seattle, WA 98101-3099
   Telephone: 206.359.8000
4  Facsimile: 206.359.9000

5  Todd M. Hinnen, *pro hac vice*
   THinnen@perkinscoie.com
6  John R. Tyler, *pro hac vice*
   RTyler@perkinscoie.com
7  PERKINS COIE LLP
   1201 Third Ave. Suite 4900
8  Seattle, WA 98101
   Tel.: 206.359.8000
9  Fax: 206.359.9000

10 Attorneys for Google Inc.

11

12                    UNITED STATES DISTRICT COURT

13                   NORTHERN DISTRICT OF CALIFORNIA

14                       SAN FRANCISCO DIVISION

15 In the Matter of the Search of Content          Case No. 3-16-80263
                                  Stored at
16 Premises Controlled by Google Inc. and         **GOOGLE INC.'S REPLY IN SUPPORT OF**
   Further Described in Attachment A               **MOTION TO QUASH OR AMEND**
17                                                 **SEARCH WARRANT AND OPPOSITION**
                                                   **TO MOTION FOR ORDER TO SHOW**
18                                                 **CAUSE**

19                                                 Under Seal

20                                                 Date:    February, 16, 2017
                                                   Time:    10:00 a.m.
21                                                 Judge:   Hon. Laurel Beeler
                                                            U.S. Magistrate Judge
22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ........................................................................................................... 1

II.     REPLY IN SUPPORT OF MOTION TO AMEND OR QUASH SEARCH
        WARRANT ................................................................................................................... 3

        A.    The Court should quash the Warrant to the extent that it does not comply
              with the SCA ..................................................................................................... 3

              1.    The Warrant purports to require Google to produce data in conflict
                    with the SCA as interpreted by the Second Circuit................................... 3

              2.    The warrant seeks data that does not exist or is not adequately
                    described ..................................................................................................... 8

        B.    The Court can decide Google's motion to quash or amend based on the
              undisputed facts already available to it ........................................................... 10

III.    OPPOSITION TO MOTION FOR ORDER TO SHOW CAUSE..................................... 11

        A.    The Court should deny the government's motion for an Order to Show
              Cause ................................................................................................................. 11

              1.    Google promptly began processing the warrant......................................... 12

              2.    Google could not possibly have produced all of the records
                    encompassed in the time frame suggested by the government's
                    opposition ................................................................................................... 12

              3.    Google engaged the government immediately regarding the
                    potential impact of the Second Circuit Decision....................................... 13

              4.    Google undertook a time- and labor-intensive project to develop
                    tooling to process warrants consistent with the law................................... 14

              5.    Google diligently and in good faith sought to comply with the
                    warrant ........................................................................................................ 15

        B.    Google should not be held in contempt because it went above and beyond
              its legal obligations in order to comply with the law and the warrant................. 16

IV.     CONCLUSION ............................................................................................................ 17

# TABLE OF AUTHORITIES

CASES                                                                    PAGE(S)

E.E.O.C. v. Arabian American Oil Co.,
    499 U.S. 244 (1991) ....................................................................3

In re Warrant to Search a Certain E–Mail Account Controlled & Maintained by
    Microsoft Corporation,
    829 F.3d 197 (2d Cir. 2016), reh'g denied en banc, __ F.3d __, 2017 WL
    362765 (2d Cir. Jan. 24, 2017)....................................................1, 3, 4, 5

Microsoft Corp. v. United States,
    No. 14-2985 (2d Cir. Oct. 13, 2016) ..........................................11

Morrison v. Nat'l Australia Bank Ltd.,
    561 U.S. 247 (2010) ................................................................4, 5

STATUTES

18 U.S.C. § 2703 ....................................................................... passim

18 U.S.C. § 2707(e) ....................................................................17

28 U.S.C. § 636 ............................................................................1

SECONDARY SOURCES

Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal
    Investigations, U.S. Department of Justice, Executive Office of the United
    States Attorneys (Aug. 2009) ...................................................5, 7

Orin S. Kerr, A User's Guide to the Stored Communications Act, and a
    Legislator's Guide to Amending It, 72 Geo. Wash. L. Rev. 1208, 1219 (2004) ......................6

OTHER AUTHORITIES

Pub.L. 107-56, Title II, § 220 (Oct. 26, 2001) ...........................................4

Publ. L. 109-177, Title I, § 107(b) (Mar. 9, 2006) .........................................4

Pub.L. 111-79, § 2 (Oct. 19, 2009) ...........................................................4

H.R. Rep. No. 99-647 (1986) ..................................................................5

S. Rep. No. 99-541 (1986) ....................................................................5

The Council of Europe Convention on Cybercrime Treaty, Art. 18(1)(a) ......................6

1

The Council of Europe Convention on Cybercrime Treaty, Art. 18(1)(b) ......................................6

2

The Council of Europe Convention on Cybercrime Treaty, Explanatory Report.......................6, 15

3

*Letter of Submittal to Senate from the Department of State* at XIV, Treaty Doc.

4
    108-11 ............................................................................................................................15

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

    GOOGLE INC.'S REPLY AND
OPPOSITION, CASE NO. 3-16-80263

## I.    INTRODUCTION

The warrant at issue in this matter directed Google to produce data regarding different services for different accounts. Some of the data could not be confirmed to be stored in the United States. Some of the "services" are not in fact services at all. Some of them do not store any data. Some of them were not being used by some of the accounts. And with respect to still other services, it is not clear (and the warrant does not specify) what the government has in mind when the warrant directs Google to produce information regarding them.

In spite of the warrant's deficiencies, Google has sought diligently and in good faith to fulfill it. Google produced responsive information clearly identified by the warrant that Google could confirm was stored in the United States. With regard to the remainder, Google engaged the government to address the overbroad and unclear portions. In addition, Google engaged the government to discuss the implications of the Second Circuit's opinion in *In re Warrant to Search a Certain E–Mail Account Controlled & Maintained by Microsoft Corporation*, 829 F.3d 197 (2d Cir. 2016), *reh'g denied en banc*, __ F.3d __, 2017 WL 362765 (2d Cir. Jan. 24, 2017),[1] shortly after the opinion was handed down, and has maintained open lines of communication ever since.

Google has repeatedly sought to clarify what additional information the government seeks via the warrant and to communicate clearly to the government what, consistent with current law, the warrant can and cannot compel Google to produce. And when it became clear despite Google's efforts that the government would not further clarify what information it sought by the warrant, Google moved to quash the warrant to the extent it applied to information that could not be confirmed to be stored in the U.S., encompassed "services" that did not exist or stored no user information, or identified the information to be seized so vaguely and generally that Google could not discern what was sought. Google's motion to quash was met with the government's request for an order to show cause why Google should not be held in contempt.

---

[1] For clarity, Google refers to the panel holding as "Second Circuit Decision" and the denial of the government's request for rehearing *en banc* as "En Banc Denial."

1    Google moved to quash or amend the search warrant issued in this matter on two discrete

2 legal grounds.  First, Google requested that the Court quash the warrant to the extent it seeks data

3 that cannot be confirmed to be located in the United States because a warrant issued under §

4 2703(a) of the Stored Communications Act cannot compel Google to disclose such information.

5 Second, Google requested that the Court quash or amend the warrant to the extent it purports to

6 direct Google to disclose information from "services" for which Google does not retain any data

7 or where it fails to describe with particularity the information it seeks.

8    The government argues that § 2703 permits it to obtain a warrant that compels Google to

9 disclose data stored outside the United States.  The only federal appellate court (or district court,

10 for that matter) to address the issue held unanimously to the contrary.  *See* Part II.A, *infra*.

11    The government also misapprehends Google's overbreadth argument.  It argues that the

12 warrant cannot be overbroad because the Court issued it.  Neither the Court nor the government

13 are experts regarding Google's services, however.  They cannot have known at the time the

14 warrant was issued that some of the "services" it encompasses are not actually services at all and

15 that Google stores no user information for others. *See* Part II.B, *infra.*

16    The Court should grant Google's motion to quash the warrant.  The warrant cannot

17 compel Google to produce data stored overseas.  The warrant cannot compel Google to produce

18 data that does not exist or that is not particularly described in the warrant.  Google has already

19 produced all other data identified by the warrant.

20    Despite Google's diligence and good faith, the government has moved for an order to

21 show cause why Google should not be held in contempt.  There is no basis for such a motion, and

22 it should be denied.

23

24

25

26

27

28

GOOGLE INC.'S REPLY AND
OPPOSITION, CASE NO. 3-16-80263

II.   **REPLY IN SUPPORT OF MOTION TO AMEND OR QUASH SEARCH WARRANT**

  A. **The Court should quash the Warrant to the extent that it does not comply with the SCA.**

    1. **The Warrant purports to require Google to produce data in conflict with the SCA as interpreted by the Second Circuit.**

  Each of the arguments that the government presents here was presented to the Second Circuit. That court, the only Circuit Court to have ruled on the matter, in a unanimous decision addressed those arguments and rejected them. Second Circuit Decision, 829 F.3d at 201.

  The Second Circuit held that Congress used the term of art "warrant" advisedly to invoke the traditional attributes of a warrant, including its territorial limitations. 829 F.3d at 214. As the panel explained, if Congress intended to say "probable cause order" or "probable cause subpoena," it would have done so; instead, Congress intended to draw a distinction and "[t]he term 'subpoena,' therefore, stands separately in the statute, as in ordinary usage, from the term 'warrant.'" *Id.*; U.S.C. § 2703(c)(2) (listing the information that the government can obtain with a subpoena), § 2703(d) (listing the information the government can obtain with a court order).[2]

  Further, the Second Circuit explained that just because Congress modified the definition of "court of competent jurisdiction" to expand the jurisdiction of courts *within the United States* to issue SCA warrants does not mean that Congress intended for such warrants to compel disclosure of data located *outside the United States*. 829 F.3d at 211. The panel noted that it would be "particularly unlikely that if, Congress intended SCA warrants to apply extraterritorially" it would have done so without at least "address[ing] the subject of conflicts with foreign laws and procedures." *Id.* (quoting *E.E.O.C. v. Arabian American Oil Co.*, 499 U.S.

---

[2] The government takes inconsistent positions throughout its briefing regarding whether an SCA warrant is like a probable cause subpoena, compelling a provider to gather and produce records in its custody or control, or like a traditional warrant, authorizing the government to search Google, with Google "execut[-ing] the search" only for "[f]or logistical reasons that are presumably preferential to Google." *Compare* U.S. Opp. at 3, 10 ("Perhaps, as with a traditional warrant, the government should be tasked to [search Google's network and determine the location of stored data] in executing future warrants."), *with id.* at 15 (a warrant merely authorizes a court to require a provider to disclose documents in its possession), 16 (same). The fact that the government argues both contrary views is indicative of the need for legislative reform. Clearly, the government cannot have it both ways.

1    244, 256 (1991)).  In fact, neither when Congress amended the statute to make search warrants

2    effective outside the district of issuance nor when it amended it on two subsequent occasions did

3    Congress make search warrants effective outside the United States.  *See* Pub.L. 107-56, Title II, §

4    220 (Oct. 26, 2001) (amending the SCA to give SCA warrants effect in districts in the U.S.

5    outside the district of issuance); Publ. L. 109-177, Title I, § 107(b) (Mar. 9, 2006) (amending the

6    SCA but not giving SCA warrants extraterritorial effect); Pub.L. 111-79, § 2 (Oct. 19, 2009)

7    (same).

8         The government contends that in so holding, the Second Circuit ignored the long history

9    of case law holding that the courts had *in personam* powers to compel businesses to disclose

10   documents located overseas.  Opp. at 16.  The government is incorrect.  The Second Circuit

11   explicitly considered and rejected that proposition, holding that there is no basis to invoke case

12   law addressing traditional grand jury and trial subpoenas to address the *warrant* provisions of the

13   SCA, which do not provide such power.  *See* 829 F.3d at 215 ("neither *Marc Rich* nor the statute

14   gives any firm basis for importing the law developed in the subpoena context into the SCA's

15   warrant provisions").  All of the cases cited by the government address subpoenas, not warrants.

16        In light of its determination that a § 2703(a) warrant is indeed a warrant that directs a

17   search and seizure, that at least part of that search and seizure occurs where the documents to be

18   produced are stored, and that if some of the documents to be searched and seized are stored

19   overseas then at least part of the search and seizure takes place outside the United States, the

20   Second Circuit applied the test articulated in *Morrison* to determine whether Congress intended a

21   warrant issued under § 2703 to compel the production of documents stored extraterritorially.  *See*

22   829 F.3d at 221.  Perhaps seeking to avoid the error it had made in *Morrison*,[3] the Second Circuit

23

24   ――――――――――――――
     [3] In *Morrison*, the Supreme Court rebuked the Second Circuit for ignoring the presumption
     against extra-territoriality and instead finding that a statute applied extra-territorially where
     Congress would have wanted it to apply if it had thought about it.  *See Morrison v. Nat'l*
25   *Australia Bank Ltd.*, 561 U.S. 247, 255-57 (2010).  The Supreme Court cautioned the Second
     Circuit against "judicial-speculation-made-law--divining what Congress would have wanted if it
26   had thought of the situation before the court," *id.* at 261, and admonished the Second Circuit that
     the proper role of the courts is to "give the statute the effect its language suggests, however
27   modest that may be; not to extend it to admirable purposes it might be used to achieve," *id.* at
     270.
28

-4-        GOOGLE INC.'S REPLY AND
           OPPOSITION, CASE NO. 3-16-80263

1   held that the "focus" of § 2703 is privacy, and as such, that the locus of the act triggered by a §

2   2703(a) warrant is the location in which the private data is maintained. *Id.* at 218.

3          The government argues that the panel misapplied *Morrison* by interpreting it within the

4   context of the SCA more broadly; in the government's view, although the SCA's focus may be

5   privacy, § 2703's focus is the government's ability to compel disclosure. Opp. at 17-18. As

6   Judge Carney pointed out in her concurrence to the En Banc Denial, however, both from its own

7   structure and content and from its context in an overarching statutory framework, it is clear that

8   2703, too, is concerned with protecting the privacy of electronic communications, specifically

9   against the threat of the government compelling the provider to disclose them. *See* En Banc

10  Denial, 2017 WL 3627065 at *2-3 (Carney, J., concurring in denial of rehearing en banc).

11         This is evident not just from the text of the provision and the statute as a whole, but also

12  from the fact that § 2703 did not create a new authority to compel a business to disclose records;

13  the government already had authority to do so. *See* H.R. Rep. No. 99-647 at 22 (1986) (noting

14  that "there do not appear to be any federal statutes which directly address" limitations on

15  government access to email content). Instead, Congress's purpose in enacting § 2703 was to

16  create a set of Fourth Amendment-like restrictions to protect privacy by *restricting* the

17  government's ability to compel disclosure of data. *See* S. Rep. No. 99-541, at 5 (1986) ("[T]he

18  law must advance with the technology to ensure the continued vitality of the fourth

19  amendment."), *reprinted in* 1986 U.S.C.C.A.N. 3555, 3559. The Second Circuit thus determined

20  that the focus of § 2703, like that of the SCA as a whole, was to protect the privacy of electronic

21  communications. 829 F.3d at 217 ("The overall effect [of § 2703] is the embodiment of an

22  expectation of privacy in those communications, notwithstanding the role of service providers in

23  their transmission and storage, and the imposition of procedural restrictions on the government's

24  (and other third party) access to priority stored communications."). The Department of Justice

25  has recognized this as well. *See Searching and Seizing Computers and Obtaining Electronic*

26  *Evidence in Criminal Investigations*, U.S. Department of Justice, Executive Office of the United

27  States Attorneys at 115 (Aug. 2009) ("The Stored Communications Act . . . sets forth a system of

28  statutory privacy rights for customers and subscribers of computer network service providers.")

1    The government also contends that it makes little sense for the SCA to provide greater

2  privacy protection for records maintained by a provider than those maintained by a user, insofar

3  as the government could issue a subpoena to the account-holder to circumvent the warrant

4  restrictions.  Opp. at 16.  Contrary to the government's assertion, Congress designed a framework

5  of privacy protections that required the government to make a higher showing to obtain records

6  from a provider with no notice to the user and a lower showing where the user received notice

7  and had an opportunity to object.  *See* Orin S. Kerr, *A User's Guide to the Stored*

8  *Communications Act, and a Legislator's Guide to Amending It*, 72 Geo. Wash. L. Rev. 1208,

9  1219 (2004).  In fact, Congress expressly did precisely that in § 2703(b) (permitting disclosure of

10  certain records with a subpoena with prior notice to the user, or a warrant).

11    The government next argues that the Senate's ratification of the Council of Europe

12  Convention on Cybercrime suggests that the Senate understands the SCA to permit the

13  government to use search warrants issued pursuant to § 2703(a) to compel providers to disclose

14  content stored outside the United States.  Opp. at 22.  Assuming for the sake of argument that

15  Congress's intent in enacting the SCA in 1986 can be inferred from its ratification of the COE

16  Cybercrime Convention in 2006,[4] nowhere in the hundreds of pages of materials regarding the

17

18  [4] In fact, there is plenty of reason to be skeptical of both the government's argument that the
Court should draw such an inference, and the government's interpretation of the Convention.
19  Although the authorities cited by the government say that the Executive's interpretation of a
treaty is owed deference, Opp. at 22, and that Congress's accession to an established
20  *administrative interpretation of a statute* sheds light on Congress's understanding *of that statute*,
Opp. at 24, the government cites no authority for the dubious proposition that Congress's
21  understanding of a statute can be inferred from its subsequent ratification of a treaty.  Nor does
the Convention or its supporting materials suggest that a State must be able to compel a *provider*
22  to produce *communications content* stored overseas.  To the contrary, the provision the
government cites by its terms, and according to the Explanatory Report, does not even apply to
23  providers and the neighboring provision that does apply to providers only requires States to be
able to compel them to produce basic subscriber information.  *Compare* Art. 18(1)(a) (addressing
24  the issuance of a production order to "a person") *with* Art. 18(1)(b) (addressing the issuance of a
production order to "a service provider," and limiting production orders directed to providers to
25  "subscriber information"); Explanatory Report ¶ 173 (drawing the same distinction, and
suggesting that the "person" covered by paragraph 1(a) is the user or account-holder).  No canon
26  of interpretation endorses the government's attempt to interpret a statute through a subsequent
treaty and even if such a canon existed the treaty in question does not indicate that an SCA
27  warrant can compel a service provider to produce communications content stored outside the
United States; if anything it indicates the opposite.

28

GOOGLE INC.'S REPLY AND
OPPOSITION, CASE NO. 3-16-80263

1    Senate's ratification of the Convention is there any indication that the Senate specifically

2    considered, let alone expressed a view regarding whether a warrant issued under § 2703 could

3    compel a provider to produce records stored overseas.

4          Finally, the government argues that because Google did not move to quash prior to the

5    compliance deadline (which coincided with the date of the opinion), the reasoning of the Second

6    Circuit Decision somehow doesn't apply. Opp. at 25. This is wrong as a matter of law and

7    ignores the facts. First, the timing of Google's motion has no bearing on whether the SCA

8    permits the government to use a warrant to compel disclosure of data located outside the US;

9    either it does, or it does not.[5] The Second Circuit decision means that, under these facts, the

10   warrant simply has no effect with respect to records stored outside the United States.

11         Moreover, Google followed the well-established practice of communicating with the

12   government regarding the enforcement of legal process,[6] and engaged the U.S. Department of

13   Justice's Computer Crime & Intellectual Property Section, the government's national coordinator

14   and center of expertise regarding the SCA, as soon as the Second Circuit Decision issued. *See*

15   Senese Decl., ¶ 4. Google and its counsel also engaged with the government regarding the

16   warrant, its breadth and complexity, and the impact of the decision on compliance with the

17   warrant (indeed, the case agent acknowledged in writing that he understood that the warrant

18   "requested a large volume of information from Google, and that it would take time to gather and

19   produce the records"). Declaration of Erica Furer in Support of Reply Brief ("Furer Decl.), ¶ 29,

20   Ex. B. Only after that preferred path was exhausted, and the government made clear it had no

21   interest in further discussing the matter, did Google take the initiative and file this motion to

22   quash the warrant. Creating a rule that a provider must file a motion to quash before engaging in

23

24   _____

25   [5] The same is true with respect to whether the warrant is overbroad.

26   [6] *See Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal
     Investigations*, U.S. Department of Justice, Executive Office of the United States Attorneys at 139
27   (Aug. 2009) ("Law enforcement officials who procure records under the SCA quickly learn the
     importance of communicating with network service providers. Communication is necessary
28   because every network provider works differently.")

1    such discussions with the government would have significant, and negative, impacts upon judicial

2    efficiency, and would also be unnecessary in the vast majority of cases.

3            2.      **The warrant seeks data that does not exist or is not adequately**
                     **described.**
4

5            The warrant directs Google to produce data associated with "services" that either do not

6    exist or which contain no data.  It directs Google to produce data from accounts for services that

7    were not even used by those accounts.  As an example, the warrant sought Location History for

8    all        accounts and yet only        of the accounts had Location History data,[7]  It also directs

9    Google to produce records for services for which there is no discrete set of customer records;

10   simply naming such services and directing Google to produce any and all records relating to them

11   therefore does not particularly describe the records to be seized.  Google cannot identify the

12   records sought with respect to such services without more specific guidance.  Because the

13   government had not consulted with Google prior to obtaining the warrant (contrary to DOJ

14   guidance) and appears to have used a boilerplate list of services rather than identifying those

15   relevant to its investigation, Google faced at least the following challenges in processing the

16   warrant:

| Service Listed in Warrant | Obstacle to Production |
|---|---|
|  | No longer a Google service |
|  | Not a Google service that contains data but rather a reference to an account being a Google Apps for Work account |
|  | Not a Google service that contains data |
|  | Not a Google service that contains data |
|  | No discrete data set |

[7] Because the government can issue subpoenas that ask for a list of services used by an account, it can use the results to appropriately tailor a warrant to seek only services actually used by the accounts in question.

| Service Listed in Warrant | Obstacle to Production |
|---|---|
|  | No discrete data set; Google needs additional parameters to locate data |
|  | No discrete data set; Google needs additional parameters to locate data stored in a variety of different systems |
|  | No discrete data set; Google needs additional parameters to locate data |
|  | No discrete data set; Google needs additional parameters to locate data |
|  | No discrete data set; Google needs additional parameters to locate data |
|  | No discrete data set; Google needs additional parameters to locate data |

The government cannot have had reason to believe that records regarding these "services" would contain evidence of a crime. The government also applied for a warrant directing Google to produce "any and all content" associated with Google Maps[8] and Google Analytics, without providing information sufficient to identify such content, thus failing to identify the things to be seized with particularity.[9] Many of the accounts did not even use the services the warrant

[8] The government's opposition provides greater clarity on the information they seek from Maps. Assuming the affidavit established probable cause for this data, this is precisely the detail that should have been in the warrant itself, to permit Google to conduct a search. Without it, Google was unable to conduct a search.

[9] Law enforcement often lacks the specific information Google needs to be able to conduct a search of such services. Such information is often contained in the records produced regarding other services, however. These services generally involve notifications that would appear in the email account, and may also involve links that are often shared via the associated email. If, in this case, the government would have submitted an initial warrant for records relating to other services and reviewed the "considerable" amount of data produced as a result, it could then have described with particularity any specific records associated with Analytics, Maps, Sync or Webmaster Tools it thought might contain evidence of a crime. Google respectfully submits that this two-step process better comports with the Fourth Amendment than generally requested "any and all" records relating to such services based on speculation that some of the users targeted may have used them.

1  directed Google to search. Google explained all of this to the government in writing before it

2  filed its motion, but the government ignored Google and refused to discuss Google's concern.

3  *See* Decl. of John R. Tyler in Support of Mot. to Quash ("Tyler Decl."), Ex. D. (November 21,

4  2016 letter to AUSA Frentzen).

5      The government points to the fact that Google did not produce certain Gmail accounts,

6  Photos, attachments, and Calendar content, and argues that Google has no right to question the

7  court's finding of probable cause with respect to that data. Opp. at 4-5. The government is in

8  error. Google did not and does not argue that the government did not demonstrate probable cause

9  that records regarding these services might contain evidence of the crime; as Google explained to

10  the government weeks before filing its motion, and as is clear from the memorandum supporting

11  the motion, to the extent it did not produce such data it is because some of it is outside the United

12  States and some of it cannot be confirmed to be in the United States. *See* Tyler Decl., Ex. D;

13  Google's Memorandum of Points & Authorities at 2 (identifying records not produced because

14  Google could not confirm they were within the United States); *id.* 8 (identifying services with

15  respect to which Google argues there could not have been probable cause). Google questioned

16  the government's showing of probable cause only with respect to the 10 services listed above on

17  the basis that the government clearly did not understand the "services" (some of which are not

18  services at all) or what user records they might (or might not) contain.[10]

19  **B.    The Court can decide Google's motion to quash or amend based on the
        undisputed facts already available to it.**

20

21      The Court can resolve Google's motion to quash based on the record before it. The

22  government obtained a warrant for a large volume of data (*see* Opp. at 3), some of which was

23  insufficiently described. Before Google could process the warrant, a federal Circuit Court issued

24  a landmark opinion that an SCA warrant cannot compel a provider to produce records stored

25

26  [10] Google of course has no visibility into the probable cause showing. But it is clear from what
    Google can see that there was a deficiency of probable cause at least with regard to the demands
27  Google search services that users never used, that are not services at all, or are services that
    contain no user data to search.

28

-10-        GOOGLE INC.'S REPLY AND
            OPPOSITION, CASE NO. 3-16-80263

1    outside the United States. *See* Second Circuit Decision, 829 F.3d 197; Delaney Decl., ¶ 8.

2    Neither the Ninth Circuit nor any other federal court has ruled to the contrary. The government

3    has asserted and relied on in other litigation (without any hearing) upon the very facts it here

4    argues it needs a hearing to explore. *See* Pet. of the United States for Rehr'g and Rehr'g En Banc

5    at 3-4, *Microsoft Corp. v. United States*, No. 14-2985 (2d Cir. Oct. 13, 2016) (" En Banc

6    Petition") (describing the policy impact of the Second Circuit Decision as applied to Google's

7    network and arguing that this impact should provide a basis for rehearing en banc).

8         Google has made a clear and consistent record of what data requested by the warrant is

9    outside the United States, and therefore was not produced. *See* Tyler Decl., Ex. D.

10        Google has also argued that the warrant is overbroad, lacks particularity, or cannot have

11   been supported by probable cause with respect to some "services" because those services no

12   longer exist, are not in fact services, were not used by the accounts identified in the warrant, or do

13   not contain user data. Google has made a clear and consistent record of the "services" with

14   respect to which it has made these arguments. *See* Tyler Decl., Ex. D.

15        The government does not contest this factual record. The Court has before it all of the

16   facts it needs to rule on the legal issues raised by Google's motion, and it should decide the

17   motion on that basis.

18   **III.    OPPOSITION TO MOTION FOR ORDER TO SHOW CAUSE**

19        The government has also moved for an order to show cause and asked that the Court hold

20   Google in contempt. The government's motion is baseless, and should be denied.

21        **A.    The Court should deny the government's motion for an Order to Show**
                  **Cause.**
22

23        Only now that it is incumbent upon the government to oppose Google's Motion to Quash

24   has the government claimed that Google should be held in contempt. The government made no

25   such request when Google made its production, when Google notified the government that

26   consistent with the Second Circuit Decision it would not produce records stored outside the

27   United States, or when Google made its supplemental production. It made no such request when

28   Google clarified what had been produced and what was outside the scope of the warrant, or when

---

-11-        GOOGLE INC.'S REPLY AND
            OPPOSITION, CASE NO. 3-16-80263

1  Google tried to engage the government in constructive dialogue about what further the
2  government thought the warrant required Google to produce. The Court should be skeptical of a
3  request to hold Google in contempt precipitated by Google filing a legal challenge to the
4  government's warrant. In fact, the government's motion for an order to show cause is baseless.

5      Google labored diligently and in good faith to comply with the warrant and the laws
6  governing it and communicated openly and frequently with the government regarding its efforts
7  (often despite the lack of a response from the government). The Court should deny the
8  government's motion for an order to show cause why Google should not be held in contempt.[11]

9          **1.  Google promptly began processing the warrant.**

10     Google's records show that the warrant was not sent when it was issued on June 30, but
11  was instead sent via email several days later during a 4-day holiday weekend, without any prior
12  notice or indication of priority or urgency. Furer Decl., ¶ 18. During that holiday weekend,
13  Google received over 1,500 other demands for information. Furer Decl., ¶ 19. Google
14  nevertheless began working on the warrant the first business day after it was received. *Id*, ¶ 24.

15          **2.  Google could not possibly have produced all of the records
16              encompassed in the time frame suggested by the government's
                opposition.**

17     The warrant requested records for each of ☐ "services" for ☐ separate accounts. Furer
18  Decl., ¶¶ 20-21. Given the volume and diversity of records sought, Google could not possibly
19  have produced all of the records encompassed by it even if the Second Circuit Decision had not
20  intervened. *Id*. Even without such complications, it would have taken Google several weeks or
21  more to complete the production in response to this burdensome warrant. *Id*. Indeed, while
22  Google has a data export tool to produce data for certain services, this warrant listed services that
23

24  _____
    [11] The Court should also ignore the government's improper reference to, and mischaracterization
25  of, a 2014 stipulated order to resolve a prior motion in separate and unrelated litigation. The
    stipulation by its terms "pertains only to the March subpoena, the April warrant, and the May
26  warrant" that were at issue in that case. Opp., Ex. A at ¶ 32. It is not a "settlement," imposes no
    injunctive or prospective obligations on Google, imposes no obligation on Google to "act[ ] in
27  compliance" with it, Opp. at 26, and is not enforceable by the Court. Accordingly, the Court
    should deny the government's improper request to hold a hearing to "investigate" whether Google
28  has been acting in compliance with that stipulation.

1    required the assistance of product specialists to develop manual, individualized means of

2    identifying and exporting data. *Id.*, ¶ 20-23; Declaration of Emily Guy in Support of Google's

3    Reply and Opposition ("Guy Decl."), ¶ 6. The warrant was routed to and reviewed by multiple

4    specialists on July 9th and July 12th, Furer Decl., ¶ 24, but the laborious, time-consuming task of

5    fulfilling it was halted July 14, 2016 , when Google paused efforts to fulfill search warrants

6    because with its existing tools Google could not ensure that productions would be consistent with

7    the Second Circuit Decision. *Id.*, ¶¶ 12, 24.

8                    **3.    Google engaged the government immediately regarding the potential
                             impact of the Second Circuit Decision.**
9

10          Google was in touch with the Department of Justice about the concerns raised by the

11    Second Circuit Decision from the day the opinion was issued, and has gone to substantial lengths

12    to both keep the government informed about the technological hurdles and to develop tools to

13    permit its compliance unit to function consistent with the SCA. Declaration of Acadia Senese in

14    Support of Google's Reply and Opposition ("Senese Decl."), ¶¶ 4-7; Hinnen Decl., ¶ 3. Indeed,

15    on July 14, Google's in house counsel discussed the impact of the case in a meeting with

16    attorneys at the Office of International Affairs ("OIA") and the Computer Crime and Intellectual

17    Property Section of the Department of Justice ("CCIPS"). Senese Decl., ¶ 4. Starting the

18    following week, multiple in house Google attorneys, as well as Google's outside counsel, began

19    discussions with OIA and CCIPS about Google's network, the impact of the opinion on Google's

20    compliance capabilities, and tooling being developed by Google to address the Second Circuit

21    Decision. Hinnen Decl., ¶ 3. During these discussions, the Department and Google have

22    expressed a mutual preference to resolve issues raised by the Second Circuit Decision through

23    dialogue rather than litigation wherever possible. *Id.*

24          Google discussed these issues with the Department not simply as a courtesy, but because

25    Google faced a litany of pending requests impacted by the Second Circuit Decision. Furer Decl.,

26    ¶¶ 14, 19. Communications with the Department was thus the most efficient way to address the

27    issue. *See* Furer Decl., ¶ 19; Senese Decl., ¶¶ 5-6. The government thereafter relied in other

28

1    cases on the fact that the Second Circuit Decision substantially impacts Google's compliance

2    functions.  *See* En Banc Petition at 3-4.

3                    4.      **Google undertook a time- and labor-intensive project to develop**
                            **tooling to process warrants consistent with the law.**
4

5            Google has also undertaken substantial efforts to develop tooling to address the Second

6    Circuit Decision.  Guy Decl., ¶¶ 12; 22-23 .  Prior to the Second Circuit Decision, the tools and

7    systems used by Google to store data had no reason to report the physical location of that data on

8    Google's network, and many of them did not.  *Id.*, ¶ 7.  Necessarily, then, Google had a limited

9    capability to filter data based on the location of that data, and therefore lacked capability to

10   produce data in response to search warrants in a manner consistent with the Second Circuit

11   Decision.  Furer Decl., ¶ 12.  Immediately after the decision, however, Google began a

12   significant, high priority effort to identify all sources of data for Google services sought through

13   legal process, in order to a) determine which ones lacked a location-reporting capability, and b)

14   for those services, develop solutions that would permit Google to identify whether the data is

15   stored in the US at the time it is being requested, and to export only that data stored in the US.

16   *Id.*, ¶¶ 8-10.

17           Google employees began this effort by identifying the data source for each product, to

18   ascertain whether Google could filter and produce only that data located in the United States (to

19   ensure compliance with the Second Circuit Decision).  Guy Decl., ¶¶ 8-10.  This initial

20   assessment revealed that for some services, Google could conduct a time consuming manual

21   query to identify the location of the data, and produce that which is reported as being stored in the

22   United States.  Guy Decl., ¶¶ 14-15; Furer Decl., ¶¶ 20-23.  This was an impractical short-term

23   solution for some services.  Guy Decl., ¶¶ 14-15; Furer Decl., ¶¶ 14-16.

24           Concurrently, Google product engineers launched an effort to find a longer-term solution,

25   in which Google would develop and implement code that would permit the various sources of

26   data for each relevant service to report on the location of that data.  Guy Decl., ¶¶ 16-19.  Then,

27   Google needed to develop product-specific export functionality that would permit Google to

28   export data based on the location of the data source, test that functionality in a secure

1   environment to identify flaws while protecting the integrity of its data, and then properly train

2   compliance personnel before deployment. *Id.*, ¶¶ 20-21.

3        Despite the fact that Google has no independent business need for such export filtering

4   capabilities, this project was given urgent priority at the expense of other important business

5   projects. Guy Decl., ¶¶ 12, 22-23 . It has required coordination across dozens of independent,

6   separate product teams and hundreds of employees, collectively costing more than an estimated

7   4500 employee-hours to date. *Id.*, ¶¶ 11-12, 23. And even after a filtering solution is complete,

8   Google has completed its solutions for several products (such as YouTube and Drive), and

9   continues to develop solutions that it expects to be complete this year. *Id.*, ¶ 22.

10       Notably, the authorities provided by the government in support of its own position

11  demonstrate that Google's efforts have gone above and beyond what it is required to do.   The

12  State Department's Cybercrime Convention submittal letter and explanatory statement -- which

13  the government argues reflect Congress's view of what the SCA does and does not require --

14  expressly state that providers such as Google have "no obligation" to "obtain or deploy new

15  equipment or engage in costly reconfiguration of their systems in order to assist law

16  enforcement." *Letter of Submittal to Senate from the Department of State* ("Letter of Submittal")

17  at XIV, Treaty Doc. 108-11; *see also* Explanatory Report, ¶ 221 (same).  Not only does Google's

18  conduct not merit contempt, its efforts to develop capabilities that will enable it to fulfill this and

19  other warrants go far beyond what is required by law and beyond what the government should

20  reasonably have expected.

21       **5.    Google diligently and in good faith sought to comply with the warrant**

22       After Google had developed, implemented, and sufficiently trained its personnel on the

23  short-term solutions to comply with the law, Google began processing search warrants again on

24  August 8, 2016. Furer Decl., 16. That same day, Google contacted the case agent to ask for a

25  date range associated with the request for one of the services listed in the warrant, and suggested

26  a one-week date range. *Id.*, ¶¶ 25-26. The case agent responded positively and said that the

27  government did not require more than the one week of data suggested by Google. *Id.*

28

GOOGLE INC.'S REPLY AND
                   OPPOSITION, CASE NO. 3-16-80263

1    Over the next several weeks, Google began conducting individual, manual searches for

2  data associated with each service identified in the warrant. Furer Decl., ¶¶ 27-28. For some of

3  these services, Google could conduct no search either because the service did not exist, or

4  because the warrant failed to provide sufficient information in order for Google to look for it. *Id.*,

5  21-23. For others, Google needed to engage in a complex series of steps done manually and, on a

6  service-by-service, account-by-account basis. *Id.* Indeed, as a result of this exercise, Google

7  determined that ▮▮▮ Gmail accounts were located outside of the United States. *Id.*, ¶ 27.

8    On September 27, 2016, the case agent contacted Google to acknowledge that the warrant

9  sought a "large volume" of data that would take a long time to compile, and requested that

10  Google send a partial production of responsive information. Furer Decl., ¶ 29, Ex. B.  Google

11  made that partial production the next day. *Id.*, ¶ 30.  These communications reflect common

12  practice and expectations, particularly with respect to extensive warrants such as this one; when

13  the government requires an expedited response, they can tell Google directly, and Google will do

14  its best to do so (as it did here, by sending the partial production).

15    After the case agent followed up to inquire about the impact of the Second Circuit

16  Decision on the production, Google personnel expressly suggested that the government may wish

17  to issue a preservation request. Senese Decl., ¶¶ 8-11.  The government did not issue any

18  preservation requests nor respond to Google's concerns. *Id.*

19    The government also ignores its own delays in this matter.  The prosecutor repeatedly

20  ignored outside counsel for Google, and never even responded to Google's November 21, 2016

21  letter. Senese Decl., ¶ 12; Hinnen Decl., ¶ 5; *see also* Tyler Decl., Ex. D.  Moreover, the

22  government has repeatedly asked for continuances on this proceeding. Hinnen Decl., ¶ 6.

23    **B.**    **Google should not be held in contempt because it went above and beyond its
          legal obligations in order to comply with the law and the warrant.**

24

25    Google acted diligently and in good faith to comply with the warrant consistent with the

26  law, particularly in light of the substantial legal and technical obstacles resulting from the Second

27  Circuit Decision.  The government has provided no legal authority (nor any legal argument)

28  supporting its contempt request, nor has it specified whether it seeks criminal or civil contempt.

1   Either way, given Google's substantial and ongoing good faith efforts to find a workable solution

2   -- none of which Google was required by law to undertake -- there is no basis for an order to

3   show cause or contempt.

4          Indeed, section 2707(e) of the SCA states that a "good faith reliance" on a court warrant

5   or statutory authorization is a complete defense to any criminal or civil claim. 18 U.S.C. §

6   2707(e). Accordingly, unless the government can show that Google acted in "bad faith," Google

7   has a complete defense to any contempt finding. The facts supporting the government's

8   opposition alone show that Google relied in good faith on the warrant and the SCA, as interpreted

9   by subsequent case law, in responding thereto; the facts provided by Google in this reply remove

10  all doubt.

11         Finally, should the court determine an evidentiary hearing is necessary (which it is not),

12  Google requests a full hearing that likewise investigates the government's conduct in this matter.

13  A hearing on Google's conduct only tells half of the story, as Google had been involved in good

14  faith, transparent and amicable discussions with the Department of Justice. Google is also

15  litigating these issues with the government in a civil and non-contentious fashion in other districts

16  throughout the country. The positions taken by the government in its motion for an OSC both

17  conflict with the positions taken by the government elsewhere, and ignore facts already known to

18  the government with respect to Google's efforts.

19  **IV.     CONCLUSION**

20         For the reasons mentioned above, the Court should grant Google's motion. The Court

21  should also deny the government's motion for an Order to Show Cause and deny the

22  government's request for an evidentiary hearing. To the extent the Court believes such hearing is

23  necessary, Google requests that Court conduct a hearing into the government's conduct in this

24  matter as well.[12]

25

26  ─────────────────
    [12] The Court provided Google with the option to decline consent to have this matter heard before
    a Magistrate Judge, consistent with federal law and the local rules. 28 U.S.C. § 636; N.D. Cal.
27  Gen. Order 44. Google has declined consent and requested reassignment to a District Judge,
    likewise consistent with federal law and the local rules, and anticipates that it will be so
28  reassigned. *Id.*

1   DATED:  January 30, 2017           **PERKINS COIE LLP**

2

3                              By: _____
                                   Julie E. Schwartz, Bar No. 260624

4                                  JSchwartz@perkinscoie.com

5                         Attorneys for Google Inc.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

    GOOGLE INC.'S REPLY AND
                                OPPOSITION, CASE NO. 3-16-80263

Julie E. Schwartz, Bar No. 260624
JSchwartz@perkinscoie.com
PERKINS COIE LLP
3150 Porter Drive
Palo Alto, CA 94304-1212
Telephone: 650.838.4300
Facsimile: 650.838.4350

Todd M. Hinnen, *pro hac vice*
THinnen@perkinscoie.com
John R. Tyler, *pro hac vice*
RTyler@perkinscoie.com
PERKINS COIE LLP
1201 Third Ave, Suite 4900
Seattle, WA 98101
Tel.: (206) 359-8000
Fax: (206) 359-9000

Attorneys for Google Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In the Matter of the Search of Content ▆▆▆▆▆▆▆ Stored at Premises Controlled by Google Inc. and Further Described in Attachment A | Case No. 3-16-80263<br><br>**Declaration of Erica Furer in Support of Google Inc.'s Reply In Support of Motion to Quash or Amend Search Warrant and Opposition to Motion for Order to Show Cause**<br><br>Under Seal<br><br>Judge:  Hon. Laurel Beeler, U.S. Magistrate Judge |

-1-

FURER DECLARATION

I, Erica Furer, declare as follows:

1.      I am a Legal Operations Associate, Business Analyst at Google Inc. ("Google"),
where I have been employed for 4.5 years.  My responsibilities include Project Management,
Data Analysis, Operations Planning, and Vision Setting for the teams in the Legal Online
Operations department.

2.      I have reviewed the search warrant issued in this matter and am familiar with the
steps Google has taken to respond to the warrant.  I am also familiar with Google's standard
operating procedures for responding to legal process, and the steps Google has taken to modify its
systems since July 2016 in order to comply with what I understand to be new legal requirements
resulting from the recent decision in *In re Warrant to Search a Certain E–Mail Account
Controlled & Maintained by Microsoft Corporation* ("Second Circuit Decision"), 829 F.3d 197
(2d Cir. 2016).

3.      I am over the age of eighteen and competent to make this declaration.  I make each
of the following statements based on my personal knowledge, and I could, if necessary, testify to
the truth of each of them.

**Background Regarding Google's Legal Investigations Support Team**

4.      Google provides dozens of different services, from search, email, and video, to
business-oriented enterprise services, many of which are detailed online here:
https://www.google.com/intl/en/about/products/.

5.      Google maintains a dedicated team, known as Legal Investigations Support
("LIS"), for responding to legal process issued by law enforcement entities in the United States

-2-

and around the world.  LIS receives tens of thousands of pieces of legal process and requests for assistance on an annual basis.  Google provides specialized training for this team on the work flows and technical tools available to respond to such legal process.

### Responding to Legal Process

6.   LIS uses a data export tool to identify, export, and produce data associated with certain types of Google products in response to legal process.

7.   For services that are not integrated into the data export tool, LIS members must conduct time-consuming manual searches of multiple databases in order to identify and produce responsive data.  First, the LIS member must conduct a search to determine whether a service is even associated with the account at issue.  If so, LIS then must conduct additional searches, often of multiple databases, for responsive data related to that service.  If the warrant seeks records from multiple non-integrated services, LIS must engage in this multi-step manual process for each service for each account identified in the warrant.

8.   This is a complicated, time-consuming process -- in the ordinary course of business, it can take several weeks or more to process a search warrant seeking records from multiple non-integrated services associated with a single account.  Only certain LIS personnel have the expertise to obtain records from non-integrated services.

9.   For certain other products, such as Maps and Analytics, there are many possible sets of data for LIS to search depending on the data requested.  In order to search for data associated with these services, LIS needs to have details regarding the data sought sufficient to permit the relevant product teams and engineers to construct a query to search for the data.  In the

absence of a specific request, with specific identifiers that are meaningful for that product, there is not enough information to permit Google to construct the query.

### The Law Enforcement Request System

10.     Google provides a Law Enforcement Request System ("LERS"), through which law enforcement entities can submit legal process requests electronically. Through this system Google has provided guidance to law enforcement regarding the types of services for which Google is able to produce responsive records, and provides further guidance to law enforcement regarding how to draft warrant language regarding a particular product or service that will allow LIS to conduct an accurate search for potentially responsive data.

11.     The search warrant at issue in this matter was submitted to Google via LERS by an agent with a LERS account who therefore had access to the guidance described above.

### The Second Circuit Decision Substantially Impacted LIS

12.     On July 14, 2016, Google placed a moratorium on the processing of all search warrants, in response to the Second Circuit Decision. I understand that the court's decision in the Second Circuit Decision meant that in order to produce content, Google needed to know that the data sought was stored in the United States. However, based on existing tooling, LIS could not determine the location of responsive data. Until additional tooling was built, our team could not be confident that it could process warrants consistent with newly understood requirements of the law.

13.     Within days of the Second Circuit Decision, LIS became involved in a coordinated, multi-stakeholder, complex engineering effort to develop and implement tooling to

-4-

permit it to process warrants in compliance with such legal requirements. This effort required the cooperation of many different product teams across the entire company. We were told (repeatedly) that this effort was a top priority, and that effective, reliable solutions needed to be developed as soon as possible. The long-term goal of the project (which remains ongoing) is to develop automated tools that permit LIS to filter data based on its location.

14.     In the meantime, LIS (in conjunction with product teams) developed multiple short-term solutions to conduct manual searches of certain products that are most often requested by law enforcement, such as Gmail.

15.     After conducting an initial review, LIS determined that it could – for certain types of data – identify the alphanumeric codes of the datacenters in which the data is stored. LIS then built a translation table to match the alphanumeric code of a datacenter with its geographic location. Once complete, LIS personnel could conduct a manual search for certain types of data to identify the alphanumeric code of the associated datacenter or datacenters. Then, LIS personnel could then enter the datacenter codes into the translation table to determine the country or countries in which the data was stored. LIS could then conduct additional, manual searches to pull data solely from data centers inside the United States.

16.     In early August, as soon as it was able to develop and test tooling and workflow processes for at least some products and services that ensured compliance with the law and to train LIS personnel to implement them, LIS lifted the moratorium on processing search warrants.

17.     However, for some types of data, such as email attachments, our existing solutions still do not permit us to confirm that such data is stored exclusively in the United States. This is because single files may be broken into component parts, and each part may be stored in different

-5-

FURER DECLARATION

locations (and, accordingly, different countries). Google's state-of-the-art intelligent network may also move those component parts from one location on Google's network to another as frequently as needed to optimize for performance, reliability and other efficiencies. As a result, the country or countries in which attachment, Photos, or Drive files (or components thereof) are located may change.

### LIS Response to the Warrant in This Case

18.    On Saturday, July 2, 2016, the search warrant was submitted via LERS. The submission form indicated that the warrant was submitted by Special Agent Michael Delaney of the Federal Bureau of Investigation, and listed an execution deadline of July 14, 2016.

19.    On Monday, July 4th and Tuesday, July 5th Google was closed for business in observance of the Fourth of July holiday. Thus the earliest that an LIS team member could have been assigned and begun working to fulfill the warrant would therefore have been July 6, 2016. On July 6, there were also 1,531 other pieces of legal process demanding user data that had come in over the holiday weekend.

20.    The warrant sought "any and all" records from [redacted] different services associated with [redacted] different accounts. The warrant was promptly assigned to an LIS team member appropriate to handle a warrant of such significant size and complexity. Based on my experience, and absent any complications, I estimate that it would ordinarily take at least two weeks to produce the records requested in the warrant.

21.    The warrant directs Google to produce records for the same list of [redacted] "services" for each of the [redacted] accounts the warrant identifies. Several of the "services" identified in the warrant are not actually services, and the direction to produce user records with respect to them is

-6-

therefore nonsensical. For example, the warrant sought data related to Dasher Policy, Google Apps, and Apps Administrator Control Panel. These are internal identifiers for certain features associated with Google Enterprise accounts ("Enterprise Flags") that simply indicate the availability of certain features within the Enterprise account, but do not relate to any data. Such Enterprise Flags are typically identified in the subscriber information for enterprise accounts. The government may have cut and pasted the Enterprise Flags from a prior production into its list of "services" without understanding what they were. Although they are not associated with consumer accounts, the warrant directs Google to produce records with respect to them for consumer accounts, too.

22.     Several other identified services do not have discrete data sets associated with user accounts. For instance, the warrant sought data associated with Maps, Sync, Webmaster Tools and Analytics, which, as described in paragraph 9 above, do not contain discrete sets of responsive records. In order to produce Maps or Analytics data, Google requires further specificity. Otherwise LIS has insufficient details to create a query for Maps or Analytics data.

23.     The warrant also sought data associated with Google Talk, which is no longer a Google service.

24.     During the week of July 6, 2016, the LIS team member assigned to the warrant routed it to multiple specialists for the products and services identified in the warrant so that they could determine whether, based on the information provided in the warrant, records for their particular product or service could be identified. For example, on July 9, 2016, a YouTube product specialist reviewed the warrant. On July 12, 2016, the warrant re-entered the LIS queue for general processing, only to be put on hold two days later as part of the post-Second Circuit Decision moratorium.

-7-

25.    On August 8, 2016, LIS again began processing the warrant at issue in this case.

26.    Because the warrant sought Location History (which at the time required a manual query), the LIS employee contacted Special Agent Delaney on August 8, 2016, to request a specific date range, which is required to construct a manual query for Location History. Neither LIS, nor to my knowledge anyone else at Google had received any communication from the government regarding the warrant since it was uploaded into LERS on July 2, 2016. Special Agent Delaney responded on August 11, 2016, and provided a one-week date range for Location History. Attached as Exhibit A is a true and correct copy of that correspondence.

27.    From August 8th through September 27, 2016, LIS continued to work diligently through the extraordinary number of record requests in the warrant. LIS had to rely on tools and methods, including manual searches, developed and implemented since the Second Circuit Decision. During this time, the assigned LIS specialist searched for responsive Gmail records by querying the datacenter codes for each account identified in the warrant, and then inputting those codes into the library described in paragraph 15, above. Of the     accounts identified in the warrant,     were stored entirely outside the United States and     was a deleted account. This process itself took substantial time to complete.

28.    For the remainder of the accounts, the LIS specialists conducted additional, manual searches for each service, for each account, with respect to those services for which Google was able to determine the location of records.

29.    On September 27, 2016, Special Agent Delaney sent an email to Google asking for a status update. Except for its response to Google's inquiry about a date range for Location

-8-

History, described in paragraph 26, above, this was the first communication Google received from the government regarding the warrant since it was uploaded to LERS on July 2, 2016. Special Agent Delaney acknowledged that the breadth and complexity of the warrant meant it would take time to process. He wrote, "I realize we requested a large volume of information from Google, and that it would take time to gather and produce the records." Consistent with the generally-accepted practice of practical and collaborative communication between the government and providers regarding the execution of warrants, he asked "if we can arrange of a partial or rolling production of the records[.]" A true and correct copy of that email is attached as Exhibit B.

30.     The next day, in response to Special Agent Delaney's request for a "partial" production, LIS produced the responsive data available to it at that time, in a manner consistent with the Second Circuit Decision.

31.     On October 3, 2016, Special Agent Delaney again emailed Google, asking to discuss Google's production. I understand that my colleague Acadia Senese contacted Special Agent Delaney shortly thereafter, as described in the attached Declaration of Acadia Senese in Support of Google's Reply Brief.

32.     Between November 4 and November 18, 2016, LIS conducted additional manual searches for responsive data, as additional solutions regarding additional products and services became available. On November 18, 2016, LIS provided the government with a supplemental production that included metadata for Photos, as well as files containing the bodies and headers for all emails that contain attachments (but not the attachments themselves).

-9-

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Date: 1/30/2017

Erica Furer

-10-

# EXHIBIT A



# EXHIBIT B



Julie E. Schwartz, Bar No. 260624
JSchwartz@perkinscoie.com
PERKINS COIE LLP
3150 Porter Drive
Palo Alto, CA 94304-1212
Telephone: 650.838.4300
Facsimile: 650.838.4350

Todd M. Hinnen, *pro hac vice*
THinnen@perkinscoie.com
John R. Tyler, *pro hac vice*
RTyler@perkinscoie.com
PERKINS COIE LLP
1201 Third Ave, Suite 4900
Seattle, WA 98101
Tel.: (206) 359-8000
Fax: (206) 359-9000

Attorneys for Google Inc.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In the Matter of the Search of Content ▓▓▓▓▓▓▓ Stored at Premises Controlled by Google Inc. and Further Described in Attachment A | Case No. 3-16-80263 <br><br> **Declaration of Emily Guy in Support of Google Inc.'s Reply In Support of Motion to Quash or Amend Search Warrant and Opposition to Motion for Order to Show Cause** <br><br> Under Seal <br><br> Judge:   Hon. Laurel Beeler, U.S. Magistrate Judge |

-1-

GUY DECLARATION

I, Emily Guy, declare as follows:

1.  I am a Business Systems Analyst for the Legal Works team at Google Inc. ("Google"), where I have been employed for one and a half years.  My responsibilities while working with the Legal Works Team include product management (identify problems and devise solutions), project management (implement the solutions), and production support (responding if and when things break).

2.  I am familiar with Google's tools for exporting data to respond to legal process and with the steps Google has taken to modify those tools in light of the recent decision in *In re Warrant to Search a Certain E–Mail Account Controlled & Maintained by Microsoft Corporation* ("Second Circuit Decision"), 829 F.3d 197 (2d Cir. 2016).

3.  I am over the age of eighteen and competent to make this declaration.  I make each of the following statements based on my personal knowledge, and I could, if necessary, testify to the truth of each of them.

### Background

4.  The Google Legal Investigations Support ("LIS") team is a dedicated team for responding to legal process, including search warrants issued by law enforcement entities in the United States and around the world.

5.  Google offers users dozens of different Internet-based products and services.  Although the storage process may operate differently for different products, Google has generally designed its systems to store the data for its products in locations that maximize efficiency, optimize user experience, and minimize costs.

GUY DECLARATION

<u>**Google's Pre-Second Circuit Decision Tools for Search Warrant Productions**</u>

6.     The LIS team uses a tool that automates for some of its products and services the process of exporting data in response to legal process (the "data export tool"). The data export tool allows the LIS team to identify responsive data from certain Google products, obtain that product data, and prepare it for production. For other, "non-integrated" products, LIS team members have to perform, or request that product engineers perform, manual queries and data exports.

7.     Before July 2016, the data export tool identified and exported responsive product data, regardless of where such data was located, to servers based in the United States. The tool was data location agnostic; it did not identify where on Google's network data was stored, it identified and retrieved it regardless of location. There was no business reason for the export tool to determine the location of data.

<u>**Impact of the Second Circuit Decision**</u>

8.     When the Second Circuit Decision was issued on July 14, 2016, I was tasked with overseeing a process for developing tools that could determine data storage location, and particularly whether data was stored inside or outside of the United States, for many of Google's different products and services.

9.     I immediately worked with my LIS point of contact (POC) and counsel to reach out to the different product engineering teams and identify which of those products held any of their data exclusively outside of the United States. Once we had identified which of those products needed further investigation, my engineers were brought in to meet with each of these product teams to come up with a holistic solution. We were tasked with adapting the data export

-3-

tool to determine the location of responsive data and to enable LIS to obtain and export data stored in the United States.

10.     This meant that we needed to understand, for each product: (1) what data it stored, (2) where it stored that data, and (3) what underlying storage system(s) it used.  We needed to understand how each of these storage systems worked.  We also needed to understand the relationships between products.  Finally, we needed to understand how each integrated product interacted with the data export tool.

11.     Because data location is determined by product teams and the underlying storage systems they use to implement their products, in addition to the engineers tasked with designing the export tools or methods, we had to involve each product team and the storage system teams in developing, implementing and deploying the solution.

### Google's Efforts

12.     This project was prioritized at a "P0" level, meaning it was elevated above all other projects and business priorities.  This meant not only that the engineering team responsible for the data export tool had to put aside its preexisting business priorities, but also that the service system and product teams had to delay several of their business priorities to dedicate engineering resources to this project.

13.     Even though this project required developing and implementing tools and methods that had no value to the product teams themselves, the product and storage service teams prioritized this project above their own plans and goals, and provided significant engineering resources over a period of months to support the project.  This level of commitment from this many teams was only possible because of the clear message from high-ranking executives at the

-4-

company that this project was a top priority, and because the Google Legal team consistently stressed the urgency of developing tools and methods that would enable them to do this in the face of what I understood to be new and different requirements.

### Short-Term Solutions

14.     Despite the priority of this project and the commitment of so many company resources to it, we knew it would take several months to make significant progress on the development of long-term solutions to such a complex technical issue.  Even as the long-term solution was being developed, therefore, we sought to create short-term solutions that would meet the new technical requirements faced by the LIS team in responding to warrants.

15.     After we obtained information from product teams about how and where they stored data, we identified categories of data that were stored in the United States.  The engineers worked with product teams to implement short-term solutions for any integrated products with these categories of data.  As soon as these short-term solutions were implemented in the data export tool, they were made available to LIS for their use in responding to warrants.  For some types of data, however, we were unable to determine any manual workaround that could be implemented, given the complicated nature of the storage systems.

### Long-Term Solutions

16.     Development and implementation of a long-term solution began at the storage system layer.  The storage system used by most Google products could identify the data center or data centers that held pieces of data that, once assembled, made up records, but Google did not have a ready means of exposing to the products which data centers held these pieces of

-5-

GUY DECLARATION

data.  With many data centers located around the world, keeping the inner-workings of the storage systems invisible to the products is a priority.

17.     We therefore had to implement a library that would determine the country in which a particular data center was located.  This step could not be performed by the data export tool team, the storage system teams, nor the product teams, but instead required assistance from the Technology Resource Infrastructure Team.

18.     At the same time, two storage system teams began upgrading their libraries to start exposing information about a record's location.  These enhancements were particularly complicated because of the nature of Google's storage system, which may include data replicas and/or data that is split into component parts.  As these enhancements were proceeding, both the product teams and the data export tool team were offering feedback and suggesting further changes to make the libraries more robust.  Additionally, one of the storage systems found it had a dependency on the other storage system's solution, further complicating the technical challenge.

19.     Once the storage systems were capable of returning only data stored within the United States, each of the relevant products had to implement that capability within its own code base.

20.     Next, the export tool had to be modified to be capable of directing product exports to only return data stored within a specified country.

21.     After this capability was implemented for each product, it had to be tested and deployed to production.  Specifically, we needed to perform integrity and accuracy checks to ensure that the data being exported was accurate, responsive, and from the correct location.  This entailed a time-consuming process of generating test data and writing additional tests to make

GUY DECLARATION

sure the capability was working properly and did not adversely affect the function of other products, tools or features.  Nevertheless, it was a key and necessary step because, in at least one instance, we identified and fixed a problem in how the product exported data.

22.    This project presented a sprawling, complex organizational and engineering challenge.  I am proud of what we have been able to accomplish in a very short period of time.  We managed to produce short-term and long-term solutions more quickly than might reasonably have been expected.  We have more work to do before long term solutions are fully implemented for all integrated products, which we expect to complete before the end of this year.

23.    In total, the project has so far has required approximately 4,500 employee work hours, 150-200 change requests, and contributions from 45 technical employees on 10 product teams.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

*Emily Guy*
Emily Guy

Date: 01/29/2017

-7-

Julie E. Schwartz, Bar No. 260624
JSchwartz@perkinscoie.com
PERKINS COIE LLP
3150 Porter Drive
Palo Alto, CA 94304-1212
Telephone: 650.838.4300
Facsimile: 650.838.4350

Todd M. Hinnen, *pro hac vice*
THinnen@perkinscoie.com
John R. Tyler, *pro hac vice*
RTyler@perkinscoie.com
PERKINS COIE LLP
1201 Third Ave. Suite 4900
Seattle, WA 98101
Tel.: (206) 359-8000
Fax: (206) 359-9000

Attorneys for Google Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In the Matter of the Search of Content [redacted] Stored at Premises Controlled by Google Inc. and Further Described in Attachment A | Case No. 3-16-80263<br><br>**Declaration of Acadia Senese in Support of Google Inc.'s Reply In Support of Motion to Quash or Amend Search Warrant and Opposition to Motion for Order to Show Cause**<br><br>Under Seal<br><br>Judge:   Hon. Laurel Beeler,<br>   U.S. Magistrate Judge |

-1-

I, Acadia Senese, declare as follows:

1.    I am Corporate Counsel at Google Inc. ("Google"), where I have been employed since May 2015.

2.    I am over the age of eighteen and competent to make this declaration. I make each of the following statements based on my personal knowledge, and I could, if necessary, testify to the truth of each of them.

3.    I am a member of Google's Law Enforcement and Information Security Team.  As part of my duties, I regularly communicate with the Department of Justice and other federal, state and local agencies regarding government legal process for user data made pursuant to the Stored Communications Act, Wiretap Act, and Pen Register Trap and Trace Statute.

4.    On July 14, 2016, I was in Washington D.C. for a joint meeting with the Department of Justice's Office of International Affairs ("OIA") and the Department of Justice's Computer Crimes Intellectual Property Section ("CCIPS") to discuss Google's policies and procedures for responding to Mutual Legal Assistance Treaty Requests as well as other legal process issued by the Department of Justice.  Just prior to the meeting, I learned that the Second Circuit Court of Appeal issued its ruling in *In re Warrant to Search a Certain E–Mail Account Controlled & Maintained by Microsoft Corporation* ("*Microsoft*"), 829 F.3d 197 (2d Cir. 2016) ("Second Circuit's Decision").

5.    During the meeting, the Chief of CCIPS inquired what Google's position was with respect to that ruling.  I explained that the Second Circuit's Decision had just been issued that morning and that Google was still digesting the opinion, just as I suspected the government was as well.  I noted that Google would be in touch shortly with both OIA and CCIPS to discuss the

-2-

matter further once Google had an opportunity to review the Second Circuit's Decision. Upon my return to San Francisco, I worked with outside counsel to set up a conference call with CCIPS to further discuss the decision. *See* Dec. of Todd M. Hinnen in Support of Mot. to Quash.

6.    Subsequent to that meeting, I fielded many phone calls from federal agents and federal prosecutors around the country to answer questions about the Second Circuit's Decision. I routinely explained the holding, its impact on Google's production (if any) in response to search warrants, and answered any additional questions from the government. These phone calls were made in the spirit of addressing the Second Circuit's Decision constructively with the government and to facilitate the already ongoing dialogue with the Department of Justice.

7.    On September 2, 2016, I spoke with an Assistant United States Attorney ("AUSA") from the Northern District of California about an unrelated request made pursuant to a Mutual Legal Assistance Treaty. I explained that Google was following the Second Circuit's Decision in its response to search warrants. The AUSA mentioned that OIA was preparing to send a letter to foreign counterparts about the Second Circuit's Decision. I informed the AUSA that Google had already spoken with OIA and CCIPS about the Decision but that I would reach out to OIA regarding the letter. Immediately following my call with the AUSA, I reached out proactively to OIA and scheduled a call to discuss the letter.

8.    On October 12, 2016, in response to the government's questions about the production Google made in the instant matter, I called Special Agent Michael Delaney. I spoke with Agent Delaney and explained that ███ of ███████ target accounts were stored entirely outside of the United States and that, given the Second Circuit's Decision, the government's search warrant could not compel Google to produce that data. Google Inc. has a long-standing public policy (with limited exceptions such as disclosures made in response to emergency

-3-

disclosure requests and proactive referrals) of not disclosing user data to the government unless it is compelled to do so.

9.      I also explained to Agent Delaney that for some services, such as Gmail, certain categories of data were not produced because Google could not determine whether the data was stored in the United States. For example, I explained that Google could not determine the location of attachments to emails and Google therefore did not produce those attachments. I explained that given the manner in which Google stores some of its data, such as attachments, a file could be broken up into smaller chunks or shards, the chunks could be stored in separate servers, and the chunks could move continuously and independently of one another.

10.     During that same conversation, I suggested to Agent Delaney that he send preservation extension requests to Google Inc. for accounts that had been previously preserved and send new preservation requests for the remaining accounts. I offered that he could put those requests to my attention so that I could personally oversee them. Google Inc. has not received any preservation requests from the government for the accounts identified in the warrant since that conversation. Finally, I offered to have a conversation with the AUSA assigned to the investigation to answer any additional questions that the government might have.

11.     On October 12, 2016, anticipating that the government would submit preservation requests as I had suggested, Google extended any existing preservations related to the account beyond the 90-day period of the original preservation requests.

//

-4-

SENESE DECLARATION

12.     Shortly after I spoke with Agent Delaney, I left a voicemail with AUSA Frentzen regarding the search warrant.   By the time AUSA Frentzen returned my call several days later, I had already engaged outside counsel to represent Google in this matter.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_____                          Date: JAN 30, 2017

Acadia L. Senese

-5-

Julie E. Schwartz, Bar No. 260624
JSchwartz@perkinscoie.com
PERKINS COIE LLP
3150 Porter Drive
Palo Alto, CA  94304-1212
Telephone:  650.838.4300
Facsimile:  650.838.4350

Todd M. Hinnen, *pro hac vice*
THinnen@perkinscoie.com
John R. Tyler, *pro hac vice*
RTyler@perkinscoie.com
PERKINS COIE LLP
1201 Third Ave. Suite 4900
Seattle, WA 98101
Tel.: (206) 359-8000
Fax: (206) 359-9000

Attorneys for Google Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In the Matter of the Search of Content <br> ▓▓▓▓▓▓▓▓▓▓▓▓ Stored at <br> Premises Controlled by Google Inc. and <br> Further Described in Attachment A | Case No. 3-16-80263 <br><br> **Declaration of Todd Hinnen in Support of Google Inc.'s Reply In Support of Motion to Quash or Amend Search Warrant and Opposition to Motion for Order to Show Cause** <br><br> Under Seal <br><br> Judge:    Hon. Laurel Beeler, <br>           U.S. Magistrate Judge |

-1-

I, Todd M. Hinnen, declare as follows:

1.     I am a partner at the law firm Perkins Coie LLP and counsel to Google Inc. ("Google") in the above-captioned matter.

2.     I am over the age of eighteen and competent to make this declaration. I make each of the following statements based on my personal knowledge, and I could, if necessary, testify to the truth of each of them.

3.     Shortly after the Second Circuit handed down its Decision on July 14, 2016, I reached out on behalf of Google to the Department of Justice's Computer Crime & Intellectual Property Section, the Department's designated coordinator and center of expertise with regarding the Stored Communications Act ("SCA"), to schedule a discussion of the potential effect the Decision might have on Google's fulfillment of SCA warrants. The resulting phone call involved several different components of the Department of Justice. During the discussion, Google informed the government that it stored some data outside the United States and that it understood that under the Microsoft Decision the government would no longer be able to compel production of such data with an SCA warrant. Google and the government agreed to keep "open lines of communication" regarding the effect of the Decision and to avoid unnecessary litigation. That was the first of several such discussions Google had with the government between July and September of 2016.

4.     On November 21, 2016, I sent a letter to Assistant United States Attorney Frentzen for the purpose of clarifying with the government, and inviting further discussions with the government regarding, what information had, and what information had not, been produced in response to the warrant. The government did not respond to my letter. A true and correct copy of

-2-

that letter was provided to the Court as Exhibit D to the Declaration of John R. Tyler (Dec. 6, 2016).

    5.    On December 6, 2016, I called Assistant United States Attorney Frentzen to follow up on my letter of November 21. I did not reach Mr. Frentzen, but left a voicemail for him indicating that I understood that the government did not agree with Google that the Second Circuit's decision affected its compliance with a warrant issued in the Northern District of California, that Google would like to resolve that disagreement through discussions with the government, and that if Google were unable to resolve it through discussions, by promptly seeking clarity from a court. I noted that Google was preparing a Motion to Quash to that end, but would be happy to withdraw that motion if instead the government and Google could come to an agreement. Mr. Frentzen responded via email on December 20, 2016.

    6.    In his email of December 20, 2016, and subsequently, Mr. Frentzen has proposed to continue the briefing and argument schedule to accommodate other work and personal obligations. Google has either joined the government in, or not objected to or opposed, each such request by the government.

    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Date:  January 30, 2017

Todd M. Hinnen

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| IN THE MATTER OF THE SEARCH OF CONTENT ▓▓▓▓▓ STORED AT PREMISES CONTROLLED BY GOOGLE AND AS FURTHER DESCRIBED IN ATTACHMENT A, | Case No.  16-mc-80263-LB *SEALED* **CONSENT OR DECLINATION TO MAGISTRATE JUDGE JURISDICTION** |

**INSTRUCTIONS:** Please indicate below by checking one of the two boxes whether you (if you are the party) or the party you represent (if you are an attorney in the case) choose(s) to consent or decline magistrate judge jurisdiction in this matter. Sign this form below your selection.

( ) **Consent to Magistrate Judge Jurisdiction**

In accordance with the provisions of 28 U.S.C. § 636(c), I voluntarily **consent** to have a United States magistrate judge conduct all further proceedings in this case, including trial and entry of final judgment, I understand that appeal from the judgment shall be taken directly to the United States Court of Appeals for the Ninth Circuit.

**OR**

(X) **Decline** Magistrate Judge Jurisdiction

In accordance with the provisions of 28 U.S.C. § 636(c), I **decline** to have a United States magistrate judge conduct all further proceedings in this case and I hereby request that this case be reassigned to a United States district judge.

DATE:  January 9, 2017

NAME: Julie E. Schwartz

COUNSEL FOR (OR "PRO SE"): Non-party Google Inc.

/s/ Julie E.Schwartz

*Signature*

**PROOF OF SERVICE**

1

2    I, Marla J. Heap, declare:

3    I am a citizen of the United States and employed in Santa Clara County, California. I am

4    over the age of eighteen years and not a party to the within-entitled action. My business address

5    is 3150 Porter Drive, Palo Alto, California 94304-1212. On January 9, 2017, I served a copy of

6    the within document(s):

7    **CONSENT OR DECLINATION TO MAGISTRATE JUDGE JURISDICTION**

8    ☐    by transmitting via facsimile the document(s) listed above to the fax number(s) set
9         forth below on this date before 5:00 p.m.

10   ☒    by placing the document(s) listed above in a sealed envelope with postage thereon
          fully prepaid, the United States mail at Palo Alto, California addressed as set forth
11        below.

12   ☐    by placing the document(s) listed above in a sealed _____ envelope and
          affixing a pre-paid air bill, and causing the envelope to be delivered to a Delivery
13        Service agent for delivery.

14   ☐    by personally delivering the document(s) listed above to the person(s) at the
          address(es) set forth below.
15

16   ☒    by transmitting via e-mail or electronic transmission the document(s) listed above
          to the person(s) at the e-mail address(es) set forth below.
17

18   William Frentzen, Esq.
     United Stated Attorney's Office
19   450 Golden Gate Avenue, 9th Floor
     San Francisco, CA 94102
20   william.frentzen@usdoj.gov

21   I am readily familiar with the firm's practice of collection and processing correspondence

22   for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same

23   day with postage thereon fully prepaid in the ordinary course of business. I am aware that on

24   motion of the party served, service is presumed invalid if postal cancellation date or postage

25   meter date is more than one day after date of deposit for mailing in affidavit.

26   I declare that I am employed in the office of a member of the bar of this court at whose

27   direction the service was made.

28

Executed on January 9, 2017, at Palo Alto, California.

_Marla J. Heap_

Marla J. Heap



3150 Porter Drive
Palo Alto, CA 94304-1217

+1.650.838.4300
+1.650.838.4350
PerkinsCoie.com

December 15, 2016

Susan Y. Soong, Clerk of the Court
Office of the Clerk
United States District Court for the Northern District of California
450 Golden Gate Avenue
San Francisco, CA 94102-3489

Re:     *Pro Hac Vice* **Applications for Todd M. Hinnen and John R. Tyler,** *In the Matter of*
*the Search of Content* ▮▮▮▮▮▮▮▮▮▮ *Stored at Premises Controlled by Google Inc.*
*and Further Described in Attachment A,* **Case No. 3-16-70816**

Dear Ms. Soong:

Per Criminal Local Rule 56-1, electronic filing of sealed documents in criminal cases are not
permitted. All papers for the above-mentioned criminal case are required to be filed under seal.
Accordingly, the *Pro Hac Vice* Applications of Todd M. Hinnen and John R. Tyler are hereby
submitted under seal manually and in hard copy form.

Very truly yours,

Julie E. Schwartz
JSchwartz@perkinscoie.com

Attorneys for Non-Party Google Inc.

Perkins Coie LLP

RECEIVED
U.S. ATTORNEY'S OFFICE
SAN FRANCISCO, CA

2017 DEC 19   AM 9: 40

1   Julie E. Schwartz, Bar No. 260624
    JSchwartz@perkinscoie.com
2   PERKINS COIE LLP
    3150 Porter Drive
3   Palo Alto, CA  94304-1212
    Telephone:  (650) 838-4300
4   Facsimile:  (650) 838-4350
5
    Todd M. Hinnen, *pro hac vice pending*
6   THinnen@perkinscoie.com
    John R. Tyler, *pro hac vice pending*
7   RTyler@perkinscoie.com
    PERKINS COIE LLP
8   1201 Third Ave. Suite 4900
    Seattle, WA 98101
9   Tel.: (206) 359-8000
    Fax: (206) 359-9000
10
11  Attorneys for Google Inc.
12
13              UNITED STATES DISTRICT COURT
14              NORTHERN DISTRICT OF CALIFORNIA
15
16  In the Matter of the Search of Content          Case No. 3-16-70816
                            Stored at
17  Premises Controlled by Google Inc. and
    Further Described in Attachment A               **Application of John R. Tyler for Admission**
18                                                  **of Attorney *Pro Hac Vice***
19                                                  (Civil Local Rule 11-3)
20                                                  **Under Seal**
21
22
23
24
25
26
27
28

1    I, John R. Tyler, an active member in good standing of the bar of the Washington

2    Supreme Court, hereby respectfully apply for admission to practice *pro hac vice* in the Northern

3    District of California representing Non-Party Google Inc. in the above-entitled action.  My local

4    co-counsel in this case is Julie E. Schwartz, an attorney who is a member of the bar of this Court

5    in good standing and who maintains an office within the State of California.

| My address of record: | Local co-counsel's address of record: |
|---|---|
| 1201 Third Ave., Ste. 4900, Seattle, WA 98101 | 3150 Porter Dr., Palo Alto, CA 94304 |
| My telephone # of record: | Local co-counsel's telephone # of record: |
| (206) 359-8000 | (650) 838-4300 |
| My email address of record: | Local co-counsel's telephone # of record: |
| RTyler@perkinscoie.com | JSchwartz@perkinscoie.com |

13    I am an active member in good standing of a United States Court or of the highest court of

14    another State or the District of Columbia, as indicated above; my bar number is: 42097.

15    A true and correct copy of a certificate of good standing or equivalent official document

16    from said bar is attached to this application.

17    I agree to familiarize myself with, and abide by, the Local Rules of this Court, especially

18    the Standards of Professional Conduct for attorneys and the Alternative Dispute Resolution Local

19    Rules.

20    I declare under penalty of perjury that the foregoing is true and correct.

22    DATED: December 14, 2016           PERKINS COIE LLP

23

24                                       By: _____
                                         John R. Tyler
25                                       RTyler@perkinscoie.com

26                                       Applicant

27

28                                       -2-

1
2

**ORDER GRANTING APPLICATION
FOR ADMISSION OF ATTORNEY PRO HAC VICE**

3      IT IS HEREBY ORDERED THAT the application of John R. Tyler is granted, subject to

4  the terms and conditions of Civil L.R. 11-3.  All papers filed by the attorney must indicate

5  appearance *pro hac vice*.  Service of papers upon, and communication with, local co-counsel

6  designated in the application will constitute notice to the party.

7

8  DATED: _____

9                                                        _____
                                                          United States District/Magistrate Judge
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

-3-

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| IN THE MATTER OF THE ADMISSION | ) | BAR NO. 42097 |
| | ) | |
| OF | ) | CERTIFICATE |
| | ) | |
| JOHN RANDALL TYLER | ) | OF |
| | ) | |
| TO PRACTICE IN THE COURTS OF THIS STATE | ) | GOOD STANDING |
| | ) | |

I, Susan L. Carlson, Clerk of the Supreme Court of the State of Washington, hereby certify

### JOHN RANDALL TYLER

was regularly admitted to practice as an Attorney and Counselor at Law in the Supreme Court and all the Courts of the State of Washington on November 30, 2009, and is now and has continuously since that date been an attorney in good standing, and has a current status of active.



IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed the seal of said Court this 1st day of December, 2016.

Susan L. Carlson
Supreme Court Clerk
Washington State Supreme Court

1   Julie E. Schwartz, Bar No. 260624
    JSchwartz@perkinscoie.com
2   PERKINS COIE LLP
3   3150 Porter Drive
    Palo Alto, CA 94304-1212
4   Telephone:  (650) 838-4300
    Facsimile:  (650) 838-4350
5
    Todd M. Hinnen, *pro hac vice pending*
6   THinnen@perkinscoie.com
7   John R. Tyler, *pro hac vice pending*
    RTyler@perkinscoie.com
8   PERKINS COIE LLP
    1201 Third Ave. Suite 4900
9   Seattle, WA 98101
    Tel.: (206) 359-8000
10  Fax: (206) 359-9000
11  Attorneys for Google Inc.
12
13                  UNITED STATES DISTRICT COURT
14                 NORTHERN DISTRICT OF CALIFORNIA
15
16  In the Matter of the Search of Content              Case No. 3-16-70816
                            Stored at
17  Premises Controlled by Google Inc. and
    Further Described in Attachment A                   **Application of Todd M. Hinnen for
18                                                      Admission of Attorney *Pro Hac Vice***
19                                                      (Civil Local Rule 11-3)
20                                                      **Under Seal**
21
22
23
24
25
26
27
28
                                                        *PRO HAC VICE* APPLICATION & ORDER
                                                               Case No. 3-16-70816
                                                               41063-0096/133827831.1

1       I, Todd M. Hinnen, an active member in good standing of the bar of the Washington

2   Supreme Court, hereby respectfully apply for admission to practice *pro hac vice* in the Northern

3   District of California representing Non-Party Google Inc. in the above-entitled action.  My local

4   co-counsel in this case is Julie E. Schwartz, an attorney who is a member of the bar of this Court

5   in good standing and who maintains an office within the State of California.

| My address of record: | Local co-counsel's address of record: |
|---|---|
| 1201 Third Ave., Ste. 4900, Seattle, WA 98101 | 3150 Porter Dr., Palo Alto, CA 94304 |
| My telephone # of record: | Local co-counsel's telephone # of record: |
| (206) 359-8000 | (650) 838-4300 |
| My email address of record: | Local co-counsel's telephone # of record: |
| THinnen@perkinscoie.com | JSchwartz@perkinscoie.com |

13       I am an active member in good standing of a United States Court or of the highest court of

14   another State or the District of Columbia, as indicated above; my bar number is: 27176.

15       A true and correct copy of a certificate of good standing or equivalent official document

16   from said bar is attached to this application.

17       I agree to familiarize myself with, and abide by, the Local Rules of this Court, especially

18   the Standards of Professional Conduct for attorneys and the Alternative Dispute Resolution Local

19   Rules.

20       I declare under penalty of perjury that the foregoing is true and correct.

22   DATED:  December 15, 2016                    **PERKINS COIE** LLP

24   By: _____

25           Todd M. Hinnen
        THinnen@perkinscoie.com

26           Applicant

-2-

**ORDER GRANTING APPLICATION
FOR ADMISSION OF ATTORNEY PRO HAC VICE**

IT IS HEREBY ORDERED THAT the application of Todd M. Hinnen is granted, subject to the terms and conditions of Civil L.R. 11-3. All papers filed by the attorney must indicate appearance *pro hac vice*. Service of papers upon, and communication with, local co-counsel designated in the application will constitute notice to the party.

DATED: _____

_____
United States District/Magistrate Judge

-3-

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| IN THE MATTER OF THE ADMISSION | ) | BAR NO. 27176 |
| | ) | |
| OF | ) | CERTIFICATE |
| | ) | |
| TODD M. HINNEN | ) | OF |
| | ) | |
| TO PRACTICE IN THE COURTS OF THIS STATE | ) | GOOD STANDING |
| | ) | |

I, Susan L. Carlson, Clerk of the Supreme Court of the State of Washington, hereby certify

## TODD M. HINNEN

was regularly admitted to practice as an Attorney and Counselor at Law in the Supreme Court and all the

Courts of the State of Washington on October 28, 1997, and is now and has continuously since that date

been an attorney in good standing, and has a current status of active.



IN TESTIMONY WHEREOF, I have
hereunto set my hand and affixed
the seal of said Court this 1st day of
December, 2016.

Susan L. Carlson
Supreme Court Clerk
Washington State Supreme Court

1  Julie E. Schwartz, Bar No. 260624
   JSchwartz@perkinscoie.com
2  PERKINS COIE LLP
3  3150 Porter Drive
   Palo Alto, CA 94304-1212
4  Telephone: 650.838.4300
   Facsimile: 650.838.4350
5
   Todd M. Hinnen, *pro hac vice pending*
6  THinnen@perkinscoie.com
7  John R. Tyler, *pro hac vice pending*
   RTyler@perkinscoie.com
8  PERKINS COIE LLP
   1201 Third Ave. Suite 4900
9  Seattle, WA 98101
   Tel.: (206) 359-8000
10 Fax: (206) 359-9000
11 Attorneys for Google Inc.

12

13                    UNITED STATES DISTRICT COURT

14                   NORTHERN DISTRICT OF CALIFORNIA

15

16 | In the Matter of the Search of Content
   |                          Stored at            Case No. 3-16-70816
17 | Premises Controlled by Google Inc. and
   | Further Described in Attachment A           **PROOF OF SERVICE**
18
                                                 Under Seal
19
                                                 Judge:      Hon. Laurel Beeler,
20                                                            U.S. Magistrate Judge

21

22

23

24

25

26

27

28

PROOF OF SERVICE

I, Winnie W. Hung, declare:

I am a citizen of the United States and employed in Santa Clara County, California.  I am over the age of eighteen years and not a party to the within-entitled action.  My business address is 3150 Porter Drive, Palo Alto, California  94304-1212.  On December 15, 2016, I served a copy of the within document(s):

> **LETTER TO COURT OF CLERK REGARDING** *PRO HAC VICE* **APPLICATION FILING**
>
> **APPLICATION OF TODD M. HINNEN FOR ADMISSION OF ATTORNEY** *PRO HAC VICE*
>
> **APPLICATION OF JOHN R. TYLER FOR ADMISSION OF ATTORNEY** *PRO HAC VICE*

☒  by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, the United States mail at Palo Alto, California addressed as set forth below.

William Frentzen, Federal Prosecutor
U.S. Attorney's Office
450 Golden Gate Ave, Box 36055
San Francisco, CA 94102-3495

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on December 15, 2016, at Palo Alto, California.

_____
Winnie W. Hung

-2-