BRIAN J. STRETCH (CABN 163973)
United States Attorney

BARBARA VALLIERE (DCBN 439353)
Chief, Criminal Division

WILLIAM FRENTZEN (LABN 24421)
MERRY JEAN CHAN (CABN 229254)
Assistant United States Attorneys

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-6959
Fax: (415) 436-7234
William.Frentzen@usdoj.gov

ANDREW S. PAK (NYBN 4463436)
CATHERINE ALDEN PELKER (MD)
Trial Attorneys

    Department of Justice
    Computer Crime and Intellectual Property Section
    1301 New York Avenue, N.W., Suite 600
    Washington, D.C. 20005
    Andrew.Pak@usdoj.gov; Catherine.Pelker@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In the Matter of the Search of Content Stored at Premises Controlled by Google, Inc., and Further Described in Attachment A | Case No. CR 3-16-mc-80263 LB/RS<br><br>UNITED STATES' OPPOSITION TO MOTION FOR DE NOVO DETERMINATION OF MATTER REFERRED TO MAGISTRATE JUDGE AND MOTION FOR ORDER TO SHOW CAUSE |

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

FACTUAL BACKGROUND ....................................................................................1

ARGUMENT ...........................................................................................................3

I. HISTORY OF RELEVANT RULINGS ..........................................................4

    A. The *Microsoft* Decision...........................................................................4

        (i) The lower courts in the Southern District of New York held that an SCA warrant requiring Microsoft Corp. to produce foreign-stored content was not impermissibly extraterritorial...................4

        (ii) A panel of the Second Circuit reversed the lower courts' rulings .........................................................................................6

        (iii) The Second Circuit denied rehearing by an evenly-divided vote ...............7

    B. Magistrate Beeler's Decision In This Case.................................................7

II. THIS COURT SHOULD UPHOLD MAGISTRATE BEELER ........................8

    A. The SCA Provides Courts With Power *In Personam* To Require U.S. Providers To Produce Information In Their Custody Or Control, Regardless Of The Location Of The Information. ........................................8

        (i) The SCA grants courts power *in personam* to compel providers to produce information.......................................................8

        (ii) The scope of the SCA's grant of power allows courts to compel U.S. providers to produce information within their custody or control irrespective of where the data is located.......................10

    B. Congress's Use Of The Term "Warrant" Was Meant To Import The Probable Cause Standard And Not To Protect Privacy In A Territorial Way .................................13

    C. Whether Google Is A Merely A "Caretaker" Of Its Users' Data Is Irrelevant And, To The Extent It Is Relevant, It Is A Factual Question That Requires An Evidentiary Hearing .................................16

    D. Magistrate Beeler Properly Applied the Presumption Against Extraterritoriality.................................18

        (i) The *Microsoft* court erred in applying the second step of the extraterritoriality analysis as outlined by the Supreme Court...................18

        (ii) Section 2703's "focus" is compelled disclosure.........................20

        (iii) Because the focus of Section 2703 is compelled disclosure, and such compulsion on a U.S. provider and in the United States, it is a domestic application of the law ...........................22

       (iv)    Assuming *arguendo* that the focus of Section 2703 is privacy, the invasion of privacy authorized by an SCA warrant occurs when the information sought is disclosed to law enforcement and searched for evidence of a crime..........................................................22

    E.    Congress Has Taken Unequivocal Action Confirming That It Believes The SCA Requires Disclosure of Information, Even If Stored Abroad....................................24

III.    THE COURT SHOULD ISSUE AN ORDER FOR A SHOW CAUSE HEARING....................28

CONCLUSION..........................................................................................................30

# TABLE OF AUTHORITIES

Cases

*Abbott v. Abbott*, 560 U.S. 1 (2010)..........................................................................25

*Anschuetz & Co., GmbH. v. Mississippi River Bridge Auth.*, 483 U.S. 1002 (1987) ........................ 11, 16

*Apple, Inc.*, 13 F. Supp. 3d 157 (D.D.C. 2014)..........................................................23

*Bell v. New Jersey*, 461 U.S. 773 (1983) ..................................................................27

*Blackmer v. United States*, 284 U.S. 421 (1931) .......................................................12

*Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833 (1986) ...........................27

*Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102 (1980)..................27

*EEOC v. Arabian American Oil Co.*, 499 U.S. 244 (1991) ............................................26

*Exch. Comm'n v. Minas De Artemisa, S. A.*, 150 F.2d 215 (9th Cir. 1945) .....................10

*Fisher v. United States*, 425 U.S. 391 (1976) ...........................................................17

*Gerling Int'l Ins. Co. v. CIR,* 839 F.2d 131 (3d Cir. 1988) ..........................................11

*In the Matter of Search of Premises Controlled by Google*, Case No. 16-mc-80263-LB, 2017 WL 1487625 (N.D. Cal. April 25, 2017) ................................................................*passim*

*Hale v. Henkel*, 201 U.S. 43 (1906) ........................................................................12

*Hay Group, Inc. v. E.B.S. Acquisition Corp.*, 360 F.3d 404 (3d Cir. 2004) .....................11

*In re Anschuetz & Co., GmbH*, 754 F.2d 602 (5th Cir. 1985) ................................. 11, 16

*In re Sealed Case*, 832 F.2d 1268 (D.C. Cir. 1987)....................................................11

*In re Search of Google E-mail Accounts*, 99 F.Supp. 3d 992 (D. Alaska 2015) .....................23

*In re Under Seal*, 749 F.3d 276 (4th Cir. 2014).........................................................30

1  *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013) ........................................ 18, 26

2  *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351 (2013)........................................... 12

3  *Lowrance v. Weinig*, 107 F.R.D. 386 (W.D. Tenn. 1985). ................................................. 16

4  M-1235, 2017 WL 706307 (E.D. Wis. Feb. 21, 2017) ....................................................... 4

5  *Marc Rich & Co. v. United States*, 707 F.2d 663 (2d Cir. 1983)........................................ 11

6  *Microsoft Corp.*, 15 F. Supp. 3d 466 (S.D.N.Y. 2014)......................................................... 5

7  *Microsoft Corp.*, 829 F.3d 197 (2d Cir. 2016).......................................................... *passim*

8  *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010) ..................................... *passim*

9  *NLRB v. Bell Aerospace Co.*, 416 U.S. 267 (1974) ......................................................... 27

10 No. 14-2985, 2017 WL 362765 (2d Cir. Jan. 24, 2017) ............................................. *passim*

11 *Premises Controlled By Google, Inc.*, 33 F. Supp. 3d 386 (S.D.N.Y. 2014) .......................... 23

12 *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367 (1969) ................................................ 27

13 *Republic of the Philippines v. Marcos*, 862 F.2d 1355 (9th Cir. 1988) ............................... 10

14 *RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090 (2016) ........................... 18, 20, 22

15 *Rogers*, 1985 WL 13788 ........................................................................................... 16

16 *Samantar v. Yousuf*, 560 U.S. 305 (2010).................................................................... 12

17 *State (Admin. of State Ins.)*, 902 F.2d 1275 (7th Cir. 1990) ........................................... 11

18 *State of New Jersey v. City of New York*, 283 U.S. 473 (1931) .................................... 10, 16

19 *Steele v. Bulova Watch Co., Inc.*, 73 S. Ct. 252 (1952) ............................................. 10, 16

20 *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176 (1982)...................................... 25

21 *United States v. Baker*, 641 F.2d 1311 (1981)............................................................... 30

22 *United States v. Bank of Nova Scotia*, 691 F.2d 1384 (11th Cir. 1982) ............................... 11

23 *United States v. Barr*, 605 F.Supp. 114 (S.D.N.Y.  1985)............................................... 17

24 *United States v. Miller*, 425 U.S. 435 (1976)................................................................ 23

25 *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990).................................................. 14

26 *Walter v. United States*, 447 U.S. 651 (1980)............................................................... 17

27 *Zurcher v. Stanford Daily*, 436 U.S. 547 (1978) ........................................................... 14

28

UNITED STATES' OPPOSITION TO MOTION FOR DE NOVO DETERMINATION

## Statutes

15 U.S.C. § 78dd(a) .................................................................................................... 20
18 U.S.C. § 1962 ......................................................................................................... 20
18 U.S.C. § 1964(c) .................................................................................................... 20
18 U.S.C. § 2518(3) .................................................................................................... 15
18 U.S.C. § 2703 ................................................................................................... *passim*
28 U.S.C. § 636(b)(1)(B) .............................................................................................. 3

## Rules

Fed. R. Civ. P. 72(b) ..................................................................................................... 3
Fed. R. Crim. P. 41 ....................................................................................................... 3
Fed. R. Crim. P. 59(b)(3) .............................................................................................. 3

## Other Authorities

132 Cong. Rec. S14441-04 ........................................................................................ 15
FEDERAL PRACTICE AND PROCEDURE § 2456 ............................................................... 11

**INTRODUCTION**

This case is not about privacy.  It is about whether Google may unilaterally subvert the judgment of the courts as to the proper scope of a search warrant issued pursuant to 18 U.S.C. § 2703.  The government obtained a search warrant pursuant to 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) of the Stored Communications Act ("the SCA") by presenting probable cause to Magistrate Judge Laurel Beeler ("Magistrate Beeler").  The warrant required Google, Inc. ("Google"), a United States provider of electronic communication services and remote computing services, to disclose to the government the contents of a number of Google accounts.

On its own authority, Google chose not to timely comply with the warrant, and has tried to excuse its noncompliance based on the way it chooses to store data, citing the Second Circuit's nonbinding and analytically-flawed decision *In the Matter of a Warrant to Search a Certain E-Mail Account Controlled and Maintained by Microsoft Corp.*, 829 F.3d 197 (2d Cir. 2016) ("*Microsoft*"), *reh'g denied*, No. 14-2985, 2017 WL 362765 (2d Cir. Jan. 24, 2017) ("*Rehearing*").

Magistrate Beeler rejected Google's untimely motion to quash the search warrant, rejecting the Second Circuit's *Microsoft* decision, as have all the magistrate judges across the nation who have considered the issue.  Docket No. 45.  Magistrate Beeler ordered Google to comply with the full scope of the search warrant.

Google, again rejecting Magistrate Beeler's determination, has failed to timely comply with the warrant.  Instead, it has moved this Court for de novo consideration of its motion to quash the warrant.  Docket No. 47.

This Court should reject Google's characterizations of its efforts to supplant the Court as arbiter of the proper scope of a search warrant as in furtherance of privacy interests.  This Court should prevent Google's interference in important criminal investigations by ordering Google to comply with the search warrant by providing all responsive data immediately, and holding a hearing for Google to show cause why it should not be held in contempt.

**FACTUAL BACKGROUND**

On June 30, 2016, this Court issued the search warrant at issue directing Google to produce

UNITED STATES' OPPOSITION TO MOTION FOR DE NOVO DETERMINATION

1

data.[1]  On July 6, 2016, Homeland Security Investigations Special Agent Michael Delaney ("SA Delaney") served the warrant on Google, which called for execution by July 14, 2016.  *See* Declaration of SA Delaney, Attachment B to U.S. Opp. to Motion to Quash.

Google did not move to quash the warrant prior to the July 14 deadline, nor even shortly after that date, which coincided with the Second Circuit's decision in *Microsoft*.  *Id*.  In fact, Google did not file its motion to quash until *five months later* and after it had already announced its intention not to comply with the Court's Order.  *Id*.  At that time, Google indicated that it had produced all responsive data, other than data that Google claimed was stored outside of the United States.  *Id*.

On September 28, 2016, Google provided what it conceded was incomplete information responsive to the warrant.  *Id*.  On October 12, 2016, 2016, SA Delaney contacted Google and spoke with a representative.  *Id*.  Google indicated that it might not further comply with aspects of the search warrant, apparently claiming the ability to *sua sponte* narrow the Court's Order based on the Second Circuit's *Microsoft* decision.  *Id*.  The matter was subsequently taken up by outside counsel.  *Id*.

On November 18, 2016, Google provided data that it called "supplemental" without any explanation for the belated production.  *Id*.  On November 21, 2016, Google wrote a letter to the government claiming that it had not produced all data called for by the warrant because 1) based on the *Microsoft* decision, it "cannot produce data stored overseas to U.S. law enforcement"; 2) the warrant issued by Magistrate Beeler was "overbroad" and without "particularity" and 3) it appeared to Google that Magistrate Beeler must have erred in determining that there was probable cause for the warrant.  Apparently then realizing that it had acted as its own judge without authorization from this Court, Google filed a post hoc Motion to Quash on December 6, 2016.

The parties briefed the issues for Magistrate Beeler.  In addition to opposing the Motion to Quash, the government moved for an Order to Show Cause based upon Google's untimely response and its decision to *sua sponte* reject a valid search warrant from this Court.

Magistrate Judge Beeler heard argument on the issues and, on April 25, 2017, Magistrate Beeler denied Google's Motion to Quash.  Magistrate Beeler ordered the parties to meet and confer on certain

---

[1]  The unsealed copy of the Search Warrant is attached to Google's initial Motion to Quash.

UNITED STATES' OPPOSITION TO MOTION FOR DE NOVO DETERMINATION

2

1   issues, but otherwise ordered Google to produce data regardless of whether it was stored in the United

2   States or not.  Magistrate Beeler did not address the government's Motion for a Show Cause Order.

3   Google did not move to stay Magistrate Beeler's order.

4        On May 3, 2017, Google filed the instant Motion for a De Novo Determination.  On the same

5   date – six months after claiming they had complied with the search warrant and almost a year after

6   issuance of the original search warrant – Google also produced a large amount of additional and

7   duplicative data to the government.  *See* Declaration of SA Delaney, attached hereto as Exhibit A.

8   Google provided no real explanation for the additional production in the letter that accompanied the

9   production.  *Id*.  In an email, Google's outside counsel merely stated that the additional production was

10  "based on recently-developed tooling."  *Id*.

**ARGUMENT**

12       Although Google can only retrieve its foreign-stored data responsive to the warrants from within

13  the United States, it nevertheless argues that the search warrant issued by Magistrate Beeler, pursuant to

14  the SCA and the procedures of Fed. R. Crim. P. 41 cannot compel it to produce such data.  Google cites

15  the Second Circuit's decision in *Microsoft* as support for its position.

16       The Second Circuit does not control this Court, and for reasons discussed below, the *Microsoft*

17  decision was wrongly decided.  Indeed, outside of the Second Circuit, four magistrate judges, including

18  Magistrate Beeler, have considered the issues, and have unanimously rejected *Microsoft*'s analysis.  *See*

19  *In re Search of Content That is Stored at Premises Controlled by Google*, No. 16-mc-80263-LB, 2017

20  WL 1398279, at *4 (N.D. Cal. Apr. 19, 2017) (Judge Beeler's decision that an SCA warrant compelling

21  Google to disclose foreign-stored data is a domestic application of the SCA); *In re*

22  *[redacted]@yahoo.com, stored at premises owned, maintained, controlled, or operated by Yahoo, Inc.*,

23  Case No. 6:17-mj-1238 (M.D. Fla. Mar. 21, 2017) (holding that Yahoo can be compelled to produce

24  information stored outside the United States) ("MDFL Decision")[2]; *In re Info. associated with one*

25  *Yahoo email address that is stored at premises controlled by Yahoo*, Nos. 17-M-1234 and 17-M-1235,

26  2017 WL 706307, at *3 (E.D. Wis. Feb. 21, 2017) (holding the same in the context of ex parte

27

28  _____
         [2]  The MDFL Decision, which is unsealed but not yet available on Westlaw, is attached hereto as
     Exhibit B.

UNITED STATES' OPPOSITION TO MOTION FOR DE NOVO DETERMINATION

applications for SCA warrants for accounts held by Google and Yahoo) ("EDW Decision"); *In re Search Warrant No. 16-960-M-01 to Google, Nos. 16-960-M-1 and 16-1091*, 2017 WL 471564, at *14 (E.D. Pa. Feb. 3, 2017) (holding that Google is required to produce foreign-stored data responsive to an SCA warrant).

Of key importance, under *Microsoft*, a provider such as Google could *never* be compelled under the SCA to provide to the government data that it chooses to store outside of the United States. Google recognizes this as a problem, but nevertheless urges this Court to adopt *Microsoft,* and let Congress, if it is ever so inclined, remedy any resulting problems through new legislation. This Court should not follow the Second Circuit's flawed analysis simply because it came before. It should undertake an independent interpretation of the SCA under the appropriate canons of construction; doing so should lead this Court to the conclusion that the SCA does not limit the scope of the search warrant in this case.

*Microsoft* was wrongly decided for at least three reasons. First, the SCA's grant of power is *in personam*, not *in rem*. The Second Circuit's mistake on this point caused it to read a territorial limitation into the SCA – a territorial limitation that does not apply. Second, properly applied, the presumption against extraterritoriality, a canon of statutory construction, establishes that the compelled disclosure at issue is a permissible territorial application of the SCA. The Second Circuit misapplied the presumption against extraterritoriality. Finally, Congress has unequivocally confirmed that the SCA does in fact reach foreign-stored data. The Second Circuit failed to consider or even address the Congressional ratification.

/ /

/ /

/ /

/ /

## I.     HISTORY OF RELEVANT RULINGS

### A.     The *Microsoft* Decision

#### (i)     The lower courts in the Southern District of New York held that an SCA warrant requiring Microsoft Corp. to produce foreign-stored content was not impermissibly extraterritorial

*Microsoft* involved an SCA warrant for the content of emails and other information relating to a

user's account.  Microsoft Corp. ("Microsoft") controlled the user's data from its Redmond, Washington headquarters.  *In the Matter of a Warrant to Search a Certain E-Mail Account Controlled and Maintained by Microsoft Corp.*, 15 F. Supp. 3d 466, 467-68 (S.D.N.Y. 2014), *aff'd*, 2014 WL 4629624 (S.D.N.Y. Aug. 29, 2014) ("*In re Warrant*"), *rev'd*, 829 F. 3d 197 (2d Cir. 2016).  Exercising that control, Microsoft produced the user's non-content information, which it stored in the United States, but moved to quash the warrant with respect to the content of the user's emails, which Microsoft stored in its data center in Dublin, Ireland.  *In re Warrant*, 15 F. Supp. 3d at 468.  Microsoft argued that an SCA warrant was no different than a traditional search warrant issued pursuant to Federal Rule of Criminal Procedure 41 ("Rule 41"), and therefore, it had no extraterritorial reach and Microsoft could not be required to collect and provide information stored abroad.  *Id*. at 470.

The magistrate judge disagreed and, in an opinion that was later adopted by the district judge (*see* 2014 WL 4629624), held that the "SCA does not implicate principles of extraterritoriality."  *Id*. at 472.  The court held that 18 U.S.C. § 2703 refers to an order that, as a matter of procedure, is obtained from and issued by a court "like a search warrant" in that it involves an application made to a neutral magistrate, "who issues the order only upon a showing of probable cause."  *Id*. at 471.  The court noted that an SCA warrant is not, however, the same as a search warrant, in that it is executed "like a subpoena in that it is served on the ISP in possession of the information and does not involve government agents entering the premises of the ISP to search its servers and seize the email account in question."  *Id*.  For that reason, the court concluded "the concerns that animate the presumption against extraterritoriality are simply not present here: an SCA warrant . . . does not involve the deployment of American law enforcement personnel abroad; it does not require even the physical presence of service provider employees at the location where data are stored."  *Id*. at 475.  Rather, the SCA warrant required Microsoft personnel, operating in the United States, to retrieve the information sought (wherever located) from within the United States.  *Id*.  Because no search would occur until after the retrieved information was produced in the United States to the government, it was irrelevant that the data was stored abroad—the actual search would take place in the United States after the disclosed materials were turned over to law enforcement.  *Id*. at 472.

UNITED STATES' OPPOSITION TO MOTION FOR DE NOVO DETERMINATION

(ii)   **A panel of the Second Circuit reversed the lower courts' rulings**

After the district judge affirmed the magistrate judge's ruling in all respects, Microsoft appealed to the Second Circuit, which reversed the lower courts in a decision issued on July 14, 2016.  *Microsoft*, 829 F.3d 197.  The opinion, written by Circuit Judge Carney, and joined by Circuit Judge Lynch and District Judge Bolden (sitting by designation), purported to apply the two-step approach for analyzing statutory provisions that arguably have extraterritorial effects "set forth by the Supreme Court in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 261-65 (2010)."  *Id*. at 209.  It first inquired whether Congress clearly had intended the SCA to apply extraterritorially and concluded that it did not. *Id*.  Next, it analyzed whether "domestic contacts" were the "focus" of the SCA, or whether they were "merely secondary."  *Id*. at 216.

At this second step, the Second Circuit concluded that Congress had used the term "warrant" in the SCA as a term of art, thereby importing the domestic limitations inherent in Rule 41.  *Id*. at 212.  It was not persuaded by the government's argument that, unlike a traditional search warrant, an SCA warrant is executed like a subpoena – it requires U.S. providers, like Microsoft and Google, to disclose records under their control, rather than authorizing the government to enter private premises and access, search for, and seize records from the location where they are stored.  *Id*. at 213-16.  Moreover, even though the plain language of Section 2703 focuses exclusively on various levels of compelled disclosures within the United States, the court stated its belief that it nonetheless would be "fair to conclude . . . that privacy," as opposed to compelled disclosure, is the focus of the SCA warrant provisions in Section 2703.  *Id*. at 217.  It went on to hold that "the invasion of the user's privacy takes place under the SCA where the user's protected content is accessed – here, where it is seized by Microsoft, acting as an agent for the government."  *Id*. at 220.  Therefore, under the second step of the *Morrison* analysis, it held that extraterritorial events dominated the case before it and the use of the SCA warrant to obtain data stored in Dublin was improper.  *Id*.

In a concurring opinion, Judge Lynch acknowledged the strength of the government's argument that an SCA warrant compelling Microsoft to produce data under its control but stored in Ireland was not an extraterritorial application of the SCA.  *Id*. at 226-27.  Judge Lynch noted that, had the emails sought by the government been stored in Redmond, Microsoft had conceded there would be no obstacle

UNITED STATES' OPPOSITION TO MOTION FOR DE NOVO DETERMINATION

to the "government's acquiring them by" the SCA warrant.  *Id*. at 223.  To Judge Lynch, it was a "very close case," *id*. at 229, as to whether it was correct to focus on Ireland, where the data was kept, *id*. at 227-28, or the United States, where Microsoft's employees "can review those records" "without ever leaving their desks" and the "entire process of compliance" "takes place domestically."  *Id* at 229.  In other words, the location of the information at issue was unlike the location of tangible, physical documents and "is, in important ways, merely virtual."  *Id.*

> (iii)    **The Second Circuit denied rehearing by an evenly-divided vote**

On January 24, 2017, the Second Circuit issued an order denying the government's petition for rehearing *en banc*.  *Rehearing*, 2017 WL 362765, at *1.  By virtue of a 4-4 split,[3] the *Microsoft* decision remains in place in the Second Circuit.  As the four separate written dissenting opinions from the denial of the petition for *en banc* review make clear, half of the active Second Circuit judges participating in the case saw significant analytical and practical problems with the panel's opinion.[4]   Some of these concerns are noted below in the context of the argument on why this Court should not follow the flawed *Microsoft* decision.

> **B.    Magistrate Beeler's Decision In This Case**

On April 25, 2017, Judge Beeler denied Google's motion to quash a warrant issued pursuant to the SCA, and ordered Google "to produce all content responsive to the search warrant that is retrievable from the United States, regardless of the data's actual location."  *In re Search of Content that is Stored at Premises Controlled by Google*, Case No. 16-mc-80263-LB 2017 WL 1487625, at *4 (N.D. Cal. April 25, 2017).

Magistrate Beeler found that Google "stores its data in different locations, some in the United States and some outside the United States" and that "files may be broken into component parts, and different parts of a single file may be stored in different locations (including different countries)."  *Id.* at *1.  Additionally, Google's "network moves data – including – data responsive to the search warrant [at issue] – automatically from one location to another (including different countries)," which means that

---

[3]  Three of the judges eligible to vote recused themselves.  *Rehearing*, 2017 WL 362765, at *1 n.*.

[4]  Each dissenting opinion was joined by all of the dissenting judges.  Some of the problems the dissenting opinions noted with the panel opinion are noted, in context, below.

1  the "data's location can *change during the time period from when legal process (such as a search*

2  *warrant) is authorized and when it is served*." *Id.* (emphasis added).  Accordingly, and per the parties'

3  stipulations, "the only place to access the information is in the United States." *Id.* at *4.

4      Magistrate Beeler ultimately concluded that the disclosure required by an SCA warrant "is a

5  domestic application of the SCA." *Id.*  Magistrate Beeler reasoned that

6          an SCA warrant is not a search warrant in the classic sense, the
        government does not search a location or seize evidence.  Instead, the

7          conduct relevant to the focus – and what the SCA seeks to regulate – is
        disclosure of the data in the service provider's possession…. The service

8          provider – Google – is in the district and is subject to the court's
        jurisdiction; the warrant is directed to it in the only place where it can

9          access and deliver the information that the government seeks…. Unlike

10         *Microsoft*, where storage information was tethered to a user's reported
        location … there is no storage decision here.  The process of distributing is

11         automatic, via an algorithm, and in aid of network efficiency.

12 *Id.* (citations omitted).

13     To date, although Google has not moved to stay Magistrate Beeler's order, it has refused to

14 comply with it.  Google has produced some additional material that it concedes should have been

15 produced as responsive to the warrant.  But in direct violation of Magistrate Beeler's order, Google has

16 failed to produce all of the data responsive to the warrant, insisting that the data's actual location outside

17 of the United States exempts it.

18     **II.**    **THIS COURT SHOULD UPHOLD MAGISTRATE BEELER**

19         **A.**    **The SCA Provides Courts With Power *In Personam* To Require U.S.**

20                 **Providers To Produce Information In Their Custody Or Control, Regardless
                Of The Location Of The Information.**

21             (i)    **The SCA grants courts power *in personam* to compel providers to**

22                   **produce information**

23     The SCA grants courts *in personam* power – *i.e.*, power over a person as opposed to *in rem*

24 power over property – to require certain providers, including email providers like Google, to produce

25 certain information responsive to a warrant.  Unlike searches for physical items, or even electronically

26 stored information on a defendant's computer or cellular phone, the data at issue here, primarily email

27 content or other files stored in the "cloud," is truly intangible.  The concept of an "original" email is

28

UNITED STATES' OPPOSITION TO MOTION FOR DE NOVO DETERMINATION

inapposite.  An SCA warrant requires only the production of copies[5] of responsive data.  That is, an SCA warrant seeks the data itself, untethered from any physical or tangible item.  *See Rehearing,* 2017 WL 362765, at *6 ("Electronic 'documents' are literally intangible: when we say they are stored on a disk, we mean they are encoded on it as a pattern.") (Jacobs, J., dissenting).  Therefore, while Rule 41, generally designed to deal with tangible items, *see generally* Rule 41, is ill-equipped to deal with the type of information sought by an SCA warrant, the SCA, on the other hand, is specifically tailored to the unique nature of data at issue by focusing on courts' *in personam* authority over providers that control such data.  *See In re Search of Content that is Stored at Premises Controlled by Google*, 2017 WL 1487625, at *4 ("an SCA warrant is not a search warrant in the classic sense, the government does not search a location ….").

The *in personam* nature of the SCA's grant of power is clear from the threshold jurisdictional question raised by an application for a warrant under the SCA: whether the requested warrant is directed at an entity that the SCA covers, namely providers of electronic communication services or remote computing services.  *See* 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) (all sections of the SCA allowing the government to compel production of records under a warrant, but only with respect to "electronic communication service" or "remote computing service" providers); *see also* 2510(15) (defining "electronic communication service" providers); 2711(2) (defining "remote communication service" providers).

Moreover, since its amendments in 2001, the SCA explicitly broadened the jurisdiction of courts to issue warrants for information located outside of the district, marking a departure from Rule 41(b)(1)'s more traditional *in rem* jurisdictional requirement, which is typically focused on the territorial reach of a magistrate judge's authority.  In addition to conferring jurisdiction when the information is stored in the same district, the SCA now defines a "court of competent jurisdiction" as a court having jurisdiction over the offense under investigation or a court in the district in which the provider is located.  *See* 18 U.S.C. §§ 2703(a)-(c) (requiring in certain circumstances a "warrant issued using the procedures described in the Federal Rules of Criminal Procedure … by a court of competent jurisdiction")

---

[5] Even the term "copy" is loaded in that it suggests that there is an "original."  When dealing with emails produced from an email provider, these distinctions are meaningless.

1   (emphasis added) and 2711(3) (defining a "court of competent jurisdiction").  Accordingly, under the

2   broader jurisdiction granted by the SCA, the information required to be disclosed pursuant to a warrant

3   need not be in this district at the time the warrant is issued.

        (ii)    **The scope of the SCA's grant of power allows courts to compel U.S.**
4                      **providers to produce information within their custody or control**
5                      **irrespective of where the data is located**

6           That the SCA grants courts *in personam* power over providers is significant in light of the long

7   line of cases holding that a court's power over a person properly before it permits the court to require

8   that person to take certain acts either within, or outside of, its territorial jurisdiction.  *See*, *e.g*., *State of*

9   *New Jersey v. City of New York,* 283 U.S. 473, 482 (1931) ("Defendant contends that, as it dumps the

10  garbage into the ocean and not within the waters of the United States or of New Jersey, this Court is

11  without jurisdiction . . . [b]ut the defendant is before the Court and . . . [t]he situs of the acts . . . whether

12  within or without the United States, is of no importance.  Plaintiff seeks a decree *in personam* ….");

13  *Steele v. Bulova Watch Co., Inc*., 73 S. Ct. 252, 257 n.17 (1952) ("the District Court in exercising its

14  equity powers may command persons properly before it to cease or perform acts outside its territorial

15  jurisdiction"); *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363-64 (9th Cir. 1988) ("The

16  injunction is directed against individuals, not against property . . . Because the injunction operates *in*

17  *personam*, not *in rem*, there is no reason to be concerned about its territorial reach").

18          This fundamental principle has consistently been applied in the specific context addressed by

19  Section 2703 – the compelled disclosure of information.  If a person or entity with custody or control

20  over such information is properly before a court with *in personam* jurisdiction over that person, an order

21  to produce applies to all information over which that custody or control can be exercised, regardless of

22  whether the information is stored within the district, elsewhere in the United States, or abroad.  *See, e.g.*,

23  *Sec. & Exch. Comm'n v. Minas De Artemisa, S. A.*, 150 F.2d 215, 218 (9th Cir. 1945) ("The obligation

24  to respond applies even though the person served [with a subpoena] may find it necessary to go to some

25  other place within or without the United States in order to obtain the documents required to be

26  produced.") (cited approvingly in *Steel*, 344 U.S. at 289 & n.17 (1952) for the proposition that "the

27  District Court in exercising its equity powers may command persons properly before it to cease or

28  perform acts outside its territorial jurisdiction"); *Reinsurance Co. of Am. v. Administratia Asigurarilor*

UNITED STATES' OPPOSITION TO MOTION FOR DE NOVO DETERMINATION

10

1  *de State (Admin. of State Ins.)*, 902 F.2d 1275, 1281 (7th Cir. 1990) ("A court or agency in the United

2  States, when authorized by statute or rule of court, may order a person subject to its jurisdiction to

3  produce documents, objects, or other information relevant to an action or investigation, even if the

4  information … is outside the United States.") (quoting RESTATEMENT (THIRD) OF THE FOREIGN

5  RELATIONS LAW § 442); *Hay Group, Inc. v. E.B.S. Acquisition Corp.*, 360 F.3d 404, 412 (3d Cir.

6  2004) (Alito, J.) ("'Production' refers to the delivery of documents, not their retrieval, and therefore 'the

7  district in which the production . . . is to be made' is not the district in which the documents are housed

8  but the district in which the subpoenaed party is required to turn them over."); *United States v. Bank of*

9  *Nova Scotia*, 691 F.2d 1384, 1389-90 (11th Cir. 1982) (affirming the district court's order enforcing a

10  grand jury subpoena against a Bahamian bank which was "subpoenaed while subject to the jurisdiction

11  of  [the district court]," where the subpoena required disclosure of records located in the Bahamas);

12  *Marc Rich & Co. v. United States*, 707 F.2d 663, 667 (2d Cir. 1983) (a witness may not "resist the

13  production of [subpoenaed] documents on the ground that the documents are located abroad … [t]he test

14  for production of documents is control, not location") (citations omitted); *see also* 9A CHARLES ALAN

15  WRIGHT AND ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2456 at 31 ("[E]ven records

16  kept beyond the territorial jurisdiction of the district court . . . may be covered if they are controlled by

17  someone subject to the court's jurisdiction.").[6]  These cases reason that because a court's ability to

18  require disclosure is premised on the court's jurisdiction over the person, the compulsion – that is,

19  requiring that person to produce documents – is *not* extraterritorial.  This conclusion remains the same

20  even when some of the information required to be disclosed must be gathered from outside the United

21

22      6  *See also Gerling Int'l Ins. Co. v. CIR,* 839 F.2d 131, 140 (3d Cir. 1988) (explaining that, under
the rule governing the production of documents and other evidence in tax court, "[t]he location of the

23  documents, whether within the territorial jurisdiction of the court or not, is irrelevant"); *In re Anschuetz*
*& Co., GmbH*, 754 F.2d 602, 614 n.29 (5th Cir. 1985) (noting that "[i]t is not *ipso facto* a defense to a

24  discovery request that the law of a foreign country may prohibit production or disclosure.  As the Eleventh

25  Circuit held in *United States v. Bank of Nova Scotia*, 691 F.2d 1384 (11th Cir.1982), even at the sanction
stage, violation of foreign law is not necessarily a valid defense to a lawfully issued subpoena for

26  documents."), *cert. granted, judgment vacated on other grounds sub nom. Anschuetz & Co., GmbH. v.*
*Mississippi River Bridge Auth.*, 483 U.S. 1002 (1987); *In re Sealed Case*, 832 F.2d 1268, 1284 (D.C. Cir.

27  1987), *abrogated on other grounds by Braswell v. United States*, 487 U.S. 99 (1988) (holding that a

28  subpoena for documents in Switzerland is enforceable by the District Court if it has personal jurisdiction
over the companies whose records are sought).

UNITED STATES' OPPOSITION TO MOTION FOR DE NOVO DETERMINATION

States.  *See* Restatement (Third) of Foreign Relations Law § 442(1)(a) (1987) (making clear that "[a] court or agency in the United States, when authorized by statute or rule of court, may order a person subject to its jurisdiction to produce documents, objects, or other information relevant to an action or investigation, even if the information or the person in possession of the information is outside the United States").  Courts have long been empowered to exert authority on people and entities over whom they have jurisdiction, even if that authority has consequences overseas or otherwise outside of a court's territorial jurisdiction.  *See, e.g., Blackmer v. United States*, 284 U.S. 421, 438 (1931) ("The jurisdiction of the United States over its absent citizen, so far as the binding effect of its legislation is concerned, is a jurisdiction *in personam*, as he is personally bound to take notice of the laws that are applicable to him and to obey them."); *Hale v. Henkel*, 201 U.S. 43, 75 (1906) ("It would be a strange anomaly to hold that a state, having chartered a corporation to make use of certain franchises, could not, in the exercise of its sovereignty, inquire how these franchises had been employed, and whether they had been abused, and demand the production of the corporate books and papers for that purpose.").

This fundamental concept – that a court's power to compel disclosure is directed to the person (*in personam*), not the items to be produced (*in rem*) – was well-established at common law long before Congress enacted Section 2703 of the SCA in 1986.  "'[W]hen a statute covers an issue previously governed by the common law,' [courts] must presume that 'Congress intended to retain the substance of the common law.'" *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351, 1363 (2013) (quoting *Samantar v. Yousuf*, 560 U.S. 305, 320 n.13 (2010)).  Indeed, in light of the settled common law on the *in personam* nature of a court's power to compel the disclosure of documents, as well as Section 2703's focus on regulating such disclosure, there should be no doubt that Congress envisioned "a court of competent jurisdiction" as one empowered to compel a U.S.-based provider of electronic communications service or remote computer service to disclose information in its custody and control – regardless of where that information may be when the provider takes action in the United States to gather it.  *See In re Search of Content that is Stored at Premises Controlled by Google*, 2017 WL 1487625, at *4 ("[T]he SCA seeks to regulate … disclosure of the data in the service provider's possession …. The service provider – Google – is in the district and is subject to the court's jurisdiction; the warrant is directed to it in the only place where it can access and deliver the information that the

UNITED STATES' OPPOSITION TO MOTION FOR DE NOVO DETERMINATION

government seeks."); *EDW Decision*, 2017 WL 706307, at *3 ("Provided the service provider is within the reach of the court, the court may lawfully order that service provider to disclose data in the service provider's custody and control, without regard of where the service provider might choose to store the ones and zeros that comprise the relevant data."); *MDFL Decision*, Case No. 6:17-mj-1238 at 4 (M.D. Fla. Mar. 21, 2017) ("the court's jurisdiction over the person and its compulsion of that person, is not extraterritorial …. even if the information required to be disclosed is located outside of the United States.").

**B.     Congress's Use Of The Term "Warrant" Was Meant To Import The Probable Cause Standard And Not To Protect Privacy In A Territorial Way**

Google argues that "Congress used the term of art 'warrant' to invoke the traditional limitations and protections long associated with that term" and that "a warrant protects privacy in a distinctly territorial way."  *See* Google Mem. at 8 (citing *Microsoft*, 829 F.3d at 212).

The fatal flaw in Google's argument, however, is that it is belied by the actual text of the SCA. Congress, in enacting the SCA, could have – but did not – simply require the Government to obtain a Rule 41 warrant to obtain communications held by a provider.  Instead, it created a new kind of warrant, one that is anything but traditional.  A traditional Rule 41 warrant authorizes a law enforcement officer to take certain investigatory actions within a particular jurisdiction.  In contrast, an SCA warrant *compels* a third party provider to produce information as opposed to *authorizing* law enforcement to physically search the provider's computers.  The fact that Congress required the government to use the "*procedures*" in the Federal Rules of Criminal Procedure for obtaining the warrant, does not mean that resulting legal process is a traditional Rule 41 warrant.  *See* 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A) (emphasis added); *cf. id.* at 18 ("Congress, in drafting the SCA, had a particular kind of warrant in mind: 'a warrant issued using the procedures described in the Federal Rules of Criminal Procedure.'").

Google nevertheless argues, citing only one case, that "[s]earch warrants are not directed at persons; they authorize the search of 'places' and the seizure of 'things.'  Google Mem. at 8 (quoting *Zurcher v. Stanford Daily*, 436 U.S. 547, 555 (1978).  Google's argument relies on the following syllogism: an SCA warrant is a warrant, and the *Zurcher* court held that warrants apply to places and things, not people; therefore an SCA warrant is not an *in personam* form of legal process.  *Id.*  Yet

UNITED STATES' OPPOSITION TO MOTION FOR DE NOVO DETERMINATION

13

1   *Zurcher* clearly involved a traditional Rule 41 search warrant and, indeed, was decided eight years

2   before Congress enacted the SCA, which is, by its own terms, directed at persons (*i.e.*, providers).

3   Moreover, the SCA expressly supplants the jurisdictional requirements based on location that naturally

4   accompany a traditional Rule 41 search warrant tied to "places" or "things."  In addition to creating

5   jurisdiction when the information is stored in the same district, the SCA also defines a "court of

6   competent jurisdiction" as a court having jurisdiction over the offense under investigation or a court in

7   the district in which the provider is located.  *See* 18 U.S.C. §§ 2703(a)-(c) (requiring in certain

8   circumstances a "warrant issued using the procedures described in the Federal Rules of Criminal

9   Procedure . . . by a court of competent jurisdiction") and 2711(3)(A)(i) (defining a "court of competent

10  jurisdiction" to include any court of the United States that "has jurisdiction over the offense being

11  investigated").

12      Google also relies on *United States v. Verdugo-Urquidez*, 494 U.S. 259, 274 (1990), for the

13  proposition that a traditional warrant would be a "dead letter outside the United States" in an attempt to

14  characterize the warrant requirement as one that protects privacy in a territorial way.  *See* Google Mem.

15  at 8.  However, the *Verdugo-Urquidez* Court did not hold that the Fourth Amendment's warrant

16  requirement protects privacy in a territorial way; indeed, the Court ultimately refused to hold that the

17  Fourth Amendment was violated by the warrantless overseas search.  *See Verdugo-Urquidez*, 494 U.S.

18  at 274.  Rather, the Court held that a U.S. warrant would be a "dead letter" in another country because

19  the physical premises searched were outside of a U.S. magistrate's reach, which is unsurprising given

20  the territorial restrictions of Rule 41.  In contrast, an SCA warrant gives U.S. judges, including but not

21  limited to magistrate judges, the ability to compel production from U.S. providers like Google.  There is

22  no question that providers like Google are within this Court's reach.

23      Moreover, to the extent that the SCA seeks to protect privacy, it does so *substantively* through

24  the probable cause requirement and not *arbitrarily* based on where a provider decides to store data.  *See*

25  *Rehearing*, 2017 WL 362765, at *17 ("Congress addressed [privacy] concerns through the warrant

26  requirement in the SCA … [which] provides protection for individual privacy interests by requiring the

27  Government to make an adequate showing of probable cause.") (Droney, J., dissenting); *id.* at *6

28  ("Important as privacy is, it is in any event protected by the requirement of probable cause; so a

UNITED STATES' OPPOSITION TO MOTION FOR DE NOVO DETERMINATION

statutory focus on privacy gets us no closer to knowing whether the warrant in question is enforceable.")
(Jacobs, J., dissenting); *In re Search of Content that is Stored at Premises Controlled by Google*, 2017
WL 1487625, at *4 ("Even if the SCA's focus is privacy, the warrant requirement – with its attendant
requirement of probable cause – protects privacy.").  Indeed, as the legislative history of the SCA makes
clear, the SCA is "designed to protect legitimate law enforcement needs while minimizing intrusions on
the privacy of system users" by providing "*standards* by which law enforcement agencies may obtain
access to both electronic communications and the records of an electronic communication system."  132
Cong. Rec. S14441-04 (1986) (emphasis added).  The goal of ensuring that probable cause exists,
however, has no significance on whether an SCA warrant operates extraterritorially.

Google points to the Wiretap Act's reference to an order supported by "probable cause" as a
basis for finding that the SCA's reference to a "warrant" was not meant only to import the probable
cause requirement, but also to import a territorial limitation.  Google Mem. at 7 (citing 18 U.S.C. §
2518(3)).  However, the Wiretap Act's use of the term "probable cause" was made uniquely necessary
by the fact that a finding of probable cause alone is insufficient to obtain the order.  *See, e.g.*, 18 U.S.C.
§ 2518(3)(c) (incorporating an exhaustion requirement).  Because the requirement to obtain a wiretap
order requires more than just probable cause, it is no surprise that Congress needed to refer to that
standard specifically in order to lay out the government's requisite showing for a wiretap.  Moreover,
given that Section 2518 deals with the interception of live communications, as opposed to stored
communications that already exist and are stored by the provider, Congress's use of the term "warrant"
would have been more confusing than helpful.  In the context of the SCA, on the other hand, the use of
the term "warrant" immediately brings to mind the probable cause standard.  Where the appropriate
standards for legal processes defined in the SCA are not immediately apparent, as is with the case of
court orders under Section 2703(d), Congress was required to articulate the standard within the statutory
text.

Finally, Google and the *Microsoft* court's reliance on the SCA's use of the terms "warrant" and
"subpoena" amount to a superficial reading of the statute.  *See Microsoft*, 829 F.3d at 214 ("We see no
reasonable basis in the statute from which to infer that Congress used 'warrant' to mean 'subpoena.'");
Google Mem. at 7 ("Congress distinguished between a 'warrant,' … and a 'subpoena' ….").  The

UNITED STATES' OPPOSITION TO MOTION FOR DE NOVO DETERMINATION

*Microsoft* court erred by defining the extent of a court's *in personam* power to compel document

production as simply the "Law on 'Subpoenas.'" *Id.* at 214.  To distinguish these cases as merely

applying to subpoenas ignores the principle underlying these decisions – that a court can compel a

person properly before it to act outside of its geographical jurisdiction.  For instance, although many of

the cases dealing with a court's ability to compel a person properly before it to produce documents,

unsurprisingly, involve subpoenas, the same principle applies in other contexts where the source of a

court's power to compel a person before it to do something is *in personam.  See, e.g.*, *State of New*

*Jersey*, 283 U.S. at 482 (injunctive relief); *Steele*, 73 S. Ct. at 257 n.17 (same); *Rogers*, 1985 WL 13788,

at *2-3 (same); *Marcos*, 862 F.2d at 1363-64 (same); *In re Anschuetz & Co., GmbH*, 754 F.2d at 614

n.29 (civil discovery); *Reinsurance Co. of Am.*, 902 F.2d at 1281 (same); *Lowrance v. Weinig,* 107

F.R.D. 386 (W.D. Tenn. 1985) at 388-89 (same).

> ### C.   Whether Google Is A Merely A "Caretaker" Of Its Users' Data Is Irrelevant And, To The Extent It Is Relevant, It Is A Factual Question That Requires An Evidentiary Hearing

Google argues that it is merely a caretaker of its users' communications, and this "renders inapt

any analogy between a subpoena or order used to compel production of business records, and a warrant

to search and seize customer communications."  Google Mem. at 12.  The *Microsoft* court also

attempted to categorically distinguish cases involving subpoenas by noting that they do not involve

situations where the subpoenaed entity was "merely a caretaker for another individual and that

individual, not the subpoena recipient, has a protectable privacy interest in the item."  829 F.3d at 215-

16 (distinguishing Second Circuit's *Marc Rich* decision as being limited to the "subpoena context").

However, this reasoning would have to be premised on the anomalous conclusion that records

held by a "caretaker" are somehow entitled to greater protection than if they were held directly by the

individual with the privacy interest in those records.  There is no reason to believe that records held by a

third-party "caretaker" are entitled to greater protection than they would be when held by the owner of

such records.  Both scenarios would require the process to be reasonable under the Fourth Amendment.

*See Fisher v. United States*, 425 U.S. 391, 401, 408-09 (1976) (holding that the Fourth Amendment's

reasonableness requirement applies to a summons or subpoena compelling the production of private

papers held by criminal defendants' attorneys); *cf. Hale*, 201 U.S. at 73-76 (the Fourth Amendment

UNITED STATES' OPPOSITION TO MOTION FOR DE NOVO DETERMINATION

imposes a reasonableness requirement in the context of compelled disclosure of a corporation's records)
[7]; *United States v. Barr*, 605 F.Supp. 114 (S.D.N.Y.  1985) (upholding a subpoena to a bailee to produce
"snail mail.").[8]  Accordingly, there was no logical basis for the Second Circuit to give any consideration
to the fact that "Microsoft is unlike the defendant in *Marc Rich* and other subpoena recipients who are
asked to turn over records in which only they have a protectable privacy interest."  *Id.* at 220-21.
Indeed, given Microsoft's concession that had the user's emails been stored in Redmond, it would have
produced them, "caretaker" or not, the only question was whether *in personam* jurisdiction also required
the production of those emails Microsoft happened to store abroad.  Accordingly, Google's reliance on
its claim of being merely a caretaker of records is inapposite.

Moreover, the notion that Google is merely a caretaker of records with a relationship to its
customers' communications that is analogous to a hotel or bank's relationship with its guests' luggage or
its customers' safe deposit box is specious at best.  Google Mem. at 11-12.  Google claims that "the
communications obtained with a warrant are not the provider's business records or information
conveyed to the provider by the customer; they are the customer's private communications …."  *Id.* at
11.  Yet in connection with a number of class action litigations, Google has admitted that it uses
automated processes to scan its users' email for purposes of generating advertising revenue and,
accordingly, its access to such communications is a central part of its business model.  *See* Google Inc.'s
Answer to Plaintiffs' Amended Complaint ¶ 1, No. 15-cv-04062-LHK (N.D. Ca. Oct. 21, 2016), ECF
No. 59 ("Google admits that it offers Gmail, a web-based email service, to users, that it does not charge
Gmail users money for their use of Gmail, and that it applies automated processing to certain emails to
identify information that is used to provide various Google services and product features, including
relevant advertising."); Defendant Google Inc.'s Motion to Dismiss Plaintiffs' Consolidated Individual
and Class Action Complaint; Memorandum of Points and Authorities in Support Thereof at 11, No. 13-
md-02430-LHK, ECF No. 44 ("Here, all Plaintiffs who are Gmail users consented to the automated

---

[7]  Of course, the process taken under the SCA is eminently reasonable in that the government is required to get a warrant prior to being able to require the production of records.

[8]  Although a warrant may be required to *search* information lawfully *obtained* by law enforcement without a warrant, *see Walter v. United States*, 447 U.S. 651, 655 (1980), an SCA warrant nevertheless authorizes the search of information obtained from a provider.

UNITED STATES' OPPOSITION TO MOTION FOR DE NOVO DETERMINATION

1   scanning of their emails (including for purposes of delivering targeted advertising) in exchange for using

2   the Gmail service.")  These scenarios stand in contrast to a hotel's relationship to a guest who has left

3   luggage at the hotel or a bank's relationship to the holder of a safe deposit box.  Accordingly, if the

4   Court were to decide that this claim by Google would be relevant, the government respectfully requests

5   an evidentiary hearing and an opportunity to examine the appropriate Google representative(s) regarding

6   the company's access to its users' communications for commercial and other purposes.

### D.   Magistrate Beeler Properly Applied the Presumption Against Extraterritoriality

#### (i)   The *Microsoft* court erred in applying the second step of the extraterritoriality analysis as outlined by the Supreme Court

11      The Second Circuit misapplied the Supreme Court's two-step framework for analyzing

12   extraterritoriality as explained in *Morrison v. Nat'l Australia Bank, Ltd.*, 561 U.S. 247 (2010), *Kiobel v.*

13   *Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013), and *RJR Nabisco, Inc. v. European Community*,

14   136 S. Ct. 2090, 2100-01 (2016).  The *Morrison* Court explained that the presumption against

15   extraterritoriality, a canon of statutory construction, means that "[w]hen a statute gives no clear

16   indication of an extraterritorial application, it has none."  *Morrison*, 561 U.S. at 255.  The Court in *RJR*

17   *Nabisco* subsequently detailed the two-step framework for applying the canon that was set forth in

18   *Morrison*.  "At the first step, [a court must] ask whether the presumption of extraterritoriality has been

19   rebutted – that is whether the statute gives a clear, affirmative indication that it applies

20   extraterritorially."  *RJR Nabisco,* 136 S. Ct. at 2101.  At the second step, triggered only if a provision is

21   found not to apply extraterritorially, courts must determine whether the case nonetheless "involves a

22   domestic application of the statute . . . by looking to the statute's 'focus.'"  *Id.*  Ultimately, if the

23   relevant conduct "occurred in the United States, then the case involves a permissible domestic

24   application *even if other conduct occurred abroad*." *Id.* (emphasis added).  Judge Beeler's decision

25   correctly applied the second step of this test when it held that "the conduct relevant to the focus – and

26   what the SCA seeks to regulate – is disclosure of the data in the service provider's possession."  *See In*

27   *re Search of Content that is Stored at Premises Controlled by Google*, 2017 WL 1487625, at *4 ("[T]he

28   SCA seeks to regulate … disclosure of the data in the service provider's possession …. The service

UNITED STATES' OPPOSITION TO MOTION FOR DE NOVO DETERMINATION

1    provider—Google—is in the district and is subject to the court's jurisdiction; the warrant is directed to it

2    in the only place where it can access and deliver the information that the government seeks."); *see also*

3    *EDW Decision*, 2017 WL 706307, at \*3 ("Provided the service provider is within the reach of the court,

4    the court may lawfully order that service provider to disclose data in the service provider's custody and

5    control, without regard of where the service provider might choose to store the ones and zeros that

6    comprise the relevant data."); *MDFL Decision*, Case No. 6:17-mj-1238 at 4 ("the court's jurisdiction

7    over the person and its compulsion of that person, is not extraterritorial …. even if the information

8    required to be disclosed is located outside of the United States.").

9         The *Microsoft* court, however, erred at the second step of *Morrison* when it determined that (1)

10   the relevant "focus" of Section 2703 of the SCA under a *Morrison* analysis is privacy, as opposed to

11   disclosure, and (2) any invasion of that privacy "takes place . . . where the customer's protected content

12   is accessed – here, where it is seized by Microsoft, acting as an agent of the government." *Id.* at 216-20.

13        In discerning the focus under step two of the *Morrison* analysis, the *Microsoft* court concluded

14   that Section 2703's warrant provision evokes a focus on privacy because "Rule 41 is undergirded by the

15   Constitution's protections of citizens' privacy[.]"  829 F.3d at 217 (quotations omitted).  The court then

16   looked to other sections of the SCA, noting that various provisions included mechanisms designed to

17   protect individuals' "privacy interest in their stored communications." *Id.* at 217-18.  Finally, the court

18   cited legislative history indicating that Congress sought to "ensure protections traditionally afforded by

19   the Fourth Amendment" and "to protect privacy interests in personal and proprietary information, while

20   protecting the Government's legitimate law enforcement needs." *Id.* 219-20 (quotations omitted).

21        The Second Circuit erred, however, when it went beyond Section 2703 to look at the SCA as a

22   whole in order to discern its "focus" – that is, the focus of the SCA as a whole – because a proper

23   extraterritoriality analysis should proceed on a section by section basis. *See, e.g.*, *Morrison*, 561 U.S. at

24   263–65 (holding that Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), does not

25   apply extraterritorially, but that Section 30(a), 15 U.S.C. § 78dd(a), does); *RJR Nabisco*, 136 S. Ct. at

26   2100-11 (holding that RICO's substantive provisions, 18 U.S.C. § 1962, apply extraterritorially to the

27   extent the charged predicates apply extraterritorially, but that RICO's civil damages provision, 18

28   U.S.C. § 1964(c), does not).  To the extent that looking at other sections of a statute to help interpret the

UNITED STATES' OPPOSITION TO MOTION FOR DE NOVO DETERMINATION

particular section at issue may be appropriate in conducting an extraterritoriality analysis, it is clear that doing so further confirms that the focus of Section 2703 is on disclosure. Judge Cabranes, dissenting from the denial of rehearing in *Microsoft*, made this point through a compelling textual analysis. Judge Cabranes explained that the panel decision focused on where information responsive to an SCA warrant was *accessed*, and noted that since Congress clearly identified situations where "access" was the focus of a section – in connection with Section 2701's unlawful access provisions – that it is also clear that Section 2703's reference to required "disclosure" signaled Congress's decision to regulate *disclosure* as opposed to *access*. *Rehearing*, 2017 WL 362765, at *12-13 (Cabranes, J., dissenting).

(ii)     <strong>Section 2703's "focus" is compelled disclosure</strong>

Section 2703's focus on disclosure is not just apparent from its title – "Required disclosure of customer communications or records" – but also from the fact that in each subsection, the exact same requirement (*i.e.*, to disclose) applies without regard to the type of process that must issue as a precondition to the requirement. *See* 18 U.S.C. § 2703(b) (creating the same authority to require disclosure pursuant to warrants, subpoenas, and court orders under Section 2703(d)); *see also* § 2703(c) (requiring disclosure pursuant to warrants, subpoenas, court orders, consent, and certain written requests). Regardless of the process to be followed, the requisite showing that must be made, or the level of information that must be disclosed, once the statute's requirements are met, the end result is that the provider is compelled to disclose the information described.[9] It is difficult to conceive of a section whose focus on disclosure could be clearer.

Section 2703 impacts privacy by detailing when, and on what basis, the government can require the disclosure of certain information. The various processes and showings required reflect the way Congress balanced privacy concerns against the government's legitimate law enforcement needs. That,

---

[9] *See* 18 U.S.C. § 2703(a) (requiring a warrant for disclosure "by a provider of electronic communication service of the contents of a wire or electronic communication, that is in electronic storage in an electronic communications system for one hundred and eighty days or less"); § 2703(b) (setting rules for disclosure of specified information by a provider of remote computing service and requiring either a warrant, court order, or subpoena, depending on whether notice is provided to the subscriber); § 2703(c)(1) (applicable to disclosures of a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications) and requiring either a warrant, court order, consent of the subscriber, or a formal request by law enforcement in certain enumerated circumstances); and § 2703(c)(2) (permitting a subpoena to require the disclosure specified basic subscriber information).

UNITED STATES' OPPOSITION TO MOTION FOR DE NOVO DETERMINATION

1    however, does not alter the language of Section 2703, which is only about disclosure.  *See Morrison*,

2    561 U.S. at 261 (favoring a textually-bound inquiry over "judicial-speculation-made-law – divining

3    what Congress would have wanted if it had thought of the situation before the court").  As Judge Beeler

4    and other magistrate judges have already held, compelled disclosure, not privacy, is the basic conduct

5    regulated by Section 2703 and is, therefore, its focus under a *Morrison* analysis.  *See In re Search of*

6    *Content that is Stored at Premises Controlled by Google*, 2017 WL 1487625, at *4 ("[T]he SCA seeks

7    to regulate … disclosure of the data in the service provider's possession …. The service provider –

8    Google – is in the district and is subject to the court's jurisdiction; the warrant is directed to it in the only

9    place where it can access and deliver the information that the government seeks."); *EDW Decision*, 2017

10   WL 706307, at *3 ("the relevant section of the SCA is not best regarded as an authorization for law

11   enforcement to seize data but rather as a command for a service provider to disclose data in its

12   possession."); *MDFL Decision*, Case No. 6:17-mj-1238 at 4 ("the court's jurisdiction over the person

13   and its compulsion of that person, is not extraterritorial …. even if the information required to be

14   disclosed is located outside of the United States.").

15          Moreover, Congress's broad policy reasons for enacting the SCA's warrant provisions are not

16   the relevant "focus" under a proper extraterritoriality analysis.  The facts of *Morrison* itself are

17   instructive.  There, the Supreme Court held that the "focus" of the securities fraud provisions of the

18   Securities and Exchange Act of 1934 (the "SEA") were transactions involving securities listed on

19   national exchanges or transactions of securities, not so registered, occurring in the United States.

20   *Morrison*, 561 U.S. at 267.  Although the SEA was enacted to serve the "public interest" of protecting

21   U.S. investors and the integrity of U.S. markets, the Court eschewed any notion that the statutory

22   "focus" of the SEA was to regulate fraud impacting U.S. investors or otherwise occurring in U.S.

23   markets.  *Compare Morrison*, 561 U.S. at 284–85 (J. Stevens, concurring in judgment), *with id.* at 257 &

24   266-67 (holding that the impact on U.S. investors or U.S. markets incorporated by the "conduct" and

25   "effects" test went beyond the relevant statutory "focus" under an extraterritoriality analysis).  The

26   Court instead looked to the text of the statute to discern its "focus" – the regulation of certain types of

27   securities transactions.  *Id.* at 267.  Like the SEA's broader purpose of protecting U.S. investors and the

28   integrity of U.S. markets, the SCA may have been enacted to serve a broader policy objective of

UNITED STATES' OPPOSITION TO MOTION FOR DE NOVO DETERMINATION

1    enhancing privacy protections.  However, *Morrison* instructs that the broader policy concerns animating

2    Congress to create legislation is irrelevant to an extraterritoriality analysis.  What matters is the actual

3    mechanism enacted by Congress for addressing its larger policy goals as determined by the statutory

4    text, and not the public interest driving the statutes' enactment.  For the SEA, that mechanism was the

5    regulation of certain types of securities transactions; for the SCA, that mechanism is the regulation of

6    when and under what circumstances the government can compel a provider to disclose records.

7              (iii)    **Because the focus of Section 2703 is compelled disclosure, and such**

                       **compulsion occurs on a U.S. provider and in the United States, it is a**

8                           **domestic application of the law**

9          Disclosure in accordance with the section's requirements is not an extraterritorial application of

10   the statute where the compulsion occurs in the United States, on United States providers, and in United

11   States courts.  *See RJR Nabisco*, 136 S. Ct. at 2101 ("If the conduct relevant to the statute's focus

12   occurred in the United States, then the case involves a permissible domestic application *even if other*

13   *conduct occurred abroad*.") (emphasis added).  In exactly the same way as occurs for other types of

14   compelled production of materials, *Reinsurance Co. of Am.*, 902 F.2d at 1281, the compulsion to

15   require the disclosure of information pursuant to process under the SCA – whether the process that gives

16   rise to the requirement is a subpoena, a court order under Section 2703(d), or a warrant – occurs in the

17   United States, and thus is not an extraterritorial application of Section 2703.

18             (iv)    **Assuming *arguendo* that the focus of Section 2703 is privacy, the**

                       **invasion of privacy authorized by an SCA warrant occurs when the**

19                          **information sought is disclosed to law enforcement and searched for**

                       **evidence of a crime**

20         Even assuming that Section 2703's focus is privacy, any invasion of the customer's privacy

21   occurs when the information is disclosed to the government in the United States and then searched

22   pursuant to the warrant by investigators in the United States.  As outlined in the warrant at issue, Google

23   is not being conscripted to search for evidence of the specified federal offenses. *Compare* Attachment

24   B.I (describing the materials Google is required to disclose), *with* Attachment B.II (describing the

25   information the government may search for and seize).  Rather, the search of the disclosed

26   information is conducted by the government in the United States once it receives the information

27   from Google and searches it for evidence of a crime.

28   

UNITED STATES' OPPOSITION TO MOTION FOR DE NOVO DETERMINATION

This two-step approach – first the disclosure of information by a provider, and second, its search by law enforcement – reflects the fact that Google is simply a custodian of certain information the court has determined should ultimately be searched by law enforcement for evidence of crime.  *See In the Matter of the Search of Information Associated with [redacted]@mac.com that is Stored at Premises Controlled by Apple, Inc.*, 13 F. Supp. 3d 157 (D.D.C. 2014) (approving of the two-step approach to email search warrants because "[e]nlisting a service provider to execute the search warrant could also present nettlesome problems"); *In the Matter of a Warrant for All Content & Other Info. Associated with the E-mail Account xxxxxxx gmail.com Maintained at Premises Controlled By Google, Inc.*, 33 F. Supp. 3d 386, 395 (S.D.N.Y. 2014), as amended (Aug. 7, 2014) (approving of two-step process in part because "[p]lacing the responsibility for performing these searches on the email host would also put the host's employees in the position of appearing to act as agents of the Government vis-à-vis their customers"). In fact, Google has expressed a preference for this procedure.  *In re Search of Google E-mail Accounts*, 99 F.Supp. 3d 992 (D. Alaska 2015) (sustaining Google's objection that it be required under a warrant to search for "communications with a minor, a person purporting to be or have access to a minor or which otherwise related to the 'enticement of a minor to engage in sexual activity for which any person can be charged with a criminal offense'" on the grounds that it was not competent to do so).

The role of the provider in disclosing the information to be searched is precisely like the role of any party compelled to produce information.  Persons compelled to produce documents are not deemed to be agents of the government simply because they comply with their obligations ordered by a court or subpoena.  *See, e.g., United States v. Miller*, 425 U.S. 435, 443-44 (1976) (finding that bank responding to subpoena for bank records is not an agent for the government, and applying the "general rule that the issuance of a subpoena to a third party to obtain the records of that party does not violate the rights of a defendant, even if a criminal prosecution is contemplated at the time . . . the subpoena is issued"); *Rehearing*, 2017 WL 362765, at *15 ("we need to convene *en banc* to clarify that a service provider who complies with a § 2703(a) warrant … does not thereby conduct a search or seizure as the agent of the government") (Raggi, J., dissenting).  Google is not being required to seize control over information in someone else's possession or review it for evidence of an offense; rather, it is required to produce information that is already in its possession, custody, and control.

UNITED STATES' OPPOSITION TO MOTION FOR DE NOVO DETERMINATION

Google nevertheless argues that the "location of the search is … crucial to the analysis, and the magistrate judge erred by reducing the process of assisting in the execution of a warrant to 'access[ing] and deliver[ing]' data from Google's headquarters in the United States."  Google Mem. at 13.  It then goes on state that its access and delivery involves the following:

> Writing a query to search databases located in countries outside of the United States; executing the query to search databases located in countries outside of the United States; executing the query to search for files and file components stored in said databases; seizing the files and file components; reassembling the file components into files; and then retrieving those communications to the United States for production to the government.

*Id.*  However, apart from wherever the original queries may have been written,[10] all of the processes described above are actually conducted by Google's employees in California.  *See* Stipulation of Facts ¶ 5, ECF No. 37 ("Only Google personnel in Google's Legal Investigations Support team are authorized to access the content of communications in order to produce it in response to legal process.  All such Google personnel are located in the United States."); Declaration of Erica Furer ¶¶ 5-9, ECF No. 49-8 (describing Google's "Legal Investigations Support" team as a "dedicated team … for responding to legal process issued by law enforcement entities in the United States and around the world" and describing various steps, all conducted by the Legal Investigations Support team in the United States, associated with responding to legal process).

### E.   Congress Has Taken Unequivocal Action Confirming That It Believes The SCA Requires Disclosure of Information, Even If Stored Abroad

Action taken by Congress since it enacted the SCA further confirms that Congress intended the SCA to require providers in the United States to disclose foreign-stored data in its custody or control.  The United States and at least 54 other countries have concluded, in connection with the Council of Europe's Convention on Cybercrime (the "Cybercrime Convention"), that compelling a person or entity

---

[10]  Of course, where such code was written cannot be relevant, otherwise a provider could take the ludicrous position that the hard drives used on its servers (domestic or otherwise) and originally manufactured outside of the United States would make an SCA warrant calling for data on such hard drives an impermissible extraterritorial application of the statute.

UNITED STATES' OPPOSITION TO MOTION FOR DE NOVO DETERMINATION

located domestically to produce data that is in its control or custody, regardless of location, is a *domestic exercise* of power.[11]  In 2006, the Senate ratified the Cybercrime Convention, the leading international treaty concerning combatting cybercrime and the collection of electronic evidence.  Article 18 of the Cybercrime Convention requires its signatories to "adopt such legislative and other measures as may be necessary to empower its competent authorities to order . . . a person in its territory to submit specified computer data in that person's possession or control, which is stored in a computer system or a computer-data storage medium[.]" Cybercrime Convention, Art. 18.1.a.[12]

The Department of State's interpretation of Article 18, as presented to Congress, was that under subsection (a), a "person" includes a "third party custodian of data, such as an ISP."  *See Letter of Submittal* at XV ("Under Article 18 authorities must be able to order a person, *including third party custodian of data, such as an ISP* [meaning "internet service provider"], to produce data, including subscriber information, that is in that person's possession or control.") (emphasis added); *see also Abbott v. Abbott*, 560 U.S. 1, 15 (2010) (referring to the "well established canon of deference" to the "Executive Branch's interpretation of a treaty") (relying on *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 185 (1982)).  Indeed, the official Explanatory Report transmitted to the Senate explains that a "service provider" is a category of "persons."  *See* Explanatory Report ¶ 26 (noting that the "term 'service provider' encompasses a broad category of persons that play a particular role with regard to communication or processing data on computer systems"); *see also* Letter of Submittal at V (specifically referencing the "official Explanatory Report" for review by the Senate).[13]

---

[11]  Ratification materials related to the Cybercrime Convention (including letters of transmittal, the Convention, and the Explanatory Report) are attached as Exhibit C.  Materials relating to the Hearing Before the Committee on Foreign Relations relating to the Cybercrime Convention are attached as Exhibit D.

[12]  In ratifying the Cybercrime Convention, the United States Senate was asked to provide advice and consent on a multilateral treaty outlining, *inter alia*, requirements for its signatories "to have the ability to investigate computer-related crime effectively and to obtain electronic evidence in all types of criminal investigations and proceedings."  *See Letter of Transmittal to Senate from the President* ("Letter of Transmittal") at III, Treaty Doc. 108-11. The signed treaty was submitted to the Senate by then-president George W. Bush accompanied by a letter of submittal from the Department of State, signed by Colin L. Powell, along with its "official Explanatory Report, which was also adopted by the [Council of Europe's] Committee of Ministers on November 8, 2001." *See Letter of Submittal to Senate from the Department of State* ("Letter of Submittal") at V, Treaty Doc. 108-11.

[13]  Although the Cybercrime Convention and its Explanatory Report could not be clearer in indicating that service providers are a subset of persons, a recent Guidance Note, issued on March 1,

UNITED STATES' OPPOSITION TO MOTION FOR DE NOVO DETERMINATION

25

1    Further, the Explanatory Report indicates that the Convention's use of the term "possession or

2    control" in paragraph 1(a) of Article 18 "refers to physical possession of the data concerned in the

3    ordering Party's territory, *and situations* in which the data to be produced *is outside of the person's*

4    *physical possession but the person can nonetheless freely control production of the data from within the*

5    *ordering Party's territory . . . .*"  *See* Explanatory Report ¶ 173 (emphasis added).  Simply stated, all of

6    the signatories to the Cybercrime Convention – including the United States – viewed the compelled

7    production of data stored abroad, but controllable and accessible from within the signatories' borders, as

8    a domestic act, and required that domestic legislation exist to ensure each signatory has such power.[14]

9    When it ratified the Convention, the Senate agreed with the President, the Department of State,

10   and the Department of Justice that federal statutes governing the collection of electronic data – *i.e.*, the

11   SCA – already provided the power required under Article 18.  *See* Letter of Transmittal at III (with

12   certain reservations and declarations not including Article 18, the Cybercrime Treaty "would not require

13   implementing legislation for the United States"); Letter of Submittal at VI ("The Convention would not

14   require implementing legislation for the United States."); S. Hrg. 108-721 at 9 (testimony of Samuel M.

15   Witten, Deputy Legal Advisor, U.S. Department of State, before the Senate Committee on Foreign

16   Relations that "[t]he Convention would not require implementing legislation for the United States") *and*

17   27 (testimony of Bruce Swartz, Deputy Assistant Attorney General, Criminal Division, U.S. Department

18   of Justice, that "the Convention will be implemented in the United States under our existing statutes").

19   The Senate Committee on Foreign Relations report specifically notes that Articles 16 through 21 of the

20

21   2017, further confirms this interpretation.  T-CY Guidance Note #10 ("Guidance Note #10") (attached
     hereto as Exhibit E).  In Section 3.1 of Guidance Note #10, entitled "The scope of Article 18.1.a"—the
22   very provision Google contends does not apply to service providers—it states that "[t]he scope is broad:
     a 'person' (which may include a 'service provider') that is present in the Party's territory"; the data it
23   refers to "is not restricted to 'subscriber information' and covers all types of computer data"; and it
     applies where in cases where "the person has no physical possession" but nevertheless "freely controls
24   the computer data to be submitted under Article 18.1.a from within the Party's territory."  *Id.* at 6.  In a
     footnote, Guidance Note #10 goes on to state that "'person' is a broader concept than a 'service
25   provider', although a 'service provider' can be 'a person.'"  *Id* at 6 n.7.

26   [14]  In light of the consensus between all of the countries that have signed or acceded to the
     Cybercrime Convention, the Second Circuit's application of the presumption against extraterritoriality is
27   inconsistent with the very interest that the presumption is meant to serve.  As stated by the Supreme
     Court, the "presumption [against extraterritoriality] 'serves to protect against unintended clashes
28   between our laws and those of other nations which could result in international discord.'"  *Kiobel*, 1333
     S. Ct. at 1659, 1664 (citing *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 248 (1991)).

UNITED STATES' OPPOSITION TO MOTION FOR DE NOVO DETERMINATION

Convention require parties to have the ability to "preserve, search, and seize stored computer data" and conclude that "[i]t bears emphasis that all of these investigative tools *are already provided for under U.S. domestic law*." Senate Executive Report 109-6 (emphasis added).

When Congress interprets a prior enactment in the context of the "proceed[ing] formally through the legislative process," that interpretation is entitled to "great weight in statutory construction." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 118 n.13 (1980) (explaining *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 380–81 (1969)); *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846 (1986) ("It is well established that when Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the 'congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress.") (quoting *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 274-75 (1974)); *see also Bell v. New Jersey*, 461 U.S. 773, 784-85 (1983) ("Of course, the view of a later Congress does not establish definitively the meaning of an earlier enactment, but it does have persuasive value.").

The Cybercrime Convention was ratified in 2006, which was well after not only the original enactment of the SCA in 1986, but also its substantial modification in 2001, when Congress deliberately broadened the jurisdiction of courts to issue warrants so that it includes information outside the jurisdiction of the issuing court (as discussed above). Indeed, the recency of the Cybercrime Treaty and the resulting view that the SCA need not be amended in order for the United States to fulfill its obligations under it mitigates the *Microsoft* court's concern that the SCA was passed "almost thirty years ago" and that the "technological context" was very different back then. *See* Microsoft, 829 F.3d at 205-06; *see also* Google Mtn. at 2. Congress plainly saw no need to amend the SCA or create new legislation to meet the Convention obligations described above. Moreover, Congress has since revisited the SCA to amend it in related ways, but still has not found it necessary to add any new language or provisions to empower courts to compel the disclosure of foreign-stored data from domestic providers as required by Article 18. *See* 123 Stat. 2086 (enacting the Foreign Evidence Request Efficiency Act of 2009, which made certain amendments to the SCA designed to address requests by foreign law enforcement with respect to foreign criminal investigations).

UNITED STATES' OPPOSITION TO MOTION FOR DE NOVO DETERMINATION

1    Accordingly, there now have been two occasions – first when the Senate ratified the Cybercrime

2    Convention, and then when Congress enacted subsequent amendments to the SCA – on which Congress

3    has acted in a manner consistent with its view that the SCA already gives courts the power to require

4    U.S. service providers to disclose information, pursuant to a warrant, in their possession or control,

5    regardless of from where the data must be gathered.  This is further and powerful indication that the

6    SCA must be read to authorize the compelled production of information domestically, even if stored

7    remotely abroad, and that, consistent with the scope of courts' *in personam* power, such compulsion is a

8    permissible and domestic exercise of power.

9    **III.    THE COURT SHOULD ISSUE AN ORDER FOR A SHOW CAUSE HEARING**

10    Google's production was effectively due on the date that the Second Circuit issued the Microsoft

11    decision, July 14, 2016.  The search warrant provided for production "FORTHWITH."  Ignoring that,

12    Google did not produce data responsive to the search warrant until one production in September and

13    another in November of 2016.  Google did not seek permission from the Court to ignore the plainly

14    worded search warrant.  Google did not seek an advisory opinion from a Court in this District or in this

15    Circuit.  Instead, Google, on its own, decided that it did not have to produce data stored

16    extraterritorially.  Google acted contemptuously by replacing its own views for those of the Court.

17    Even if Google were entitled to withhold evidence that it stored outside the United States,

18    Google still acted in contempt of the Court's search warrant.  It did not produce data for months.

19    Although Google claims the cause for its undue delay to September and November stemmed from its

20    own decision to try to develop "tooling" to determine data locations, it did so at its own peril.  No Judge

21    or Court gave Google permission to decide that withholding data outweighed the needs of the

22    government's investigation.  There is evidence that Google has previously acted untimely when

23    producing information to the government pursuant to search warrant.[15]  While Google pledged to take

24    certain remedial steps in that prior instance, the current failure to produce on a timely basis appears to be

25    part of a continuing pattern.

26

27    _____

28    [15]   The Settlement previously reached between this Office and Google related to a failure to
comply by Google that led to a loss of evidence in a murder investigation.  *See* Settlement, attached to
United States' Opposition to Motion to Quash.

UNITED STATES' OPPOSITION TO MOTION FOR DE NOVO DETERMINATION

Even if there were an excuse for producing data six months late in September and November of 2016, Google has now conceded that its representations in November 2016 – that it had produced all domestic data – were false.  In May of 2016, Google produced approximately *ten times* the data that it originally produced in September and November of 2016.  *See* Delaney Declaration.  Even that production came with further notification that Google would be making another production approximately another month later – a production that Google still has not made.  *Id*.  The government has done a preliminary review of the data provided in May of 2017.  *Id*.  Based on that review, it is clear that the data was material to the government's investigation.  *Id*.  Google should have simply produced the data that the warrant demanded and not meddled by withholding data that it chose not to produce. Usually, when a court issues a search warrant, the government conducts its own search and obtains the evidence directly.  If there is a flaw in the warrant or the scope of the evidence obtained, the proper measure of addressing the issue is through a motion to suppress the evidence.  Here, Google appointed itself as the arbiter of what it should produce, in spite of the Order of this Court, and to the detriment of the government's investigation.

While Google persists in blaming these untimely productions on its "tooling" to determine what is and is not in the United States, the decision to undergo that consideration was one that Google made on its own.  Without Google's decision to ignore this Court, none of that tooling – and therefore delay – would have occurred.  Google's decisions to ignore this Court's clear Orders has caused the delay and Google cannot run away from its responsibility for impairing and impeding the government's proper investigation.

Google was aware that the search warrant required production "FORTHWITH."  Google delayed production of the data repeatedly at its own decision regardless of the Order in place.  When evaluating conduct alleged to be contempt, "[a] good faith effort to comply with the order is a defense, although delaying tactics or indifference to the order are not."  *United States v. Baker*, 641 F.2d 1311 (1981). Other decisions have upheld findings of contempt in the context of violating the SCA.  *In re Under Seal*, 749 F.3d 276 (4th Cir. 2014) (upholding trial court decision to hold Lavabit in contempt for failure to comply with pen register and SCA orders); *Microsoft* (concededly, in *Microsoft*, the parties stipulated to

1  a contempt finding for the purpose of appeal).  Obviously, ignoring a direct order of this Court in the

2  form of a search warrant – and delaying production for almost a year – should constitute contempt.

3      Therefore, the Court should hold a hearing to determine whether Google has complied with the

4  order or not.  Plainly, from the face of this litigation, it would appear that Google has not acted in

5  compliance with the Court's Orders.  Here, Google continues to refuse to comply – or has complied

6  inexcusably late.  The Court should discourage this type of interference in future search warrants

7  addressed to Google and to other service providers.

8                                          **CONCLUSION**

9      For the reasons stated above, the government respectfully submits that this Court should agree

10  with the well-reasoned Order authored by Magistrate Beeler, issue an Order that Google produce the

11  remaining data immediately, and hold a hearing to determine whether Google should be held in

12  contempt.

13

14  Dated:  May 19, 2017                      Respectfully submitted,

15

16                                          BRIAN J. STRETCH
                                            United States Attorney

17                                          _____/s/_____

18                                          William Frentzen
                                            Merry Jean Chan

19                                          Assistant United States Attorneys

20                                          Andrew S. Pak
                                            Catherine Alden Pelker

21                                          Trial Attorneys

22

23

24

25

26

27

28

UNITED STATES' OPPOSITION TO MOTION FOR DE NOVO DETERMINATION